## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ORACLE AMERICA, INC., )
)
500 Oracle Parkway )
Redwood City, CA 94065 )
)
      Plaintiff, )
)
  v. )
)   Civil Action No. _1:19-cv-3574_____
U.S. DEPARTMENT OF LABOR; U.S. )
OFFICE OF FEDERAL CONTRACT )
COMPLIANCE PROGRAMS; EUGENE )
SCALIA Secretary of the U.S. Department of )
Labor; CRAIG E. LEEN, in his official )
capacity as Director of the U.S. Office of )
Federal Contract Compliance Programs )
)
200 Constitution Ave NW )
Washington, D.C. 20210 )
)
      Defendants. )
)

## COMPLAINT

### INTRODUCTION

1.    This matter comes before this Court in response to unprecedented overreach by an executive agency. The case raises a constitutional challenge to the authority of an agency to create an administrative trial system wherein agency officials prosecute and adjudicate discrimination claims against government contractors and then award broad injunctive and compensatory relief if the agency finds violations. This agency scheme and the rules supporting it go far beyond any Act of Congress; indeed, they violate Acts of Congress and exceed any authorization from the President. Because the creation and implementation of this regulatory scheme violates fundamental constitutional principles, and because Oracle America, Inc. is currently subject to that regime, Oracle files this action for declaratory relief.

2.      The Constitution separates different governmental functions into different government bodies:  Congress makes the law, the President enforces the law, and the Judiciary says what the law is.  *See* U.S. Const. arts. I-III.  This separation of powers forms a bedrock of the Constitution and protects individual rights.

3.      The rise of the modern administrative state has altered our government structure, with Congress more frequently delegating authority to the President to promulgate rules and regulations that flesh out complex statutory schemes.  But the modern administrative state has not undone our constitutional structure; rather, the cornerstone doctrines of administrative law are themselves built upon basic separation-of-powers principles.

4.      This case demonstrates why these constitutional principles are so important. Starting in 1977 and continuing through today, the U.S. Department of Labor and its Office of Federal Contract Compliance Programs (OFCCP) have created a coercive administrative-enforcement and adjudicative regime for both prosecuting and deciding claims by the agency that federal contractors have not complied with the anti-discrimination contractual provision in their government contracts.  When the OFCCP suspects that a contractor has violated the contractual provision by engaging in employment discrimination or by failing to comply with the Department of Labor's affirmative-action regulations, the process for resolving that dispute is far removed from how breach-of-contract claims are normally resolved.  Instead of bringing government contractors before an Article III tribunal, the OFCCP brings administrative-enforcement proceedings against accused contractors before Department of Labor administrative law judges (ALJs).  Rather than pursue claims for breach of the government contract, the OFCCP prosecutes claims of employment discrimination and affirmative-action violations.  In cases in which the agency prevails, the OFCCP claims the right to obtain not contract damages

but, instead, individualized back pay and other "make whole" relief on behalf of the contractor's employees as well as broad injunctive relief.  Without authority from *any* Act of Congress—indeed, in contravention of congressional legislation—a group of unelected, unaccountable, and unconfirmed administrative officials have cut from whole cloth this adjudicative agency-enforcement scheme.

5.      The OFCCP has claimed that this regulatory scheme reflects its authority under Executive Order 11,246.  Exec. Order No. 11,246, 3 C.F.R. 167 (1965).  But relevant here, the Executive Order requires only that government officials include a set of anti-discrimination provisions—collectively known as the Equal Opportunity Clause—in government contracts, and tasks the Secretary of Labor with overseeing a limited, contract-based compliance system.  It contemplates that the Secretary may, after consulting with the contracting agency, direct the agency to sanction an offending contractor by altering the contractor's ongoing relationship with the government, such as by suspending or cancelling the contract.  Executive Order 11,246 does not authorize the OFCCP to create an administrative system to bring, prosecute, and adjudicate claims of employment discrimination and affirmative-action violations and to obtain injunctive relief, back pay, and other make-whole relief for employees of government contractors.

6.      Nor does any Act of Congress.  Executive Order 11,246 identifies no source of statutory authority for the OFCCP's regime:  It states merely that it is promulgated "[u]nder and by virtue of the authority vested in [the] President of the United States by the Constitution and statutes of the United States."  3 C.F.R. at 167.  And the Supreme Court, although it has not ruled on whether congressional authority exists, has signaled doubt, noting that the source of congressional authority is "somewhat obscure and ha[s] been roundly debated by commentators and courts."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979).  The Court has noted two

purported sources of legislative authority postulated by others: (1) the Federal Property and

Administrative Services Act of 1949 (Procurement Act), Pub. L. No. 81-152, 40 U.S.C. §§ 101

*et seq.*; and (2) Titles VI and VII of the Civil Rights Act of 1964, Pub L. No. 88-352, 42 U.S.C.

§§ 2000d to 2000e-17, including amendments to Title VII by the Equal Employment

Opportunity Act of 1972 (EEOA), Pub. L. No. 92-261.  Neither hypothesized basis is plausible.

7.     The Procurement Act does not provide the necessary authorization.  "[N]owhere

in the Act is there a specific reference to employment discrimination." *Chrysler*, 441 U.S. at 304

n.34.  Its express purpose is simply "to provide the Federal Government with an economical and

efficient system" for "[p]rocuring and supplying property and nonpersonal services, and

performing related functions," "[u]sing available property," "[d]isposing of surplus property,"

and "[r]ecords management." 40 U.S.C. § 101.  And by its own terms, it authorizes the President

only to "prescribe policies and directives" to guide Executive Branch agencies and officials in

pursuit of these objectives.  40 U.S.C. § 121(a).  This provision authorizes the President to

centralize government contracting and insist on inclusion of certain terms in government

contracts.  But it does not delegate to the Department of Labor or the OFCCP the vast power to

regulate into existence an administrative system to prosecute and adjudicate employment-

discrimination claims and affirmative-action violations, let alone award injunctive relief and

make-whole relief on behalf of classes of employees against their government-contractor

employers.

8.     Far from conferring the President with substantive lawmaking or adjudicatory

authority over government contractors, the Civil Rights Act and the EEOA amendments

contradict the notion that the OFCCP is entitled to the power it exercises.  The Supreme Court

has already decided that Titles VI and VII contain no relevant "express substantive delegation to

the President." *Chrysler*, 441 U.S. at 305 n.35.  Indeed, Title VI foreswears any relevant "authoriz[ation] [of] action … by any department or agency with respect to any employment practice of an employer."  42 U.S.C. § 2000d-3.  And Title VII disclaims that anything within it "require[s] any employer" to institute affirmative-action programs.  42 U.S.C. § 2000e-2(j). Consequently, rather than asking whether these statutes affirmatively authorize the OFCCP's regime, "the question has usually been put in terms of whether [the regime] is *inconsistent*" with them.  *Chrysler*, 441 U.S. at 305 n.35 (emphasis added).  It is.  Title VII is where Congress has addressed employee-discrimination claims involving federal contractors and other private-sector employers, and Title VII requires a *judicial* dispute-resolution mechanism for claims of discrimination—involving prosecution by the agency or individuals in an Article III court.  That radically differs from the Department of Labor and the OFCCP's self-created, agency-based enforcement and adjudication scheme.

9.     Everyone originally recognized the OFCCP's limits.  As originally issued, Executive Order 11,246 and its initial implementing regulations authorized the OFCCP to terminate a contract or debar a contractor if that contractor engaged in prohibited discriminatory conduct; the OFCCP was required, however, to refer breach-of-contract claims to the U.S. Department of Justice (DOJ) and discrimination claims based on violations of Title VII to either the DOJ or the Equal Employment Opportunity Commission (EEOC) for litigation in an Article III court.  3 C.F.R. at 172-73.  Through both Title VII and the EEOA amendments to it, Congress demonstrated and reaffirmed its understanding of the OFCCP's narrow power.  Congress specifically rejected provisions that would have increased the OFCCP's authority.  Instead, Congress approved provisions *cutting back* on the OFCCP's power and created the EEOC— vesting the EEOC with only *limited* enforcement powers.  The judicially based enforcement

scheme with limited agency powers that Congress authorized for the EEOC is radically at odds with the current approach the OFCCP created for itself. All the while, during the 1960s and early 1970s, legislators, executive-branch officials, and commenters who spoke on these subjects plainly understood the OFCCP as a contract-compliance manager, not a prosecutor of Title VII-like discrimination claims or claims of affirmative-action violations. It was only thereafter that the Department of Labor and the OFCCP seized enforcement, adjudicatory, and remedial powers through an administrative scheme.

10.     As the above-described congressional actions indicate, the OFCCP's current administrative-enforcement and adjudicatory scheme far exceeds the authority conferred by the Procurement Act or any other law. The OFCCP's regime therefore violates the separation of powers, contravenes the core requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 500 *et seq.*, and conflicts with Executive Order 11,246 and Title VII.

11.     It is important to observe right up front, however, what is not at issue. At issue is not *whether* claims of discrimination and affirmative-action violations connected with government contracts should be adjudicated, but rather *where* and *in what manner* such claims can be adjudicated. Oracle recognizes that lawful prosecution and adjudication, before an Article III court, of employment-discrimination claims against employers, including government contractors, can play an important role in promoting equal employment opportunity and ending unlawful employment discrimination. The issue here—and what Oracle objects to—is the unlawful, agency-originated and agency-based administrative-enforcement and adjudicative regime to which Oracle and other government contractors are currently subject.

12.     For these reasons and those discussed below, this Court should declare the OFCCP's enforcement regime unlawful.

## PARTIES

13.     Plaintiff Oracle America, Inc. is a corporation organized and existing under the laws of the State of Delaware.  Oracle's principal place of business is at 500 Oracle Parkway, Redwood City, California 94065.  Oracle is a federal contractor and a defendant in an administrative-enforcement proceeding brought by the OFCCP.

14.     Defendant Department of Labor is an executive agency of the United States within the meaning of the APA.

15.     Defendant OFCCP is an executive agency of the United States within the meaning of the APA.  Defendant OFCCP has determined that Oracle is subject to Executive Order 11,246's requirements.

16.     Defendant Eugene Scalia is the Secretary of the Department of Labor.  He is sued in his official capacity.

17.     Defendant Craig E. Leen is the Director of the OFCCP.  He is sued in his official capacity.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 2201 and 5 U.S.C. §§ 702 *et seq.*

19.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) because defendants reside in this judicial district.

## FACTUAL ALLEGATIONS

### I.  The History of the OFCCP's Regulatory Regime

20.     The Equal Opportunity Clause that the OFCCP enforces has modest origins.  First required in certain government contracts in 1941, for the first 36 years of the provision's existence, the government enforced it through prospective remedies such as termination,

cancellation, or suspension of contract, debarment of the contractor, and publishing the

contractor's name. In some cases, the government would also ask the DOJ to bring breach-of-

contract suits. But in 1977, without any relevant statutory change, the OFCCP promulgated new

regulations that dramatically expanded its own power to enforce the Equal Opportunity Clause,

initiating a sweeping regulatory enforcement regime that the OFCCP oversees to this day.

### A. *The OFCCP's Pre-1977 Regime*

21.     On June 25, 1941, during World War II, President Roosevelt issued Executive

Order 8802. He instructed "[a]ll contracting agencies of the Government of the United States" to

"include in all defense contracts hereafter negotiated by them a provision obligating the

contractor not to discriminate against any worker because of race, creed, color, or national

origin." Exec. Order No. 8802, 3 C.F.R. 234, § 2 (1941). As authority for this order, President

Roosevelt cited his war powers and unspecified statutes. *See* Exec. Order No. 8802, 3 C.F.R. at

234; *see also* Exec. Order No. 9001, 3 C.F.R. 330, 330-31, tits. I-II, §§ 1-2 (1941) (citing the

President's war powers and wartime legislation in requiring nondiscrimination clauses in certain

military contracts); Exec. Order No. 9346, 3 C.F.R. 1280 (1943) (citing the President's war

powers and unspecified statutes).

22.     Since President Roosevelt's time, various executive orders have continued in

force and expanded this early requirement that every government contract include

nondiscrimination provisions. *See, e.g.*, Exec. Order No. 10,210, 3 C.F.R. 72 (1951); Exec.

Order No. 10,557, 3 C.F.R. 69 (1954). None of these orders authorized administrative sanctions

for noncompliance. *See* OFCCP, Preliminary Report on the Revitalization of the Federal

Contract Compliance Programs 121 (Sept. 1977).

23.     In 1961, President Kennedy increased the scope of the nondiscrimination requirement, instructing that government contracts must also require employers to "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin."  Exec. Order No. 10,925, 3 C.F.R. 86, 87-88, § 301(1) (1961).  This order also created the President's Committee on Equal Employment Opportunity and empowered it to investigate compliance issues, terminate a contract or debar a contractor, and refer cases to the DOJ for breach-of-contract suits.  *See id.* at 86-87, 90-91, §§ 101-02, 312.

24.     In 1965, President Johnson issued Executive Order 11,246, the order in place today (as amended) and the one that the OFCCP's current regulations purport to enforce.

25.     Executive Order 11,246 kept in place the Equal Opportunity Clause found in its predecessor order, though it transferred responsibility for this Clause to the Secretary of Labor, *see* Exec. Order No. 11,246, 3 C.F.R. at 68, § 201, who then created the Office of Federal Contract Compliance and delegated some responsibility to it, *see* Dep't of Labor Secretary's Order No. 26-65 (Oct. 5, 1965), 31 Fed. Reg. 6921, 6921 (May 11, 1966).  Shortly thereafter, President Johnson amended the order to bar discrimination on the basis of sex.  *See* Exec. Order No. 11,375, 3 C.F.R. 406 (1967).

26.     Like earlier orders, Executive Order 11,246 authorized the Secretary to pursue a narrow range of remedies through administrative proceedings.  Section 206(a) authorized the Secretary to "investigate the employment practices of any Government contractor … to determine whether or not the [Equal Opportunity Clause] ha[d] been violated," and § 206(b) authorized the Secretary to "receive and investigate" employee complaints.  3 C.F.R. at 171.

Additionally, § 208(b) authorized the Secretary to hold hearings "prior to imposing, ordering, or recommending the imposition of penalties and sanctions under this Order." *Id.*

27.     The "sanctions and penalties" provided under Executive Order 11,246 all involved the government's ongoing relationship with its contractors.  They did not involve compensating alleged victims of prior discrimination or otherwise addressing the employer-employee relationship.  Like earlier orders, it authorized the Secretary to publish the names of violating contractors, § 209(a)(1), "[c]ancel, terminate, [or] suspend … any contract," § 209(a)(5), and "[p]rovide that any contracting agency shall refrain from entering into further contracts … with any noncomplying contractor," § 209(a)(6).  *Id.* at 172.

28.     Executive Order 11,246 authorized the Secretary to turn the matter over to other agencies whenever the Secretary thought relief beyond that specified above was necessary.  When there was a "substantial or material violation" of the Equal Opportunity Clause, the Secretary could refer the matter to the DOJ so that "appropriate proceedings [could] be brought to enforce those provisions" in federal court, including seeking injunctions against those interfering with compliance.  § 209(a)(2).  *Id.*  Similarly, the Secretary could refer cases to the DOJ or the EEOC so that "appropriate proceedings [could] be instituted under" Title VII in federal court.  § 209(a)(3).  *Id.*

29.     The Department of Labor's initial implementing regulations reflected the agency's limited view of its enforcement authority.  Under those regulations, the Secretary could impose only those sanctions specified in Executive Order 11,246, referring matters to the DOJ or the EEOC for breach-of-contract or Title VII suits and conducting its own proceedings for the publishing of a contractor's name, termination of the contract, or debarment.  *See* 41 C.F.R. § 60-1.27 (1969) (authorizing these sanctions by or with the Director's approval and referral to the

DOJ or EEOC by the Director); § 60-1.24(b)(3) (1969) (authorizing the sanctions after an administrative hearing).

30.     The OFCCP's other pre-1977 regulations were in accord.  *See* 41 C.F.R. § 60-1.24(c)(3) (1972) (authorizing administrative sanctions that included only cancellation, debarment, or other sanctions authorized by Executive Order 11,246); § 60-1.26(b) (1972) (establishing hearing procedures for instances in which the Director seeks to publish the name of a breaching contractor, cancels a contract, or debars a contractor); § 60-1.27 (1972) (requiring the Director's approval to impose such sanctions or to refer a case to the DOJ or the EEOC).

## B.  *The OFCCP's 1977 Power Grab*

31.     In 1977, without any change in any relevant statute, the OFCCP radically departed from its previous understanding of its power.  Without authority, the OFCCP transformed itself into a super-EEOC by giving itself power that exceeds what Congress granted to the EEOC.  The OFCCP authorized itself to pursue purely administrative litigation by investigating and prosecuting employment-discrimination claims and claims of affirmative-action violations through Department of Labor administrative proceedings before ALJs employed by the Department—not in Article III courts before Article III judges.  Moreover, the agency fashioned sanctions beyond those enumerated in Executive Order 11,246, such as injunctions, back pay, and "make whole" relief for employment applicants and employees.

32.     The OFCCP's 1977 regulations carried forward the remedies found in their predecessors, though those powers were now only obliquely mentioned.  *See, e.g.*, 41 C.F.R. § 60-1.27 (1977) (authorizing "[t]he sanctions described in subsections (1) [publication of contractor names], (5) [termination], and (6) [debarment] of [Executive Order 11,246]" by or with the Director's approval).

33.     The OFCCP similarly maintained its referral mechanisms.  *See* 41 C.F.R. § 60-1.26(a)(2) (1977) (providing authority to refer matters to the DOJ "[w]henever the Director has reason to believe that there is substantial or material violation … of the contractual provisions of the Order or of the rules, regulations or orders issued pursuant thereto," so that the DOJ could "enforce the contractual provisions of the Order"); 41 C.F.R. § 60-1.24(a) (1977) (authorizing the OFCCP to refer complaints to the EEOC); *see also* 41 C.F.R. § 60-1.27 (1977).

34.     Those remedies and referral mechanisms, however, took a back seat to the OFCCP's newfound powers.  "Where any complaint investigation or compliance review" indicated that a contractor had violated the Equal Opportunity Clause and that the dispute could not be resolved informally through reasonable conciliation efforts between the OFCCP and the contractor, 41 C.F.R. § 60-1.24(c)(3) (1977), the Director was now empowered to "institut[e] … administrative … proceedings to enforce the Order and to seek appropriate relief."  41 C.F.R. § 60-1.26(a)(1) (1977).

35.     The OFCCP took an expansive view of "appropriate relief."  The Director now claimed the authority to seek to "enjoin the violations, to seek appropriate relief (which may include affected class and back pay relief), and to impose appropriate sanctions, or any of the above."  41 C.F.R. § 60-1.26(a)(2) (1977).  No previous version of the regulations had purported to authorize the Director to seek "affected class and back pay relief" or to enjoin violations administratively.

36.     The Director's newfound proceedings bore all the hallmarks of agency prosecution and adjudication.  After the submission of evidence and motions, an ALJ was tasked with making recommended "findings, conclusions [of law], and a decision" about the

contractor's violations, 41 C.F.R. § 60-30.27 (1977), with the final determination to be made by

the Secretary, *see* 41 C.F.R. § 60-30.30 (1977).

37.     The OFCCP's overreach did not go unnoticed.  As the OFCCP reported, "[a]

number of commentators opposed the portion in proposed § 60-1.25(a)(2) [*sic*], which references

affected class and back pay relief as being appropriate under … Executive Order [11,246].  They

opined that the Executive Order is only prospective in nature, and that it contains no provision

authorizing remedial relief."  42 Fed. Reg. 3454, 3456 (Jan. 18, 1977).

38.     In response, the OFCCP claimed that "it has been OFCCP policy for a number of

years that affected class and back pay relief are authorized by … Executive Order [11,246]."  *Id.*

The OFCCP pointed to no statute, executive order, or regulation justifying this purported policy.

39.     The OFCCP claimed that its policy was "recently upheld in" *United States v.*

*Duquesne Light Co.*, 423 F. Supp. 507 (W.D. Pa. 1976).  The court in *Duquesne Light*, relying

on both the Procurement Act and on supposed inherent presidential powers, reasoned that

§ 209(a)(2) of the Executive Order's reference to "appropriate proceedings" brought by the *DOJ*

authorized the government to "invoke the equitable powers of this *Court*" and seek back pay.  *Id.*

at 509 (emphasis added).  The OFCCP never explained how the *Duquesne Light* decision—

addressing *the DOJ's* authority to seek back pay *in federal court*—proved that *the OFCCP* had

authority to award back pay or other compensatory relief *through administrative proceedings*.

40.     Unsurprisingly, government contractors remained unconvinced and continued to

object to the OFCCP's expansion of its authority.  In responding to such comments on a

subsequent proposed rulemaking, the OFCCP once again failed to cite any statutory source for

its power to seek individualized relief.  Instead, it continued to rely on the assertion that it had

claimed such powers as a matter of policy since "at least" 1967.  44 Fed. Reg. 77,000, 77,000

(Dec. 28, 1979).  And for the first time, it argued that one provision of the Equal Opportunity

Clause—found at § 202(6) of Executive Order 11,246—gave it carte blanche to impose

previously unimagined sanctions.  *Id.*  That provision requires government contracts to include a

term stating that "such other sanctions may be imposed and remedies invoked as provided in [the

Executive Order], or by rule, regulation, or order of the Secretary, or as otherwise provided by

law."  Exec. Order No. 11,246, 3 C.F.R. at 169, § 202(6).  In the Secretary's view, this

boilerplate contract provision authorized whatever administrative penalties or sanctions the

OFCCP wished to impose, even if that meant expanding the Executive Order's specific list of

sanctions that the Secretary was permitted to impose.  *See id.* at 172, § 209(a).

41.     But not even the OFCCP was fully convinced.  Two years later, it took the

unusual step of seeking additional comment on its supposedly well-established authority to

award back pay.  *See* 46 Fed. Reg. 36,213, 36,215 (July 14, 1981).

42.     Although the OFCCP acknowledged that the "general thrust" of the resulting

comments concerned, among other things, "whether the President has authority to recover back

pay relief under" Executive Order 11,246, the OFCCP refused to identify the source of this

authority.  47 Fed. Reg. 17,770, 17,773 (Apr. 23, 1982).  Instead, without offering any additional

legal argument beyond another reference to its own supposed past practice, the OFCCP simply

declared:  "Upon reexamination of the authority issue, the Department of Labor has …

concluded that the Executive Order vests OFCCP with the legal authority to seek back pay for

victims of discrimination."  *Id.*

## C.  *The OFCCP's Current Regulatory Regime*

43.     The OFCCP's unexplained power grab remains in place today.  According to

current regulations, when the OFCCP receives a complaint or performs a compliance evaluation

that, in the OFCCP's view, indicates a violation of the Equal Opportunity Clause that has not

been remedied through informal means, administrative-enforcement proceedings may be

initiated within the Department of Labor by the Solicitor of Labor on recommendation from the

OFCCP.  41 C.F.R. § 60-1.26(b)(1); *see id.* §§ 60-1.20(a), -1.24(b), (c)(3).

44.     In those proceedings, the "OFCCP may seek back pay and other make whole

relief for victims of discrimination identified during a complaint investigation or compliance

evaluation.  Such individuals need not have filed a complaint as a prerequisite to OFCCP seeking

such relief on their behalf."  41 C.F.R. § 61-1.26(a)(2).  The OFCCP may also seek through

administrative-enforcement proceedings "to enjoin violations, to seek appropriate relief, and to

impose appropriate sanctions."  41 C.F.R. § 61-1.26(b)(1).

45.     The OFCCP's administrative-enforcement proceedings are conducted "under the

control and supervision of the Solicitor of Labor and under the Rules of Practice for

Administrative Proceedings to Enforce Equal Opportunity under Executive Order 11246" found

in 41 C.F.R. part 60-30.  41 C.F.R. § 60-1.26(b)(2).

46.     Under those regulations, an ALJ employed by the Department of Labor conducts

the initial administrative proceeding.  *See* 41 C.F.R. § 60-30.14.  The ALJ resolves motions, *see*

41 C.F.R. § 60-30.8, receives evidence, *see, e.g.*, 41 C.F.R. §§ 60-30.9-.11, .19, and holds oral

argument, *see* 41 C.F.R. § 60-30.21.  The ALJ then "recommend[s] findings, conclusions, and a

decision" with respect to whether the contractor violated the Equal Opportunity Clause and, if so,

what the appropriate sanction should be.  41 C.F.R. § 60-30.27.

47.     If one of the parties takes exception to the ALJ's recommended decision, that

party may seek review before the Administrative Review Board (ARB), also housed in the

Department of Labor and staffed by Department of Labor ALJs.  41 C.F.R. 60-30.28.  "If the

[ARB] … concludes that the defendant has violated the Executive Order, the equal opportunity

clause, or the regulations, an Administrative order shall be issued enjoining the violations, and requiring the contractor to provide whatever remedies are appropriate, and imposing whatever sanctions are appropriate, or any of the above."  41 C.F.R. § 60-30.30.

48.    It is only *after* a contractor defends itself before an ALJ and the ARB, and has a final order entered against it, that it can seek review in an Article III court.  Even then, however, the ARB's findings and conclusions are subject to deferential "arbitrary and capricious" and "substantial evidence" review under the APA.  *See* 5 U.S.C. § 706(2)(A), (E); *see also, e.g.*, *United Space All., LLC v. Solis*, 824 F. Supp. 2d 68, 78 (D.D.C. 2011); *cf.* 42 U.S.C. § 2000e-17.

49.    The OFCCP claims that there is no limitations period for the institution of enforcement actions and that it may bring an administrative-enforcement action no matter how long ago the alleged violations occurred.  The OFCCP's regulations themselves, for example, contain no statute of limitations.  *See* 41 C.F.R. § 60-1.26(b)(1).  And in the analogous context of administrative-enforcement proceedings under Section 503 of the Rehabilitation Act, 29 U.S.C. § 793, which requires that government contractors promise to take affirmative action to employ disabled individuals, the ARB has repeatedly held that the OFCCP faces no limitations period. *See OFCCP v. Am. Airlines, Inc.*, 94-OFC-9, 1996 WL 33170032, at *11, Secretary's Decision and Order of Remand (Dep't of Labor Apr. 26, 1996) ("The [OFCCP] regulations contain no time limits for formal administrative complaints arising out of compliance reviews."); *OFCCP v. Wash. Metro. Area Transit Auth.*, 84-OFC-8, 1989 WL 1003977, at *5-6, Secretary's Decision and Order of Remand (Dep't of Labor Mar. 30, 1998) (same).

50.    Since these regulations were promulgated originally, the OFCCP has had multiple occasions to reconsider its administrative-enforcement authority.  But in each subsequent rulemaking, including some in the last six years, the OFCCP has stuck with its expansive

enforcement regime.  Indeed, in that timeframe, the OFCCP has expanded the scope of its

administrative-enforcement authority to reach new violations not previously reached by prior

regulations.

## II.  The OFCCP's Enforcement Regime Exceeds Any Congressionally Delegated Power

51.     The OFCCP's 1977 expansion of its enforcement powers requires Congress to

have authorized the OFCCP to promulgate such a regime.  That is because "[t]he President's

power, if any, to issue [an executive] order must stem either from an act of Congress or from the

Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The

Constitution furnishes no power on the President to make laws or otherwise exercise legislative

authority:  "[T]he President's power to see that the laws are faithfully executed refutes the idea

that he is to be a lawmaker."  *Id.* at 587; *see* U.S. Const. arts. I-II.  So Congress must provide the

authority:  "The legislative power of the United States is vested in the Congress, and the exercise

of quasi-legislative authority by governmental departments and agencies must be rooted in a

grant of such power by the Congress and subject to limitations which that body imposes."

*Chrysler*, 441 U.S. at 302.  "Agencies may play the sorcerer's apprentice but not the sorcerer

himself."  *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

52.     As the Supreme Court in *Chrysler* noted and as Executive Order 11,246's

historical provenance suggests, "[t]he origins of the congressional authority for [the order] are

somewhat obscure and have been roundly debated by commentators and courts."  441 U.S. at

304.  *Chrysler* identified—but expressed skepticism of—two possible legislative sources of

OFCCP power postulated by others: (1) the Procurement Act and (2) Titles VI and VII of the

Civil Rights Act, including the EEOA amendments.  *See id.* at 304-06 & nn. 34-36.  *Chrysler*

ultimately resolved the dispute before it without deciding whether Congress had authorized the

OFCCP's administrative-enforcement regime, concluding that the specific regulations at issue in that case were not authorized by any of the aforementioned statutes.

53.     Similarly, none of these statutes authorizes the OFCCP to create an administrative-enforcement regime to prosecute claims of employment discrimination and affirmative-action violations brought by the OFCCP against government contractors, to do so without any limitations period, and to award sanctions such as injunctive relief, back pay, and other "make whole" remedies for applicants and employees of government contractors.

### A.  *The Procurement Act*

54.     The Procurement Act, passed in 1949, authorizes the President only to "prescribe policies and directives" to guide Executive Branch agencies and officials in pursuit of a uniform procurement policy.  40 U.S.C. § 121(a); *see id.* § 101.  From the Act's inception until 1977, everyone understood this to be the case.  The President, acting through the Department of Labor and the OFCCP, could insist on certain terms in government contracts.  If a contractor violated those terms, the government's remedy sounded in contract, such as a breach-of-contract suit.  No one understood the Procurement Act to authorize the OFCCP to promulgate and oversee an administrative-enforcement regime that awarded remedies on behalf of contractors' employees or employment applicants.  Indeed, the Procurement Act does not even mention employment discrimination.  *See Chrysler*, 441 U.S. at 304 n.34.

55.     The Procurement Act's narrow purpose is revealed through Congress's words. The Act was designed merely "to provide for the Government an economical and efficient system for … the procurement and supply of personal property and nonpersonal services."  63 Stat. 377, 378, *previously codified at* 40 U.S.C. § 471.

56.     In keeping with this important but limited goal, Congress authorized the President to centralize the administration and control of government contracting.  It gave the President the power to direct components of the Executive Branch, not bind private entities with the force of law:  The President could "prescribe such *policies and directives*, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of this Act, which *policies and directives shall govern the* [*General Services Administration*] *Administrator and executive agencies* in carrying out their respective functions hereunder."  63 Stat. at 389, *previously codified at* 40 U.S.C. § 486(a) (emphases added).  This language remained unchanged from its enactment until after President Johnson issued Executive Order 11,246 in September 1965.

57.     There has been no substantive change in the nearly 55 years since.  The Procurement Act still empowers the President only to "prescribe policies and directives that the President considers necessary to carry out this subtitle."  40 U.S.C. § 121(a).  Although Congress in 2002 removed the language about the policies and directives "govern[ing] … executive agencies," this amendment was merely part of ongoing housekeeping efforts in the United States Code, and thus "ma[de] no substantive change in the law."  H.R. Rep. No. 107-479, at 3 (2002).

58.     Today, Congress still describes the goal of the Procurement Act as "provid[ing] the Federal Government with an economical and efficient system for" procurement-related activity: (1) "[p]rocuring and supplying property and nonpersonal services, and performing related functions"; (2) "[u]sing available property"; (3) "[d]isposing of surplus property"; and (4) "[r]ecords management.  40 U.S.C. § 101.

59.     In short, since its inception and at the time President Johnson issued Executive Order 11,246, the Procurement Act by its plain terms authorized the President to instruct and

govern contracting agencies. The Procurement Act did not authorize the President to construct an administrative-enforcement and adjudicative regime aimed at providing relief to applicants and employees of government contractors based on alleged violations of the anti-discrimination terms found in government contracts.

60. None of the Procurement Act's legislative history even hints at the possibility that Congress authorized the President to create a brand new administrative-enforcement regime, much less one to address issues of employment discrimination and affirmative action. Nor does it suggest that the President could set up administrative tribunals to provide individualized redress to those persons allegedly discriminated against by government contractors.

61. Executive Branch materials confirm that the Procurement Act was not understood as broadly authorizing the President to create an administrative-enforcement and adjudicatory regime for OFCCP claims of employment discrimination and violations of affirmative-action regulations against government contractors. In 1961, then-Vice President Johnson, serving as Chairman of the President's Committee on Equal Employment Opportunity, asked Attorney General Robert Kennedy whether Executive Order 10,925's affirmative-action provisions were a valid exercise of presidential authority, presumably because the inherent war powers and wartime legislation originally invoked in support of earlier executive orders no longer applied. *See* Validity of Executive Order Prohibiting Government Contractors from Discriminating in Employment Practices on Grounds of Race, Color, or National Origin, 42 Op. Att'y. Gen. 97, 97 (1961).

62. Attorney General Kennedy's answer reflected the limited scope of authority delegated to the President by the Procurement Act and the background principles of government contract law governing these executive orders.

63.     First, Attorney General Kennedy indicated that the government generally enforces its contract rights, including rights stemming from a contractor's breach of the Equal Opportunity Clause, through breach-of-contract suits in federal court:  "Under ordinary rules of contract law, failure of the contractor to comply with the nondiscrimination clause is a breach of contract, for which the United States is entitled to an appropriate remedy by way of damages, rescission or injunction, against the contractor or a third party who induces a breach of contract. Any contentions as to whether the termination of the contract by the United States was authorized by the terms of the contract, or as to the appropriateness of the judicial remedies sought by the United States, can be litigated in the courts in an appropriate action by the United States or the contractor."  *Id.* at 108.

64.     Second, Attorney General Kennedy recognized the narrow scope of the administrative proceedings that the Procurement Act authorized the President to conduct.  In determining that Executive Order 10,925's administrative proceedings for contractor debarment passed muster, he noted that debarment was a "recognized administrative practice" under regulations implementing that Act.  *Id.* at 109.  He said nothing, however, about any purported power to redress employee discrimination claims through administrative proceedings, which he surely would have done if he believed such power to exist.

65.     This narrow understanding of the Procurement Act is confirmed by the non-delegation doctrine, which holds that Congress, as the sole entity empowered by the Constitution to exercise the legislative power, cannot delegate that power to an agency without providing an "intelligible principle" to guide the agency's interpretation, implementation, and enforcement of the statute in question.  *See, e.g.*, *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974) (explaining the doctrine).  Were the Act construed to authorize the President to create

the scheme the OFCCP has conceived, the statute would lack an intelligible principle to guide his

efforts in doing so.  The Act merely states Congress's intent to have "an economical and efficient

system for … procuring and supplying property and nonpersonal services" and other

procurement-related activities.  40 U.S.C. § 101.  The Act says nothing about resolving an

individual employment applicant's or employee's discrimination claim against a government

contractor.  This delegation must be construed narrowly to avoid raising serious constitutional

questions.  *See, e.g.*, *Nat'l Cable Television Ass'n*, 415 U.S. at 342-43 (reading the relevant

statute "narrowly to avoid constitutional problems" arising from the non-delegation doctrine).

### B. *The Civil Rights Act and the EEOA*

66.     The text and legislative histories of both Titles VI and VII of the Civil Rights Act

and the EEOA amendments make clear that no statute authorizes the OFCCP to create an

administrative-enforcement and adjudicative regime for employee discrimination.

67.     To begin with, there is no provision in Title VI, Title VII, and the EEOA

delegating substantive authority for the OFCCP's regime.  *See Chrysler*, 441 U.S. at 305 n.35

(noting that Title VI has a limited delegation not applicable to Executive Order 11,246 and

concluding that "Title VI and Title VII contain no other express substantive delegation to the

President").

68.     Indeed, Titles VI and VII both contain provisions explicitly undercutting the

notion that they provide authority for the OFCCP's regime.  Title VI, with an exception not

relevant here, expressly forbids anything within it from "be[ing] construed to authorize action …

by any department or agency with respect *to any employment practice of any employer*."  42

U.S.C. § 2000d-3 (emphasis added).  And Title VII expressly forbids anything within it from

"be[ing] interpreted to require any employer" to institute affirmative-action programs.  *Id.*

-22-

§ 2000e-2(j) (explaining that Title VII does not require any employer "to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by [the] employer … in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area").  Title VI therefore cannot provide any authority at all, and Title VII cannot provide authority for at least the affirmative-action regulations that the OFCCP has promulgated under Executive Order 11,246.  *See* 41 C.F.R. parts 60-2, -4.

69.      The legislative histories of Title VII and the EEOA further confirm that Congress did not intend to give the OFCCP authority to prosecute quasi-Title VII claims.

### 1. The Legislative History of Title VII

70.      In 1963 and 1964, when debating whether to enact Title VII, Congress specifically considered and rejected legislation that would have expanded the President's authority to enforce the Equal Opportunity Clause found in government contracts.  Section 711(b) of the proposed bill H.R. 7152 provided that "[t]he President is authorized to take such action as may be appropriate to prevent the committing or continuing of an unlawful employment practice [such as a Title VII violation] by a person in connection with the performance of a contract with an agency or instrumentality of the United States."  H.R. Rep. No. 88-914, at 14, § 711(b) (1963).  In the view of its supporters, this proposal "strengthened and broadened the enforcement provisions [of Title VII] by giving the President blanket and unlimited authority (sec. 711(b))."  U.S. Equal Employment Opportunity Commission,

Legislative History of Titles VII and XI of the Civil Rights Act of 1964 at 2087 (hereinafter "Legislative History of Title VII").

71.     Section 711(b)'s proposed expansion of presidential power faced withering criticism.  As one Representative put it, "[m]any of us have felt section 711[(b)] to be a highly dangerous section of the bill."  110 Cong. Rec. 2575 (1964) (statement of Rep. Dowdy).  Another added that section 711(b) was objectionable precisely because it "went beyond reasonable limits" in offering "this blanket authority that was proposed to have been given to the President."  Id. at 2574 (statement of Rep. Willis).

72.     Section 711(b) did not survive this criticism.  It was struck from the amended version of H.R. 7152, which later passed the House and (after revision) the Senate.

73.     Thus, in debating and enacting Title VII, Congress denied that the President had the authority to enjoin discrimination by government contractors through administrative proceedings before an executive agency.  If the President already possessed that power under the Procurement Act, proposed section 711(b) would have been superfluous and unnecessary for its supporters, and its vocal opponents would not have been able to object on the bases that they did and their successful efforts to defeat section 711(b) would have been meaningless.

74.     Title VII's broader text and history further demonstrate that Congress never intended for the President to remedy government-contractor employment discrimination on behalf of employment applicants and employees through administrative proceedings.

75.     Early versions of Title VII would have given the Executive Branch adjudicative enforcement powers over Title VII claims.  An Administrator housed within the Department of Labor would have had authority to investigate claims and, if he could not resolve them through voluntary compliance, lodge an administrative complaint with the proposed Equal Employment

Opportunity Board.  The Board, an independent five-member tribunal, would then adjudicate the claim and "issue broad remedial orders to remedy violations which it finds."  Those decisions would then be subject to deferential review in the Courts of Appeals.  Legislative History of Title VII at 3070-71.

76.     Congress explicitly rejected this adjudicative model of agency enforcement for Title VII discrimination claims.  Instead, in 1964, Congress created the EEOC, vesting it with much less power than had been proposed in earlier versions of the bill.  The EEOC retained authority to investigate discrimination claims and seek informal resolution, but it had no authority to resolve them administratively.  Indeed, it even lacked the authority to bring suits on its own:  Private plaintiffs could bring suit, but the EEOC could only refer matters—including claims alleging a pattern or practice of discrimination—to the DOJ for litigation in federal court. *See, e.g.*, Richard K. Berg, *Equal Employment Opportunity Under the Civil Rights Act of 1964*, 31 Brook. L. Rev. 62, 64-68 (1964) (tracing the evolution of Title VII).

77.     Representative William McCulloch explained why Congress cut back on earlier proposals that gave the President, through the EEOC, broad administrative powers:

> As the title was originally worded, the Commission would have had authority to not only conduct investigations, but also institute hearing procedures and issue orders of a cease-and-desist nature.  A substantial number of [House Judiciary] committee members, however, preferred that the ultimate determination of discrimination rest with the Federal judiciary.  Through this requirement, we believe that settlement of complaints will occur more rapidly and with greater frequency.  In addition, we believe that the employer or labor union will have a fairer forum to establish innocence since a trial de novo is required in district court proceedings together with the necessity of the Commission proving discrimination by a preponderance of the evidence.

Title VII Legislative History at 2150.

78.     Thus, when Congress specifically addressed the enforcement of Title VII's anti-discrimination provisions, Congress rejected a proposal to create an administrative agency with

the power to award remedies for employees and employment applicants after an in-house prosecution and adjudication within the Executive Branch.  And yet that is precisely the authority the OFCCP now claims.

79.     It is inconceivable that Congress believed that, despite its careful efforts to avoid administrative adjudication of Title VII claims, the sparse, contract-focused text of the Procurement Act already conferred upon the President the power to do just that for claims against government contractors.  Any such assertion is belied by the fact, discussed above, that Congress rejected a different proposal that would have given the President such power specifically with respect to government contractors.

### 2.  The Legislative History of the EEOA Amendments

80.     In 1972, Congress further revised Title VII through the EEOA.  The EEOA's amendments to Title VII again demonstrate that Congress never intended for the President to provide redress on behalf of alleged victims of discrimination through administrative proceedings.

81.     When Congress specifically addressed the President's administrative authority over government contractors in the EEOA, it *limited* that authority rather than sanctioned an expansive use of it.  For example, as part of the EEOA, Congress added 42 U.S.C. § 2000e-17 to Title VII.  *See* 86 Stat. 113 (1972), *codified at* 42 U.S.C. § 2000e-17.  That section provides that "[n]o Government contract … with any employer[] shall be denied, withheld, terminated, or suspended, by any agency … under any equal employment opportunity law or order, where such employer has an affirmative action plan which has previously been accepted … without first according such employer full hearing and adjudication under the [APA]."

82.     Section 2000e-17 illustrates Congress's narrow view of the OFCCP's mission. As that provision's chief proponent noted, government contracts are "referred to the [OFCCP] for only one purpose": to "afford[] that office an opportunity to determine whether the affirmative action plan which is required is in compliance with the laws, the Executive order, and the regulations prohibiting discrimination in employment.  That is the only function of the [OFCCP] in the matter."  Sen. Committee on Labor and Public Welfare, Legislative History of the Equal Employment Opportunity Act of 1972 at 955 (hereinafter "EEOA Legislative History") (statement of Sen. Ervin).

83.     Section 2000e-17 was designed to curb problematic exercises of the OFCCP's power through judicial oversight.  As Senator Sam Ervin stated, "All [§ 2000e-17] says is that after [the OFCCP] ha[s] approved [an affirmative-action plan], they cannot repudiate the approval without affording the employer who has satisfied the other agencies of Government with the terms of the contract the opportunity to have the question determined, not by arbitrary action on the part of an executive office, but by a court of justice."  EEOA Legislative History at 955.

84.     The controversy caused by the OFCCP even having the authority to repudiate contracts after agency adjudication demonstrates that Congress certainly would have rejected any notion that would have afforded the OFCCP the power to conduct and decide administrative litigation that sought back pay and other "make whole" relief for alleged victims of contractor discrimination.

85.     While enacting the EEOA, Congress also rejected a proposal to transfer "[a]ll authority, functions, and responsibilities vested in the Secretary of Labor pursuant to Executive Order 11246 relating to nondiscrimination in employment by Government contractors" to the

EEOC.  EEOA Legislative History 117 (text of rejected proposal for H.R. 1746 § 717(f)); *see*

EEOA Legislative History at 74-75 (minority and separate views on H.R. 1746).  Statements

made by members of Congress and executive officials during discussions about this proposal

reflect a shared understanding of the OFCCP's limited role.

86.     For example, Senator William Saxbe, the proponent of an amendment to

eliminate the transfer, observed the differences in philosophy and remedy between judicially

resolved discrimination claims and Executive Order 11,246:

> The Executive order program should not be confused with the judicial remedies for
> proven discrimination which unfold on a limited and expensive case-by-case basis.
> Rather, affirmative action [under the Executive Order] means that all Government
> contractors must develop programs to insure that all share equally in the jobs
> generated by the Federal Government's spending.  Proof of overt discrimination is
> not required.

EEOA Legislative History at 915.

87.     Senator Saxbe further distinguished between the EEOC and the OFCCP, noting

that the EEOC was a "regulatory agency under Title VII," and the OFCCP only a "procurement

program manager."  EEOA Legislative History at 916.

88.     Representative John Erlenborn similarly explained the differences between the

OFCCP's focus on contractors and the EEOC's focus on individual rights:

> I think it is important to understand what the jurisdiction of the [OFCCP] in the
> Department of Labor is.  The [OFCCP] is not enforcing Title VII rights.  The
> [OFCCP's] authority is derived from an Executive order.  The jurisdiction of the
> EEOC is under the 1964 Civil Rights Act, and it is to enforce those constitutional
> rights of equality….
>
> The [OFCCP] is an altogether different type of jurisdiction.  It is not based upon
> constitutional rights.  It is not based on statutory rights.  The genesis of the power
> of the [OFCCP] is the contractual relationship that exists between the Federal
> Government and those with whom they contract[.]

EEOA Legislative History at 230-31.

89.     William Brown, then-Chairman of the EEOC, also disfavored the proposed

transfer because it would blur the remedial distinction between prospective contractor-specific

actions, such as debarment, and retrospective applicant- or employee-specific individual claims:

> I can envision numerous conflicts in cases where the same company becomes
> subject to differing procedures from the same agency.  For example, while an
> individual may sue under Title VII to have an individual grievance redressed, under
> the provisions of the executive order *the proper remedy is contract debarment, not
> individual redress*.  Also, the differences between the two remedies will probably
> necessitate different burdens of proof and differing emphasis on particular kinds of
> violations.

EEOA Legislative History at 932 (emphasis added).

90.     Then-Under Secretary of Labor (and later D.C. Circuit Judge) Laurence

Silberman echoed Chairman Brown's concerns.  As he explained to the Senate, the EEOC and

the OFCCP are "substantially different" both in purpose and the remedies they seek.  *Equal

Employment Opportunities Enforcement Act of 1971: Hearing on S. 215, S. 2617 and H.R. 1746

Before the Subcomm. on Labor & the Pub. Welfare*, 92d Cong. 80-81 (1971).  Under Secretary

Silberman explained that "contracting agencies" should declare any offending contractor to be a

"nonresponsible offeror and therefore ineligible for contract award." *Id.* at 79.  He identified

"[o]ther sanctions such as cancellation and debarment." *Id.*  He added that "[t]he threat of being

declared a nonresponsible bidder, of being cancelled or debarred is a powerful inducement to

compliance." *Id.*  He said nothing about remedies for alleged victims of discrimination.  Instead,

Under Secretary Silberman explained that "[T]itle VII created the Equal Employment

Opportunity Commission to redress identifiable instances of discrimination" as part of its

"nondiscrimination program," whereas the OFCCP sought to "assure that contractors take

affirmative action to provide equal employment opportunity." *Id.* at 76, 80-81.  If the proposed

transfer of the OFCCP's authority to EEOC went through, EEOC officials would "hav[e] to

perpetually shift mental gears from the nondiscrimination approach of [T]itle VII to the affirmative action philosophy of the contract compliance program." *Id.* at 82.

91.     Those who supported transfer of the OFCCP's authority to the EEOC also expressed a narrow understanding of the OFCCP's enforcement authority.  Howard Glickstein, then-Staff Director of the U.S. Civil Rights Commission, spoke in favor of transfer because it would increase the President's enforcement options beyond the remedy of termination.  He noted that termination was "an extreme measure" that the OFCCP was reluctant to use, and argued that, under proposed-but-later-rejected changes to the EEOC's power, "[c]ease and desist power exercised by EEOC would prove to be an effective sanction supplementary or alternative to termination of a contract." *Equal Employment Opportunity Enforcement Procedures: Hearing Before the Gen. Subcomm. on Labor of the Comm. on Educ. and Labor*, 92d Congress, 108 (1971).

92.     Similarly, the United States Commission on Civil Rights supported transfer because, in its view, transfer would have given the EEOC greater incentive to use the OFCCP's contract-compliance sanctions.  *See* U.S. Comm'n on Civil Rights, *The Federal Civil Rights Enforcement Effort Seven Months Later* 24 (1971).  The Commission made no mention of the existence of any greater sanctioning power possessed by the OFCCP, such as back pay and other make-whole relief for victims of discrimination.

93.     As with Title VII itself, the EEOA amendments' overall thrust also reflected Congress's view that individual discrimination claims should be remedied through litigation in federal court, not agency-enforcement proceedings.

94.     Early drafts of the EEOA would have transformed the EEOC into an adjudicative

agency with authority to make administrative findings of discrimination, issue cease-and-desist

orders, and award individualized relief.  *See* EEOA Legislative History 157-87 (text of S. 2515).

95.     Again, these proposals provoked an outcry from those who wanted to guarantee

employers accused of discrimination the protections of an Article III court.  As Senator Peter

Dominick memorably put it:

> Picture yourself as an employer visited one day by an investigator from the Equal
> Employment Opportunity Commission.  His agency, he says, has received a
> complaint that you have discriminated against a job applicant.
>
> From then on, everyone you're up against is a member of the same team.  The first
> man goes on to investigate, and to file a formal complaint—with the EEOC.  The
> same agency arranges a hearing at which another EEOC employee is the prosecutor
> and still another is the trial judge.  When a decision is handed down, other EEOC
> employees proceed to act as a reviewing authority.
>
> If you're dissatisfied with their judgment, you can—after the time and expense of
> that drawn-out process—embark on a new, lengthy and costly litigation in a U.S.
> Court of Appeals.  But only after the EEOC has finished….
>
> The principal objection to [this] administrative approach is that it harkens back to
> the "Star Chamber" proceedings outlawed in England more than 300 years ago.
> That is, the EEOC would, in effect, become investigator, prosecutor, trial judge and
> judicial review board—all before you ever got to the Court of Appeals!

117 Cong. Rec. 40290 (1971).

96.     Senator Dominick was not alone.  Representative David Martin declared that

"[t]he committee bill … would set up this five-man EEOC board to be the investigator, the

prosecutor, the judge, and the jury of these cases.  An employer would be considered guilty until

he proves himself innocent….  This is a very, very dangerous piece of legislation."  117 Cong.

Rec. 31959 (1971).

97.     Congress responded to these criticisms by stripping from the EEOA those

provisions that would have broadened EEOC's authority by authorizing it to issue cease-and-

desist orders and administratively adjudicate discrimination claims.  Although the EEOA gave

the EEOC the power to bring discrimination suits without referral to the DOJ, *see* 42 U.S.C.

§ 2000e-5(f), those suits still had to be brought in federal court.

98.    Congress could not have imagined that the very powers it again denied the EEOC

when amending Title VII were powers already conferred upon the President by the Procurement

Act so long as a government contract was involved.  Indeed, as noted, Congress has previously

*rejected* giving the President such power with respect to government contractors.

### 3. The Current Provisions of Title VII

99.    Title VII as it stands today further demonstrates that Congress knows how to

create a detailed enforcement regime when it wishes to do so.  Congress specifically empowered

the EEOC to conduct investigations, issue reasonable-cause findings, eliminate violations

through conciliation, and litigate cases *in federal court*.  *See* 42 U.S.C. §§ 2000e-5, 2000e-6,

2000e-8, 2000e-9.

100.    Congress has also demonstrated that it knows how to protect employers' rights

when authorizing an enforcement regime.  For example, the EEOC cannot file an enforcement

action in federal court unless it completes a multi-step process that includes receipt of a charge,

notice of that charge, an investigation, a reasonable-cause determination, and conciliation

proceedings.  *See* 42 U.S.C. § 2000e-5(b), (f)(1).

101.    Similarly, Congress shielded employers by establishing specific timetables for

EEOC action.  For example, Congress enacted 180-day and 300-day charge-filing periods to

limit claims brought by individuals and the EEOC.  *See* 42 U.S.C. §§ 2000e-5(e)(1), 2000e-6(e).

102.    According to the OFCCP, however, none of these protections exist if an employer

happens to be a government contractor.

103.    By the OFCCP's own estimate, government contractors subject to Executive

Order 11,246 employ "approximately one-fifth of the entire U.S. labor force"—a percentage that

translates to around 32 million workers.  OFCCP, History of Executive Order 11,246,

https://www.dol.gov/ofccp/about/50thAnniversaryHistory.html (last visited Nov. 26, 2019).

Congress would not have crafted Title VII's careful discrimination-enforcement regime for

employers generally while leaving government contractors at the mercy of the OFCCP's

administrative scheme.

### C. *Time Limits on Government-Contract Claims*

104.    Congress has carefully protected government contractors by enacting statutes of

limitations for claims brought by the government based on alleged breaches of contract.  Those

limitations periods further demonstrate that the OFCCP lacks authority to promulgate its own

administrative-enforcement regime for prosecuting alleged violations of the Equal Opportunity

Clause.

105.    The Contract Disputes Act (CDA) generally governs "any … contract … made by

an executive agency for" the procurement of personal property and services.  41 U.S.C.

§ 7102(a).  Except where fraud is involved, the CDA provides that "each claim by the Federal

Government against a contractor relating to a contract shall be submitted within 6 years after the

accrual of the claim."  41 U.S.C. § 7103(a)(4)(A).

106.    Government contractors are similarly shielded from stale claims by 28 U.S.C.

§ 2415(a), which requires that "every action for money damages brought by the United States or

an officer or agency thereof which is founded upon any contract … shall be barred unless the

complaint is filed within six years after the right of action accrues or within one year after final

decisions have been rendered in applicable administrative proceedings required by contract or by

law, whichever is later."

107.    The OFCCP does not adhere to a six-year statute of limitations in its disputes with

contractors.  In fact, the OFCCP's regulations contain no statute of limitations governing the

initiation of enforcement proceedings, and the OFCCP maintains that it is not bound by any

limitations period.  *See* 41 C.F.R. § 60-1.26(b)(1) (providing no limitations period for

enforcement actions); *OFCCP v. Am. Airlines, Inc.*, 1996 WL 33170032, at *11 ("The [OFCCP]

regulations contain no time limits for formal administrative complaints arising out of compliance

reviews."); *OFCCP v. Wash. Metro. Area Transit Auth.*, 1989 WL 1003977, at *5-6 (holding

that analogous enforcement actions brought under disability-related antidiscrimination clauses

were not bound by a limitations period).

### III.  The OFCCP's Power Grab Was and Remains Unlawful

108.    The OFCCP's enforcement regime is not authorized by any Act of Congress, and

it is incompatible with the statutory and regulatory regime governing discrimination claims.

109.    The OFCCP's regime goes well beyond anything authorized by the Procurement

Act.  That Act merely authorizes the President to prescribe "policies and directives" to guide

government-contracting officials.  40 U.S.C. § 121(a).  This limited delegation authorizes the

President to centralize government contracting, for example by requiring the inclusion of certain

terms in government contracts and allowing him to seek ordinary judicial remedies in federal

court for breach of those contracts.  But the Act says nothing about the President's authority to

create an administrative regime, like the current one, for enforcing and remedying alleged

violations of the anti-discrimination provision contained in government contracts.

110.    Because Congress did not delegate authority to prosecute, adjudicate, and

remediate claims of alleged employment discrimination brought by the OFCCP against

government contractors administratively, the OFCCP's regime is *ultra vires*.

111.     The OFCCP's regime also conflicts with Executive Order 11,246 itself.  The order could not be clearer about the kinds of sanctions the agency may impose.  It states that, "[i]n accordance with such rules, regulations, or orders as the Secretary … may issue or adopt, the Secretary … may" impose the specified six sanctions found within § 209(a) of the Order. *See* Exec. Order 11,246, 3 C.F.R. 406, 410-11, § 209(a) (1967).  By authorizing the Secretary to impose those six enumerated sanctions, the Executive Order prohibits him from imposing others. *See, e.g.*, *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) (because a statute listed certain "hardship" exceptions, "under the maxim *expressio unius est exclusio alterius*, we must presume that these were the only 'hardship cases' Congress intended to exempt").

112.     Moreover, Executive Order 11,246 carefully distinguishes between the types of sanctions the OFCCP may impose on its own and those that require it to enlist other agencies. The OFCCP itself may publish violators' names, direct a contracting agency to terminate a violator's existing contracts, and order contracting agencies to refrain from entering new ones with a violator.  Exec. Order 11,246, 3 C.F.R. at 410-11, §§ 209(a)(1), (5), (6).  But when the OFCCP wishes a contractor to face substantive, retrospective liability, it must refer the matter to another agency for proceedings in federal court: either a breach-of-contract suit by the DOJ to "enforce [the Equal Opportunity Clause]," *see id.* at 410, § 209(a)(2); or a Title VII action by the DOJ or the EEOC, *see id.* at 410, § 209(a)(3).

113.     The OFCCP's enforcement regime defies these limits.  The OFCCP claims it can authorize remedies far beyond anything listed in Executive Order 11,246, including back pay and other "make whole" relief.  41 C.F.R. § 60-1.26(a)(2).  And, despite the order's careful distinction between the remedies the OFCCP can itself award and the breach-of-contract and individual Title VII claims it must refer to the EEOC and the DOJ—which are subject to judicial

oversight—the OFCCP adjudicates all of these issues before a Department of Labor ALJ, subject only to deferential review under the APA. *See* 41 C.F.R. §§ 60-1.26(b), -30.

114.     The OFCCP's regulatory regime also conflicts with Title VII, further demonstrating the gap between that regime and any source of statutory authority. Congress, through Title VII, has carefully cabined the EEOC's authority and protected employers from potential overreach. The EEOC's investigative authority is tied to charges filed with the Commission. Unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction, the EEOC is entitled to access only evidence "relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). And before the EEOC can file any lawsuit, it must investigate those charges, make a reasonable-cause determination, and attempt conciliation. *See* 42 U.S.C. §§ 2000e-5(b), (f)(1). Even if the EEOC meets all of these mandatory pre-suit requirements, it still must go to federal court—rather than to its own in-house ALJ—and ask the federal court and, in most cases, a jury, to hold someone liable for Title VII violations. *See* 42 U.S.C. § 2000e-5(f)(1). Then and only then may the EEOC seek relief such as injunctions, back pay, and so on. *See* 42 U.S.C. § 2000e-5(g). And even then, Title VII places a host of restrictions on the relief that courts may award. *See, e.g.*, 42 U.S.C. § 2000e-5(g)(1).

115.     The OFCCP has not only usurped the EEOC's existing role when it comes to government contractors, but also assumed powers that not even the EEOC possesses. The OFCCP claims that it can prosecute what are essentially individual and class-based Title VII claims without the carefully crafted procedural protections that Congress enacted to protect employers from the government. For example, the OFCCP claims that it can bring cases and seek remedies on behalf of individual employees, groups of employees, and classes of employees

who have never alleged that they were discriminated against or brought a claim of discrimination to the attention of any government authority, let alone to the EEOC.  *See* 41 C.F.R. § 60-1.26(a)(2).  And it claims that it can bring these cases before a Department of Labor ALJ rather than an Article III judge.  *See* 41 C.F.R. §§ 60-1.26(b)(2), -30.14.  When passing the original Title VII and the EEOA amendments to it, Congress clearly recognized the difference between the OFCCP's contract-focused mission and the EEOC's focus on individual plaintiffs' discrimination claims.  Nonetheless, the OFCCP has bootstrapped itself into an enforcement role over Title VII claims that not even the EEOC possesses.

116.   The OFCCP's enforcement regime also contradicts basic principles of contract law.  Under Executive Order 11,246, the OFCCP is supposed to preside over a *contract* regime: The OFCCP can require agencies to include the Equal Opportunity Clause in their government contracts, monitor contractors to make sure they are keeping their promises, and, if there is a breach, take prospective steps such as directing termination of the contract or debarring the contractor.  If the OFCCP seeks retrospective relief, it can refer the matter to the DOJ for a traditional breach-of-contract suit.  Each of these remedies addresses the relationship between the government and the federal contractor, not the relationship between the contractor and its employees.  For the latter, the OFCCP must refer the matter to the EEOC.

117.   The OFCCP's regulations, however, go well beyond and conflict with these principles of contract law.  Unlike a traditional breach-of-contract suit brought before an Article III court, the OFCCP's regulations make government contractors play entirely on the agency's home turf.  *See* 41 C.F.R. §§ 60-1.20, 1.35, 30.14, 30.15, 30.30.  And unlike an ordinary breach-of-contract suit, the OFCCP regulations promise remedies that have little to do with the relationship between the contracting parties:  Rather than measure the damage to the government

from any alleged breach, the regulations promise back pay and other "make whole" relief to employees and applicants of the contractor. *See* 41 C.F.R. § 60-1.26(a)(2). They also promise injunctive relief as a matter of course. *See* 41 C.F.R. § 60-30.30; *see also* 41 C.F.R. § 60-1.26(b)(1).

118.    The OFCCP's enforcement regime also conflicts with Congress's specific time limitations on breach-of-contract claims. Under the CDA and the more general statute of limitations applicable to contract-based claims by the government, contractors can rest assured that the government only has a six-year window in which to bring its claims. *See* 41 U.S.C. § 7103(a)(4)(A); 28 U.S.C. § 2415(a).

119.    But the OFCCP claims authority to bring claims seeking money damages at its leisure, without regard for the six-year statute of limitations imposed on other government contract claims. *See* 41 C.F.R. § 60-1.26(b)(1); *see also OFCCP v. Wash. Metro. Area Transit Auth.*, 1989 WL 1003977, at *5-6.

120.    The OFCCP has no authority to disregard the clearly expressed intent of Congress, and its refusal to abide by the six-year statute of limitations is, by definition, unreasonable agency action. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 481 (2001) (invalidating agency's interpretation of a statute where it "contradicts what in our view is quite clear"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (where Congress has "directly spoken to the precise question at issue …, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress" (quotation marks and citations omitted)).

121.    As these conflicts between the OFCCP's enforcement regime and the Procurement Act, Title VII, and Executive Order 11,246 all demonstrate, the OFCCP's

enforcement regime exceeds the scope of any power ever conferred upon the Executive Branch by Congress.  It is therefore unlawful and cannot be deployed against Oracle.

### IV.  A Justiciable Controversy Exists Regarding the Validity of the OFCCP's Regulatory Regime and the Timing of Its Claims

122.    The OFCCP considers Oracle subject to Executive Order 11,246's requirements.

123.    In September 2014, the OFCCP initiated a compliance review at Oracle's headquarters in Redwood Shores, California.

124.    On March 11, 2016, the OFCCP issued a Notice of Violation to Oracle, claiming that it had found violations of Executive Order 11,246 based on its compliance review.  These included alleged violations of the OFCCP's affirmative-action regulations.  *See* 41 C.F.R., part 2.

125.    From March 2016 through June 2016, Oracle corresponded with the OFCCP regarding the violations alleged by the OFCCP and attempted to resolve the OFCCP's concerns.

126.    On June 8, 2016, the OFCCP issued to Oracle a Notice to Show Cause.  The notice gave Oracle 30 days to demonstrate why enforcement proceedings should not be instituted purportedly pursuant to Executive Order 11,246 and the OFCCP regulations supposedly implementing the order.  *See* 41 C.F.R. 60-1.26.

127.    In its June 29, 2016 response, Oracle denied the OFCCP's allegations of violations and emphasized its willingness to engage in good-faith conciliation efforts.  But the OFCCP made no real effort to resolve this matter informally through conciliation; rather, the OFCCP raced to initiate litigation, particularly after the 2016 Presidential election and before the Presidential Inauguration.

128.    On October 6, 2016, the OFCCP and Oracle held what the OFCCP contends was a conciliation meeting to informally resolve the matter between the parties.  But during that meeting, the OFCCP did not disclose to Oracle the factual basis for its allegations so Oracle

could evaluate the OFCCP's allegations and meaningfully respond.  Rather, the OFCCP instead

insisted that Oracle submit more data and documentation to the OFCCP so it could continue its

inquiry.  Oracle nevertheless complied and submitted more data and documentation on

October 31, 2016.

129.    Oracle did not hear from the OFCCP again until early December 2016—

approximately one month after the 2016 Presidential election.  At that point, the OFCCP abruptly

ended the conciliation process without any reasonable attempt at informal resolution.  Then, on

January 9, 2017, the OFCCP gave Oracle an ultimatum:  Oracle had three days to make a "best

and final" counteroffer or else the OFCCP would sue Oracle within the Department of Labor.

130.    On January 17, 2017, Oracle responded that, instead of engaging in reasonable

efforts to reach an amicable resolution without litigation, the OFCCP appeared to be intent on

filing a midnight complaint against Oracle moments before a change in administrations.  That

same day, just days before the Presidential inauguration, the OFCCP made good on its threat and

began enforcement proceedings against Oracle by filing an administrative complaint in the

Department of Labor's Office of Administrative Law Judges, alleging compensation, recruiting,

and hiring discrimination in violation of Executive Order 11,246, as well as related alleged

affirmative-action violations.  The OFCCP claimed the Office had jurisdiction under sections

208 and 209 of Executive Order 11,246 and 41 C.F.R. § 60-1.26 and part 60-30.

131.    At the time of filing of this Complaint, the OFCCP's lawsuit against Oracle

within the Department of Labor is still in active litigation within the Department of Labor.

132.    The OFCCP's administrative-enforcement and adjudicatory regime is

unauthorized and impermissible.  The sanctions the OFCCP seeks to impose in its enforcement

proceeding against Oracle—including a permanent injunction and "complete relief to the

affected classes, including lost compensation, interest, and all other benefits of employment,"
Second Am. Compl. at 16-17 (Prayer for Relief)—punctuate that the OFCCP interprets its
regulatory authority in a way that exceeds the scope of authority conferred upon the OFCCP by
the President and upon the President by any Act of Congress or part of the Constitution.
Accordingly, the OFCCP has subjected Oracle to administrative proceedings that are
unauthorized and impermissible, in violation of the law, and separation of powers.

133.    In pursuing its unlawful proceedings, the OFCCP has imposed significant
hardship on Oracle.  To avoid further harm from these unlawful proceedings, Oracle brings this
suit for declaratory relief under 5 U.S.C. § 702 and 28 U.S.C. §§ 2201-2022.

134.    There is an actual, justiciable controversy between Oracle and the defendants.
Absent a declaration resolving this controversy, Oracle will be required to endure administrative-
enforcement procedures unauthorized by any grant of authority and in conflict with Title VII and
Executive Order 11,246.

135.    Oracle has no administrative remedies to exhaust.  The Secretary has prohibited
the ARB—the Department of Labor entity purportedly responsible for making final
determinations with respect to violations of the Equal Opportunity Clause—from examining the
validity of Department of Labor regulations.  *See* Dep't of Labor Secretary's Order 2-2012,
§ 5(c), 77 Fed. Reg. 69,378, 69,379 (Nov. 16, 2012) ("The [ARB] shall not have jurisdiction to
pass on the validity of any portion of the Code of Federal Regulations that has been duly
promulgated by the Department of Labor[.]"); *see also, e.g.*, *Sparre v. Norfolk S. Ry. Co.*, ARB
No. 18-022, 2018 WL 2927683, at *2 (Dep't of Labor, Adm. Rev. Bd. May 31, 2018) (refusing
to pass on an issue given the Secretary's prohibition).  Any attempt by Oracle to administratively
exhaust its challenge to the OFCCP's enforcement scheme would therefore be futile.

136.    Finally, to be clear, Oracle is not challenging employment discrimination laws generally.  Oracle recognizes that lawful, constitutional prosecution and adjudication of employment claims against employers, including government contractors, can play an important role in promoting equal employment and ending employment discrimination, in all forms.  Oracle opposes discrimination, which has no place in employment or anywhere else.  The issue here is the place and manner in which claims of discrimination and affirmative-action violations are prosecuted and adjudicated.  Those claims must be pursued fairly and constitutionally.  Thus, although the OFCCP has the authority to refer claims to the EEOC or the DOJ for appropriate proceedings under Title VII, or to the DOJ for a breach-of-contract action in federal court, the OFCCP's current administrative-enforcement regime unconstitutionally violates the bedrock principle of separation of powers that forms the foundation of the federal government and the respective branches of that government.

## FIRST CLAIM FOR RELIEF

### The OFCCP's Enforcement Regime Violates the Constitution's Separation of Powers and the Administrative Procedure Act
**(U.S. Const. arts. I-II; 5 U.S.C. §§ 558(b), 702, 706(2)(A)-(C))**

137.    Oracle incorporates and re-alleges every allegation contained in the preceding paragraphs as though fully set forth herein.

138.    The Constitution empowers Congress to make the law and the President to enforce it.  Under those basic principles, an executive-enforcement regime must stem from a statutory grant of authority to the Executive Branch to create such a scheme.

139.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A)-(C); *see id.* § 702.  An agency may not administratively impose "sanction[s]

… or [issue] a substantive rule or order … except within jurisdiction delegated to the agency and as authorized by law."  5 U.S.C. § 558(b).

140.    The Department of Labor and the OFCCP have promulgated an expansive enforcement regime to prosecute and adjudicate discrimination claims and claims of affirmative-action violations against government contractors, and to award compensatory remedies to individual employees and injunctive relief against employers.

141.    This enforcement regime vastly exceeds the authority conferred upon the President by the Procurement Act, Title VII, or any other possible source of statutory support. The Procurement Act authorizes the President to issue policies and directives to govern contracting officials, not to administratively prosecute, adjudicate, and remediate discrimination claims and alleged affirmative-action violations related to government contracts.  Meanwhile, Title VI, Title VII, and the EEOA amendments provide the President with no lawmaking authority over government contractors.

142.    Indeed, Title VII and the EEOA amendments distinctly reject the OFCCP's model of enforcement.  Title VII places primary responsibility for the enforcement of discrimination claims on behalf of employees and employment applicants on the EEOC.  It also carefully cabins the EEOC's authority.  The EEOC must meet pre-suit requirements, including the filing of a charge, notice of a charge to the respondent, an investigation, a reasonable-cause determination, and conciliation.  Even when the EEOC meets these requirements, Title VII requires that the EEOC to go to federal court to seek relief rather than conduct administrative proceedings.  And even then, damages are capped, depending on the size of the employer.  *See* 42 U.S.C. § 1981a. The OFCCP, in contrast, has set forth its own pre-enforcement investigation regime for discrimination claims against government contractors.  It has developed its own administrative

procedures for resolving those claims and awarding compensatory damages against government contractors on behalf of their employees and employment applicants and imposing injunctive relief against government contractors.  The OFCCP's enforcement regime thus violates the law by usurping the EEOC's authority and contravening the specific limitations on Title VII claims that Congress has imposed.

143.    That the OFCCP's regime violates the law is also evidenced by the agency's disregard of the six-year limitations periods imposed by the CDA and the more general statute of limitations applicable to contract-based claims by the government.  The CDA generally imposes a six-year statute of limitations on "each claim by the Federal Government against a contractor relating to a contract."  41 U.S.C. § 7103(a)(4)(A).  The more general statute of limitations imposes a six-year statute of limitations on "every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract."  28 U.S.C. § 2415(a).  The OFCCP should be bound by these statutes of limitations, and yet the OFCCP claims that it operates under no statute of limitations whatsoever.

144.    These conflicts between the OFCCP's enforcement regime and various statutes all illustrate that the OFCCP's enforcement regime exceeds the scope of any power conferred upon the Executive Branch by Congress.  It is therefore unlawful.

145.    Alternatively, the OFCCP's enforcement regime reflects an unreasonable construction of the Procurement Act under the second step of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  The Procurement Act's simple contract-based provisions bear no relationship to the detailed regime the OFCCP has constructed, which conflicts with the enforcement regimes Congress has expressly created for the adjudication and enforcement of unlawful employment discrimination.

146.     And even if the Procurement Act is construed to provide statutory support for this regime, the Procurement Act would violate the non-delegation doctrine, which bars Congress from delegating legislative power to an agency without providing an "intelligible principle" to guide the agency's implementation of that power.  That Act provides no intelligible principle to guide the President in crafting an enforcement regime for individual discrimination claims against government contractors.

### SECOND CLAIM FOR RELIEF

**The Regulations Comprising the OFCCP's Enforcement Regime Violate
the Constitution's Separation of Powers and the Administrative Procedure Act
(U.S. Const. arts. I-II; 5 U.S.C. §§ 558(b), 702, 706(2)(A)-(C))**

147.     Oracle incorporates and re-alleges every allegation contained in the preceding paragraphs as though fully set forth herein.

148.     At least each of the following individual regulations that comprise the OFCCP's enforcement regime lacks statutory authority, violates the Constitution, and violates the APA:

    a.     41 C.F.R. §§ 60-1.24(c)(3), 60-1.26(b), and 60-30 purport to authorize the administrative proceedings and procedures the Department of Labor uses to prosecute and adjudicate the OFCCP actions against government contractors.  These regulations include § 60-30.14 (which authorizes ALJs to hear these cases), § 60-30.27 (which authorizes them to recommend decisions), and § 60-30.30 (which authorizes the ARB to make a final agency decision).  Neither the Procurement Act nor any other statute authorizes such administrative adjudication.

    b.     41 C.F.R. § 60-1.26(a)(2) purports to authorize the OFCCP to "seek back pay and other make whole relief for victims of discrimination identified during a complaint investigation or compliance evaluation."  Neither the

Procurement Act nor any other statute authorizes the OFCCP to seek
individualized employee remedies administratively.

c.     41 C.F.R. §§ 60-1.24(c)(3) and 60-1.26(b) purport to authorize the
OFCCP to seek individualized employee remedies and injunctive relief
through administrative proceedings.  Neither the Procurement Act nor any
other statute authorizes the OFCCP to administratively seek these
sanctions.

e.     41 C.F.R. § 60-30.30 purports to instruct the ARB to "enjoin[] the
violations" and "requir[e] the contractor to provide whatever remedies are
appropriate, and [to] impos[e] whatever sanctions are appropriate" if it
determines a contractor has violated the Equal Opportunity Clause.
Neither the Procurement Act nor any other statute authorizes the Secretary
to impose injunctive relief or compensatory relief administratively.

149.     Alternatively, at least each of these regulations violates *Chevron* Step 2 because
each impermissibly construes the Procurement Act.

150.     Alternatively, if the Procurement Act is construed to provide statutory support for
these regulations, the Procurement Act violates the non-delegation doctrine.

**THIRD CLAIM FOR RELIEF**

**The OFCCP's Enforcement Regime Is Contrary to Executive Order 11,246**
**(E.O. 11,246, § 209; 5 U.S.C. §§ 558(b), 702, 706(2)(A)-(C))**

151.     Oracle incorporates and re-alleges every allegation contained in the preceding
paragraphs as though fully set forth herein.

152.     Executive Order 11,246 specifies six remedies that the Secretary of Labor may
seek for violations of the Equal Opportunity Clause in government contracts—he can publish the

names of violating contractors, direct that the contract be terminated or suspended by the

contracting agency, suspend or debar the contractor from future contracts, or he can refer matters

to the DOJ for a breach-of-contract suit, refer them to the DOJ for any criminal activity, or refer

them to the DOJ or the EEOC for a Title VII suit.  Exec. Order 11,246, 3 C.F.R. at 410-11,

§ 209(a).

153.    The Department of Labor and the OFCCP's enforcement scheme exceeds these

limits.  Rather than refer Title VII claims to the DOJ or the EEOC for federal court action, the

Secretary pursues them through his own administrative proceedings, in contravention of the

referral provisions in Executive Order 11,246.

154.    In those proceedings, the Solicitor of Labor seeks injunctive relief, back pay, and

other "make whole" remedies that exceed the Secretary's authority under Executive Order

11,246.

155.    The current enforcement regime thus exceeds the Secretary's authority under

Executive Order 11,246 and violates the law.

## PRAYER FOR RELIEF

Oracle respectfully requests that this Court grant the following relief:

(a)  Declare that the OFCCP's regime violates the Constitution and the APA and conflicts

with Title VII, the applicable six-year statutes of limitations, and Executive Order 11,246.

(b)  Declare that the regulations cited and discussed above—41 C.F.R. §§ 60-1.24(c)(3),

60-1.26(a)(2), 60-1.26(b), and 60-30.30—violate the Constitution and the APA and conflict with

Executive Order 11,246 and Title VII insofar as they are used to impose injunctive or

compensatory relief through administrative proceedings.

(c)  Costs, disbursements, and reasonable attorney fees associated with this litigation

pursuant to 28 U.S.C. § 2412 and any other applicable authority.

(d)  Any other relief that the Court deems just and proper.

Dated: November 27, 2019                          Respectfully submitted,


                                                  /s/ Andrew D. Silverman
                                                  Andrew D. Silverman (D.C. Bar No. 1013835)
                                                  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                  51 West 52nd Street
                                                  New York, NY 10019-6142
                                                  Telephone:      +1 212 506 5000
                                                  Facsimile:      +1 212 506 5151
                                                  asilverman@orrick.com

                                                  Robbie Manhas (D.C. Bar No. 1029976)
                                                  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                  Columbia Center
                                                  1152 15th Street, N.W.
                                                  Washington, DC  20005-1706
                                                  Telephone:      +1 202 339 8400
                                                  Facsimile:      +1 202 339 8500
                                                  rmanhas@orrick.com