## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ORACLE AMERICA, INC.,

               Plaintiff,

     v.

U.S. DEPARTMENT OF LABOR; U.S. OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS; EUGENE SCALIA, Secretary of the U.S. Department of Labor; CRAIG E. LEEN, in his official capacity as Director of the U.S. Office of Federal Contract Compliance Programs

               Defendants.

Case No. 19-cv-3574 (APM)

[ORAL ARGUMENT REQUESTED]

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF ABBREVIATIONS .......................................................................... xiii

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................3

President Johnson Issues Executive Order 11,246, Enacting A Narrow Equal Opportunity Enforcement Regime In The Department Of Labor.........................4

OFCCP Enacts An Expansive, Extra-Statutory Adjudicative Regime That Exceeds Even The Executive Order. ....................................................................5

OFCCP Never Claims In Rulemaking Any Statutory Authority For Its Regime Of Administrative Adjudication, Until The Agency Cites The Procurement Act In 2016. ................................................................................................................6

Oracle Brings This Suit Challenging The Legality Of OFCCP's Adjudication Regime. ...............................................................................................................7

LEGAL STANDARD ............................................................................................8

ARGUMENT ........................................................................................................8

I.      The Procurement Act Does Not Authorize OFCCP's Adjudication Regime. .........................................................................................................9

        A.      Any statutory authority for OFCCP's regime must be clear, particularly given the regime's breadth and adjudicative nature. ............ 10

        B.      The Procurement Act provides no statutory authorization. .................... 13

                1.      The Procurement Act is silent as to OFCCP and its regime. ....... 13

                2.      The Procurement Act does not provide OFCCP rulemaking authority. ................................................................................. 15

                3.      The Act's focus on procurement cannot justify OFCCP's adjudication regime, even if OFCCP had rulemaking authority under the Act. ........................................................................... 17

                4.      The old, inapposite decisions cited by Proposed Intervenors highlight the lack of foundation for OFCCP's adjudication regime. ................................................................................... 22

        C.      Title VII and the Contract Disputes Act conflict with OFCCP's regime, further demonstrating that it is not authorized by Congress. ...... 23

                1.      In enacting Title VII, Congress considered, but rejected, expanding executive power over government contractors in connection with the Equal Opportunity Clause in their contracts. ................................................................................. 24

i

2. In enacting Title VII, Congress considered, but rejected, administrative adjudication of discrimination claims. ................. 25

3. In amending Title VII, Congress limited OFCCP's power and expressed a narrow view of the agency's role. .................... 26

4. OFCCP's regime is inconsistent with the Contract Disputes Act. .......................................................................................... 30

5. Proposed Intervenors' arguments regarding implicit congressional ratification go nowhere. ......................................... 32

D. The Procurement Act cannot constitutionally authorize OFCCP's regime. ........................................................................................... 35

II. At A Minimum, The Procurement Act Does Not Authorize OFCCP's Provision Of Injunctive And Monetary Relief Through Agency Adjudication ........................................................................................... 40

III. Amici's Policy Arguments Are Irrelevant And Ill-Conceived. .......................... 43

CONCLUSION ........................................................................................................................ 45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[1]

Page(s)

**Cases**

*Adams Fruit Co. v. Barrett*,
    494 U.S. 638 (1990)...................................................................................16

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)............................................................................32, 33, 43

*\*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Kahn*,
    618 F.2d 784 (D.C. Cir. 1979).........................................13, 19, 20, 21, 36, 38, 39

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946).....................................................................................38

*Atl. City Elec. Co. v. FERC*,
    295 F.3d 1 (D.C. Cir. 2002).........................................................................9, 10

*Bauer v. Marmara*,
    774 F.3d 1026 (D.C. Cir. 2014)....................................................................12

*Estate of Boyland v. Young*,
    242 F. Supp. 3d 24 (D.D.C. 2017).................................................................34

*California Indep. Sys. Operator Corp. v. FERC*,
    372 F.3d 395 (D.C. Cir. 2004)....................................................................3, 9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)..................................................................................32

*\*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)..........................................2, 9, 14, 22, 23, 32, 34

*Coit Indep. Joint Venture v. Fed. Savings & Loan Ins. Corp.*,
    489 U.S. 561 (1989)..................................................................................12

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986)..................................................................................11

*Contractors Ass'n of E. Pa. v. Sec'y of Labor*,
    442 F.2d 159 (3d Cir. 1971)....................................................................21, 22

---

[1] Authorities principally relied upon are designated by an asterisk (*).

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
    543 U.S. 157 (2004) .................................................................................................23

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015) ...............................................................................34

*D'Amato v. Wis. Gas Co.*,
    760 F.2d 1474 (7th Cir. 1985) ................................................................................43

*D.C. Fed'n of Civic Ass'ns, Inc. v. Airis*,
    391 F.2d 478 (D.C. Cir. 1968) ...............................................................................34

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*,
    514 U.S. 122 (1995) .................................................................................................12

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
    485 U.S. 568 (1988) .................................................................................................39

*EEOC v. Commercial Office Prods. Co.*,
    486 U.S. 107 (1988) .................................................................................................45

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ............................................................................................23

*Farkas v. Tex. Instrument, Inc.*,
    375 F.2d 629 (5th Cir. 1967) ..................................................................................22

*Farmer v. Philadelphia Elec. Co.*,
    329 F.2d 3 (3rd Cir. 1964) ......................................................................................22

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..........................................................................................23, 37

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944) .................................................................................................37

*Fort Bend Cty. v. Davis*,
    139 S. Ct. 1843 (2019) ............................................................................................26

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) .................................................................................................17

*Guardians Ass'n v. Civil Serv. Comm'n*,
    463 U.S. 582 (1983) .................................................................................................19

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ............................................................................................36

iv

*Helvering v. Hallock*,
   309 U.S. 106 (1940)........................................................................................32

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)......................................................................................1, 9

*Legal Aid Soc. of Alameda Cty. v. Brennan*,
   608 F.2d 1319 (9th Cir. 1979) ..........................................................................22

*Liberty Mut. Ins. Co. v. Friedman*,
   639 F.2d 164 (4th Cir. 1981) ................................................................21, 22, 23

*Loving v. IRS*,
   742 F.3d 1013 (D.C. Cir. 2014) ........................................................................11

*Lyng v. Payne*,
   476 U.S. 926 (1986)..........................................................................................1

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*,
   811 F.3d 542 (2d Cir. 2016).............................................................................17

*Marshall Cty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ..........................................................................8

*MCI Telecomms. Corp. v. AT&T Co.*,
   512 U.S. 218 (1994) ........................................................................................15

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
   385 F. Supp. 3d 81 (D.D.C. 2019)................................................10, 17, 18, 19, 43

*Michigan v. EPA*,
   268 F.3d 1075 (D.C. Cir. 2001) ........................................................................10

*Mistretta v. United States*,
   488 U.S. 361 (1989)..........................................................................35, 36, 37, 40

*Ex parte Mitsuye Endo*,
   323 U.S. 283 (1944)........................................................................................35

*Motion Picture Ass'n of Am., Inc. v. FCC*,
   309 F.3d 796 (D.C. Cir. 2002) ..........................................................................43

*Nat'l Ass'n of Mfrs. v. Perez*,
   103 F. Supp. 3d 7 (D.D.C. 2015)........................................................................21

*Nat'l Fed'n of Fed. Emps., Local 1622 v. Brown*,
   645 F.2d 1017 (D.C. Cir. 1981) ........................................................................17

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) .........................................................................16

*NBC v. United States*,
   319 U.S. 190 (1943) .........................................................................................37

*Ne. Constr. Co. v. Romney*,
   485 F.2d 752 (D.C. Cir. 1973) .........................................................................22

*New York v. U.S. Dep't of Health & Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..............................................................15

*OFCCP v. Wash. Metro. Area Transit Auth.*,
   No. 84-OFC-8, 1989 WL 1003977 (Mar. 30, 1989) ........................................31

*Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*,
   138 S. Ct. 1365 (2018) .....................................................................................12

*Patterson v. McLean Credit Union*,
   491 U.S. 164 (1989) .........................................................................................32

*Paul v. United States*,
   140 S. Ct. 342 (2019) .......................................................................................36

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .........................................................................................16

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002) .....................................................................................40, 42

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) ...........................................................................8

*Russello v. United States*,
   464 U.S. 16 (1983) ...........................................................................................33

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) ......................................................................8

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979) ...........................................................................................41

*Transohio Savings Bank v. Dir., Office of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ............................................................................3

*United States v. Duquesne Light Co.*,
   423 F. Supp. 507 (W.D. Pa. 1976) .................................................................6, 23

*UAW-Labor Emp't & Training Corp. v. Chao*,
    325 F.3d 360 (D.C. Cir. 2003) ...................................................................21

*Uniroyal, Inc. v. Marshall*,
    482 F. Supp. 364 (D.D.C. 1979) ...........................................................22, 23

*United States v. Brown*,
    333 U.S. 18 (1948) ...................................................................................24

*United States v. Miss. Power & Light Co.*,
    638 F.2d 899 (5th Cir. 1981) ....................................................................22

*United States v. New Orleans Pub. Serv., Inc.*,
    553 F.2d 459 (5th Cir. 1977) ...............................................................22, 23

*United States v. Philip Morris USA, Inc.*,
    396 F.3d 1190 (D.C. Cir. 2005) ................................................................42

*United States v. S. Buffalo Ry. Co.*,
    333 U.S. 771 (1948) .................................................................................24

*Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor*,
    118 F.3d 205 (4th Cir. 1997) ....................................................................31

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................11, 36, 37, 38, 39

**Statutes**

Administrative Procedure Act,

    5 U.S.C. § 702 ........................................................................................26

    5 U.S.C. § 704 ..........................................................................................8

    5 U.S.C. § 706 ..........................................................................................6

    5 U.S.C. § 706(2) ....................................................................................26

    5 U.S.C. § 706(2)(A) ...............................................................................31

    5 U.S.C. § 706(2)(B) .................................................................................8

    5 U.S.C. § 706(2)(C) .................................................................................8

    5 U.S.C. § 706(2)(D) ...............................................................................31

    5 U.S.C. § 706(2)(E) ...............................................................................31

Commodity Exchange Act,

    7 U.S.C. § 18 ..............................................................................................11

Contract Disputes Act,

    41 U.S.C. § 7102(a) ....................................................................................30

    41 U.S.C. § 7103(a)(3) ...............................................................................31

    41 U.S.C. § 7103(a)(4)(A) ..........................................................................30

    41 U.S.C. § 7103(f)(3) ................................................................................31

    41 U.S.C. § 7103(f)(4) ................................................................................31

    41 U.S.C. § 7103(f)(5) ................................................................................31

    41 U.S.C. § 7104(a) ....................................................................................31

    41 U.S.C. § 7104(b)(1) ...............................................................................31

    41 U.S.C. § 7104(b)(4) ...............................................................................31

    41 U.S.C. § 7105 ........................................................................................31

Federal Property and Administrative Services Act of 1949 (Procurement Act),

    40 U.S.C. § 101 ...........................................................2, 7, 13, 15, 36, 37

    40 U.S.C. § 121 ......................................................................2, 36, 37

    40 U.S.C. § 121(a) ........................................2, 7, 13, 15, 18, 37

    *40 U.S.C. § 121(c) ...............................................10, 15, 23, 37

    *40 U.S.C. § 121(c)(1) ...............................................................................18

    *40 U.S.C. § 121(d)(2)(A) ....................................10, 15, 23, 37

    40 U.S.C. § 122(a) ................................................................................33, 34

    40 U.S.C. § 122(b) ......................................................................................33

    40 U.S.C. § 486(a) ......................................................................................15

McNamara-O'Hara Service Contract Act,

    41 U.S.C. § 6705(a) ....................................................................................43

41 U.S.C. § 6705(b)(1) ...................................................................43

Medicare Act,

    42 U.S.C. § 1395oo ...................................................................11

National Labor Relations Act,

    29 U.S.C. §§ 153-161 ...................................................................11

Natural Gas Act,

    15 U.S.C. §§ 717n-r ...................................................................11

Occupational Safety and Health Act,

    29 U.S.C. §§ 657-61 ...................................................................11

Rehabilitation Act,

    29 U.S.C. § 794a ...................................................................43

Shipping Act,

    46 U.S.C. §§ 41302-4 ...................................................................11

Social Security Act,

    42 U.S.C. § 1302(a) ...................................................................18, 19

    42 U.S.C. § 1395hh(a)(1)...................................................................18, 19

Title VI of the Civil Rights Act of 1964,

    42 U.S.C. § 2000d-1 ...................................................................33, 43

    42 U.S.C. § 2000d-3 ...................................................................34

Title VII of the Civil Rights Act of 1964,

    42 U.S.C. § 2000e-4(g)(1) ...................................................................45

    42 U.S.C. § 2000e-5 ...................................................................26

    42 U.S.C. § 2000e-5(d) ...................................................................45

    42 U.S.C. § 2000e-5(f)...................................................................25, 27

    42 U.S.C. § 2000e-8(b) ...................................................................45

ix

42 U.S.C. § 2000e-17 ........................................................................................29, 30

Title IX of the Education Amendments of 1972,

    20 U.S.C. § 1682 .........................................................................................43

Walsh-Healey Public Contracts Act,

    41 U.S.C. § 6503(b)(2) ................................................................................43

    41 U.S.C. § 6503(e) .....................................................................................43

**Executive Orders**

*Exec. Order No. 11,246, Equal Employment Opportunity, 30 Fed. Reg. 12,319
    (Sept. 24, 1965) ................................................................................ *passim*

Exec. Order No. 11,375, 32 Fed. Reg. 14,303 (Oct. 17, 1967) ....................................5

**Rules and Regulations**

41 C.F.R. § 60-1.26(a)(1)(i) .........................................................................................5

41 C.F.R. § 60-1.26(a)(1)(ii) ........................................................................................5

41 C.F.R. § 60-1.26(a)(2) .........................................................................................5, 40

41 C.F.R. § 60-1.26(b) ................................................................................................25

41 C.F.R. § 60-1.26(b)(1) ....................................................................................5, 30, 40

41 C.F.R. § 60-1.26(b)(2) .............................................................................................5

41 C.F.R. § 60-30.8 .....................................................................................................5

41 C.F.R. 60-30.9 ........................................................................................................5

41 C.F.R. 60-30.10 ......................................................................................................5

41 C.F.R. 60-30.11 ......................................................................................................5

41 C.F.R. § 60-30.14 ...................................................................................................5

41 C.F.R. § 60-30.27 ................................................................................................5, 6

41 C.F.R. § 60-30.28 ..................................................................................................25

41 C.F.R. § 60-30.30 .............................................................................................6, 40

Dep't of Labor Secretary's Order No. 01-2020, 85 Fed. Reg. 13,186 (Mar. 6, 2020) ........................................................................................................6

Dep't of Labor Secretary's Order No. 26-65 (Oct. 5, 1965), 31 Fed. Reg. 6921 (May 11, 1966) ....................................................................................................5

Discrimination on the Basis of Sex, 81 Fed. Reg. 39,108 (June 15, 2016) ..............................7, 13

Fed. R. Civ. P. 56(a) ............................................................................................................8

Government Contractors; Affirmative Action Requirements, 47 Fed. Reg. 17,770 (Apr. 23, 1982) ...................................................................................................6

Office of Federal Contract Compliance Programs Final Rulemaking, 42 Fed. Reg. 3454 (Jan. 18, 1977) ........................................................................................6

**Legislative Materials**

110 Cong. Rec. 2574 (1964) ........................................................................................25

110 Cong. Rec. 2575 (1964) ........................................................................................25

Equal Employment Opportunity Comm'n, Legislative History of Titles VII and XI of the Civil Rights Act of 1964 (Title VII Legislative History) ...................................24, 26

*Equal Employment Opportunities Enforcement Act of 1971: Hearing on S. 2515, S. 2617, and H.R. 1746 Before the Subcomm. on Labor of the Comm. on Labor & the Pub. Welfare*, 92d Cong. 80 (1971) ...................................................29

*Equal Employment Opportunity Enforcement Procedures: Hearing Before the Gen. Subcomm. on Labor of the Comm. on Educ. and Labor*, 92d Cong. 108 (1971) ........................................................................................................29

H.R. Rep. No. 81-670 (1949) ......................................................................................14

H.R. Rep. No. 88-914 (1963) ......................................................................................24

H.R. Rep. No. 107-479 (2002) ....................................................................................16

H.R. Rep. No. 116-62 (May 15, 2019) .........................................................................34

S. Rep. No. 81-475 (1949) ..........................................................................................14

Subcomm. on Labor of the Comm. on Labor and Pub. Welfare, 92d Cong., Legislative History of the Equal Employment Opportunity Act of 1972 (EEOA Legislative History) ...............................................................27, 28, 30

**Other Authorities**

Christopher J. Walker & Melissa F. Wasserman, *The New World of Agency Adjudication,* 107 Cal. L. Rev. 141 (2019) ...............................................................12

DOJ, *Consumer Protection Branch*, https://tinyurl.com/qoox2oq (last visited Apr. 14, 2020) ..............................................................................................................44

Federalist No. 47 (James Madison) .......................................................................3, 12

Office of Federal Compliance Programs, *Federal Contract Compliance Manual*, Introduction (2019) ..............................................................................................31

Office of Federal Compliance Programs, History of Executive Order 11,246, https://tinyurl.com/ta66tdy........................................................................................11

Restatement (Second) of Contracts (1981) .................................................................43

U.S. Chamber of Commerce, *OFCCP Right Mission, Wrong Tactics Recommendations for Reform* 20 (2017), https://tinyurl.com/y7usygqh................................19

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ALJ | Administrative Law Judge |
| APA | Administrative Procedure Act |
| ARB | Administrative Review Board |
| CDA | Contract Disputes Act of 1978 |
| DOJ | Department of Justice |
| DOL | Department of Labor |
| EEOA | Equal Employment Opportunity Act of 1972 |
| EEOC | Equal Employment Opportunity Commission |
| EO | Executive order |
| GSA | General Services Administration |
| HHS | Department of Health and Human Services |
| OFCCP | Office of Federal Contract Compliance Programs |
| Procurement Act | Federal Property and Administrative Services Act of 1949 |
| SSA | Social Security Act of 1935 |

## INTRODUCTION

Under our democratic system, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This case is about an executive agency that defies this foundational principle. The Office of Federal Contract Compliance Programs (OFCCP), a powerful but little-known agency within the Department of Labor (DOL), prosecutes employment-discrimination and affirmative-action claims against federal contractors before in-house administrative tribunals. The adjudications are trials: An administrative law judge (ALJ) resolves motions, receives evidence and witnesses, holds argument, and recommends findings and decisions on the merits. To top it off, at the close of these proceedings, the agency issues far-reaching relief against contractors determined to have violated its regulations, including class-wide money damages and injunctions.

There's just one problem: Congress never authorized OFCCP to do any of this. One could search the volumes of the U.S. Code in vain for any delegation of authority to the President, DOL, or OFCCP to prosecute, adjudicate, and remediate employment-discrimination and affirmative-action claims. Perhaps that explains why OFCCP has for decades justified this regime based not on any specific statute, but on an executive order (EO). Specifically, it has relied on Executive Order 11,246 (as amended) to support its administrative adjudication and remediation regime. But an executive order alone cannot supply the requisite authorization: "[A]n agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986). And OFCCP's regime goes far beyond EO 11,246 in any event.

Only very recently in rulemaking has OFCCP justified its regime, at least in part, on a statute. In a 2016 rule expanding its administrative regime, OFCCP relied on the Federal Property and Administrative Services Act of 1949 (the Procurement Act). That Act empowers

the President to "prescribe policies and directives" to ensure "an economical and efficient system for … [p]rocuring and supplying property and nonpersonal services." 40 U.S.C. §§ 101, 121(a). That does not come close to authorizing the regime. It says nothing about OFCCP, enforcement powers, agency adjudication, or retrospective remediation. To make matters worse, as the Supreme Court has noted, "nowhere in the [Procurement] Act is there a specific reference to employment discrimination." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979).

The absence of statutory authority is enough to doom OFCCP's regime. But OFCCP's legal problems do not end there. OFCCP's regime conflicts with Acts of Congress, including employment-discrimination statutes. In enacting and amending Title VII of the Civil Rights Act, Congress refused to grant the executive branch the authority OFCCP now claims. Congress also expressed its view that OFCCP was an agency of far more limited scope, and Congress mandated a judicial dispute-resolution mechanism for claims of discrimination by private employers— rejecting an administrative regime like the one OFCCP has created. Likewise, OFCCP's regime is inconsistent with the Contract Disputes Act (CDA). The CDA requires that any suit related to government contracts be brought within six years of the claim accruing and allows for *de novo* review of the agency's decision in federal court. By contrast, OFCCP has insisted that it can bring suits against contractors with no limitations period whatsoever and that orders of adjudication under OFCCP's regime receive deferential judicial review.

Oracle opposes discrimination in all forms. It does not challenge OFCCP's compliance, audit, and conciliation programs. Instead, Oracle challenges OFCCP's enforcement regime of administrative prosecution, adjudication, and remediation of legal claims. Oracle does not do so to circumvent or undermine the antidiscrimination laws enacted by Congress. It does so to vindicate those statutes, which establish a specific framework for government enforcement of

employment-discrimination laws that runs through the Department of Justice (DOJ), the Equal

Employment Opportunity Commission (EEOC), and—most importantly—federal courts.  "It is

central to the real meaning of the rule of law … that a federal agency does not have the power to

act unless Congress, by statute, has empowered it to do so."  *Transohio Savings Bank v. Dir.,*

*Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) (quotation marks omitted),

*abrogated in part on other grounds by Perry Capital v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir.

2017); *see, e.g.*, *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir.

2004).  This principle is of immense importance to the proper functioning of our government and

the separation of powers upon which it is based.  It would be unprecedented if an executive

agency were permitted to also act as a legislature, grant itself judicial powers to adjudicate

disputes, and impose coercive sanctions all without Congress's approval.  James Madison

warned at the Founding that such "accumulation of all powers, legislative, executive, and

judiciary, in the same hands, … may justly be pronounced the very definition of tyranny."

Federalist No. 47 (James Madison).  That is why Oracle brings this suit.

This Court should grant Oracle's Motion for Summary Judgment and declare the

regulations underlying OFCCP's unlawful regulatory regime *ultra vires* and unconstitutional.

## BACKGROUND

Without congressional authorization, OFCCP has unilaterally established an expansive

administrative regime for prosecution, adjudication, and remediation of employment-

discrimination and affirmative-action claims that goes beyond even the executive order that the

agency purportedly implements.

***President Johnson Issues Executive Order 11,246, Enacting A Narrow Equal Opportunity Enforcement Regime In The Department Of Labor.***

In 1965, President Johnson issued EO 11,246—the same order that, as amended, presently governs.  *See* Executive Order 11,246, Equal Employment Opportunity, 30 Fed. Reg. 12,319 (Sept. 24, 1965).  Like earlier executive orders, it required federal contracts to include an "Equal Opportunity Clause"—a provision barring discrimination and requiring affirmative action in employment based on race, creed, color, and national origin.  It charged the Secretary of Labor with enforcement.  It made no mention of any specific statutory authorization.

EO 11,246 purported to provide the Secretary with only limited enforcement authority. She could "investigate the employment practices of any Government contractor" to determine whether the Equal Opportunity Clause was violated.  § 206(a).  She could convene a hearing before "imposing, ordering, or recommending the imposition of penalties and sanctions." § 208(b).  But the range of "sanctions and penalties" authorized was narrow.  The Executive Order permitted the Secretary to publish the names of violating contractors, § 209(a)(1), "[c]ancel, terminate, [or] suspend" contracts, § 209(a)(5), and provide that agencies "refrain from entering into further contracts … with any noncomplying contractor," known as debarment, § 209(a)(6).  If the Secretary believed other relief was necessary, the Executive Order provided for the Secretary to refer the matter to another agency to bring suit in federal court.  § 209(a)(2)-(4).  When there was a "substantial or material violation" of the Equal Opportunity Clause, the Secretary could refer the matter to DOJ for "appropriate proceedings" in federal court. § 209(a)(2).  The Secretary could also refer cases to DOJ or EEOC for Title VII proceedings in federal court.  § 209(a)(3).  And the Secretary could ask DOJ to bring criminal proceedings against contractors that furnished false employment information.  § 209(a)(4).

After President Johnson issued EO 11,246, the Secretary created the Office of Federal Contract Compliance and delegated to it the Executive Order's enforcement responsibilities. *See* DOL Secretary's Order No. 26-65 (Oct. 5, 1965), 31 Fed. Reg. 6921, 6921 (May 11, 1966). In 1967, President Johnson amended EO 11,246 to bar discrimination by contractors based on sex. Exec. Order No. 11,375, 32 Fed. Reg. 14,303 (Oct. 17, 1967).

### *OFCCP Enacts An Expansive, Extra-Statutory Adjudicative Regime That Exceeds Even The Executive Order.*

In purportedly implementing EO 11,246, OFCCP has promulgated regulations that far outstrip what even the Executive Order ostensibly allows, establishing an expansive administrative regime to adjudicate enforcement actions in agency trials.

Notwithstanding the Executive Order's provisions that the Secretary refer matters to DOJ and EEOC for "appropriate proceedings" in the federal courts, § 209(a)(2), (a)(3), OFCCP's regulations allow it to initiate administrative proceedings within DOL if it receives a complaint or performs a compliance evaluation indicating a violation of the Equal Opportunity Clause, 41 C.F.R. § 60-1.26(a)(1)(i)-(ii), (b)(1). The proceedings are conducted under the supervision of the Solicitor of Labor and adjudicated by a DOL ALJ. *Id.* §§ 60-1.26(b)(2), 60-30.14. The ALJ resolves motions, receives evidence and testimony, and holds oral argument. *Id.* §§ 60-30.8, 60-30.9-.11, 60-30.14. At the end of the trial, the ALJ "recommend[s] findings, conclusions, and a decision" as to whether the contractor violated the Equal Opportunity Clause and, if so, what sanctions to impose. *Id.* § 60-30.27. Significantly, the agency's self-proclaimed authority includes imposing sanctions such as "back pay and other make whole relief for victims of discrimination identified during a complaint investigation," *id.* § 60-1.26(a)(2), (b)(2)—relief unmentioned in EO 11,246.

5

The ALJ's recommended findings, conclusions, and decision are then considered by the Administrative Review Board (ARB).  41 C.F.R. § 60-30.27.  The ARB issues DOL's final order, which must "enjoin[] the violations" and provide "whatever" other relief is "appropriate," *id.* § 60-30.30, subject to discretionary review by the Secretary, DOL Secretary's Order No. 01-2020, 85 Fed. Reg. 13,186, 13,188 (March 6, 2020).  The regulations do not specifically provide for judicial review; rather, if a party seeks judicial review, DOL's findings and conclusions are reviewed under the Administrative Procedure Act (APA).  5 U.S.C. § 706.

### *OFCCP Never Claims In Rulemaking Any Statutory Authority For Its Regime Of Administrative Adjudication, Until The Agency Cites The Procurement Act In 2016.*

As OFCCP has arrogated power to itself in rulemakings over the years, it has continuously invoked EO 11,246 as the basis for its authority.  Stakeholders and legal commentators have been skeptical.

For example, in 1977, several commenters contended that, even under EO 11,246, the agency's authority was limited to "prospective" relief because the Executive Order "contains no provision authorizing remedial relief."  Office of Federal Contract Compliance Programs Final Rulemaking, 42 Fed. Reg. 3454, 3456 (Jan. 18, 1977).  The agency responded that "it has been OFCCP policy for a number of years that affected class and back pay relief are authorized by the Executive Order."  *Id.*  It offered that this policy "was recently upheld in *U[nited States] v. Duquesne Light Co.*," which, in fact, upheld *DOJ's* authority to seek backpay in *federal court*— not OFCCP's authority to order such relief via in-house adjudications.  423 F. Supp. 507, 508-11 (W.D. Pa. 1976).  OFCCP offered nothing else to justify its claim to such authority.

Questions about the agency's authority persisted, and so several years later, OFCCP took the unusual step of reexamining the scope of its authority.  It asked for further comment on "whether the President has authority to recover back pay relief" under EO 11,246.  Government

Contractors; Affirmative Action Requirements, 47 Fed. Reg. 17,770, 17,773 (Apr. 23, 1982). Commenters reiterated that the agency lacked this authority, but OFCCP maintained it had broad, non-statutory remedial power.  *Id.*  It insisted that it has "historically maintained that it c[ould] seek back pay … and has recovered back pay since at least 1967."  *Id.*  And it stated, without explanation, that "the Executive Order vests OFCCP with the legal authority to seek back pay for victims of discrimination."  *Id.*  OFCCP did not say what part of EO 11,246 supplied the authorization, nor did it identify any statutory delegation of necessary authority.

In 2016, for the first time ever, OFCCP invoked a statutory source of authority in a rulemaking.  OFCCP issued a final rule overhauling how it would enforce and adjudicate sex-discrimination claims.  Discrimination on the Basis of Sex, 81 Fed. Reg. 39,108 (June 15, 2016). In that rule—after decades of silence on the source of any congressional authorization across all its rulemakings—OFCCP finally mentioned the Procurement Act.  *Id.* at 39,118 & n.80.  It briefly noted that the Act "authorizes a broad array of government contracting requirements … to achieve that act's goal of economical and efficient procurement."  *Id.* (citing 40 U.S.C. §§ 101, 121(a)).  OFCCP invoked no other source of statutory authority.

### *Oracle Brings This Suit Challenging The Legality Of OFCCP's Adjudication Regime.*

Oracle filed this lawsuit in November 2019, contending that OFCCP's enforcement regime is *ultra vires* and unconstitutional.  ECF 1, Compl.  Oracle maintains numerous contracts with the federal government, Stmt. Undisputed Facts ¶ 1, and OFCCP considers Oracle subject to EO 11,246's requirements because of these contracts, *id.* ¶ 2; *see* ECF 12-1, Defs. MTD 1-2. Oracle is also currently a defendant in an administrative lawsuit brought by OFCCP within DOL. Stmt. Undisputed Facts ¶¶ 2-4.  Oracle therefore has a concrete interest in the legality of OFCCP's enforcement regime.

Per this Court's order, ECF 9, Oracle files this Motion for Summary Judgment and its Opposition to Defendants' Motion to Dismiss, ECF 12. Oracle's filings also address the arguments raised by Proposed Intervenors in their proposed dispositive motion, ECF 11-1.

## LEGAL STANDARD

A party is entitled to summary judgment if it shows "there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party seeks review of agency action under the APA, "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Summary judgment thus "serves as the mechanism for deciding, as a matter of law, whether the agency action" contravenes the APA. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006); *see Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). The APA authorizes judicial review of final agency action for which there is "no other adequate remedy." 5 U.S.C. § 704. As relevant here, the APA provides that a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory … authority" or "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B), (C).

## ARGUMENT

OFCCP has constructed a massive administrative structure—spanning prosecution, adjudication, and remediation of employment-discrimination and affirmative-action claims against government contractors—that must topple. The reason: It is built on nothing. Congress has provided no foundation. OFCCP has exercised quasi-legislative authority in promulgating the rules and regulations undergirding its sweeping creation, but only the legislature can delegate that authority to an agency, and, here, it has not. The Procurement Act, the sole legislative basis OFCCP has invoked in rulemaking and Proposed Intervenors invoke here, does not provide any

support for this adjudicative regime.  In addition, Title VII of the Civil Rights Act, as well as the

CDA, conflict with OFCCP's regime.  Given these problems, the regulations underlying

OFCCP's administrative-enforcement regime must be declared *ultra vires* and unconstitutional.

## I.     The Procurement Act Does Not Authorize OFCCP's Adjudication Regime.

The fatal shortcoming of OFCCP's prosecution, adjudication, and remediation regime is

that Congress never authorized it.  As "a creature of statute," "a federal agency … ha[s] no

constitutional or common law existence or authority, but *only* those authorities conferred upon it

by Congress."  *Cal. Indep. Sys. Operator*, 372 F.3d at 398 (quoting *Atl. City Elec. Co. v. FERC*,

295 F.3d 1, 8 (D.C. Cir. 2002)).  "[A]n agency literally has no power to act … unless and until

Congress confers power upon it."  *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

The Supreme Court has emphasized the need for congressional authorization with regard

to OFCCP in particular.  *Chrysler*, 441 U.S. at 304-06 & nn.34-36 (noting that "[t]he origins of

the congressional authority for [EO 11,246] are somewhat obscure and have been roundly

debated by commentators and courts," and reserving the question).  Specifically, the Court has

underscored that "[t]he legislative power of the United States is vested in the Congress, and the

exercise of quasi-legislative authority by governmental departments and agencies"—such as

OFCCP's promulgation of regulations purporting to have the force and effect of law—"must be

rooted in a grant of such power by the Congress and subject to limitations which that body

imposes."  *Id.* at 302.  Thus, here, "[t]he pertinent inquiry is whether" there is a "*statutory* grant[]

of authority" for the OFCCP regulations creating its adjudication regime.  *Id.* at 306.

The answer is no.  Any statutory grant of authority must be clear.  § I.A.  Against that

standard, the sole statutory basis OFCCP has ever offered is the Procurement Act, which plainly

falls short.  OFCCP's adjudication regime finds no basis in the text and context of the Act.  § I.B.

A contrary conclusion is only more implausible in light of Title VII and the CDA, which are contrary to OFCCP's regime.  § I.C.  And any attempt to stretch the Procurement Act to authorize OFCCP's regime would violate the nondelegation doctrine.  § I.D.

>    **A.      Any statutory authority for OFCCP's regime must be clear, particularly**
>    **given the regime's breadth and adjudicative nature.**

OFCCP's adjudication regime is invalid to the extent it is not clearly authorized by statute.  Where neither an "Act's text, structure, []or context evince an intent by Congress to empower [an agency] to issue a rule," the rule is "invalid," notwithstanding any "wisdom" the "policy" might have.  *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 84 (D.D.C. 2019), *appeal filed*, No. 19-5222 (D.C. Cir. Aug. 22, 2019).  That is because an agency "cannot do more than what Congress has authorized.  The responsibility rests with Congress to act in the first instance."  *Id.*  The need for clear congressional authorization serves as a check on agency action even with respect "to the statutes that they implement," where agencies "typically enjoy expansive authority."  *Id.*  Notably, no such statute is at issue here— OFCCP does not implement the Procurement Act, which does not even mention the agency.[2]

In keeping with the above, an agency's statutory authority "may not be lightly presumed."  *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001).  "Mere ambiguity" or silence "in a statute is not evidence of congressional delegation of authority."  *Id.*; *accord Atl. City Elec. Co.*, 295 F.3d at 8-9; *Merck*, 385 F. Supp 3d at 92-93.

---

[2] Defendants contend that OFCCP "enforce[s] … EO 11,246," not the Procurement Act.  Defs. MTD 2.  Proposed Intervenors argue that OFCCP's regime "implement[s]" the Executive Order, not the Procurement Act.  Prop. Intrvrs. Br. 21.  As detailed below (*infra* § I.B.2), the Administrator of the General Services Administration has exclusive rulemaking authority under the Procurement Act, 40 U.S.C. § 121(c), that cannot be delegated to other executive agencies under these circumstances, *id.* § 121(d)(2)(A).

Here, the need for clear congressional delegation of authority is evident given the sheer breadth of OFCCP's regime.  Government contractors that OFCCP regulates employ "approximately one-fifth of the entire U.S. labor force"—around 32 million workers.  OFCCP, History of Executive Order 11,246, https://tinyurl.com/ta66tdy (last visited April 24, 2020).  A regime affecting so much of the economy must rest on a clear statutory directive; Congress "does not … hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see, e.g.*, *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (Kavanaugh, J.) (rejecting IRS position that would have "empowered [it] … to regulate hundreds of thousands of individuals in the multi-billion dollar tax-preparation industry" when "nothing in the statute's text or the legislative record contemplate[d] that vast expansion of the IRS's authority").

Further punctuating the need for a clear statutory directive is that OFCCP has created a system of administrative adjudication.  The creation and operation of this system exercises quasi-legislative and judicial powers that require authorization by Congress.  *See, e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851-57 (1986).  Indeed, when Congress authorizes administrative adjudication, it does so expressly within a highly reticulated statutory regime.[3]  The multitude of statutes in which Congress has explicitly—and in great clarity and detail—authorized the government to bring administrative lawsuits to be adjudicated in-house

---

[3] *See, e.g.*, Occupational Safety and Health Act, 29 U.S.C. §§ 657-61 (delineating DOL's investigation, enforcement, and adjudicative authority, including the ability to hold hearings and seek particular penalties, as well as providing for judicial review); National Labor Relations Act, 29 U.S.C. §§ 153-161 (same for NLRB); Commodity Exchange Act, 7 U.S.C. § 18 (setting out procedures for administrative adjudications of damage claims by agency; specifying mechanisms for appeal, enforcement, and judicial review of agency's orders); Natural Gas Act, 15 U.S.C. §§ 717n-r (detailing agency's authority to investigate complaints, hold hearings, and issue orders; providing for judicial review of agency's adjudications); Medicare Act, 42 U.S.C. § 1395oo (providing agency adjudicatory authority; detailing standards for review, finality, and appeal rights); Shipping Act, 46 U.S.C. §§ 41302-04 (authorizing agency to investigate complaints, conduct discovery, hold hearings, and issue orders).

shows that anything less is insufficient.  *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995) (because agencies are not normally authorized to sue, when Congress wants agencies to have standing to sue, "[it] says so"); *Bauer v. Marmara*, 774 F.3d 1026, 1033 (D.C. Cir. 2014) ("The express inclusion in some statutes of language granting … [a certain right] certainly suggests that Congress did not intend for such a right to be implied in the absence of express authorization."). Tellingly, the Supreme Court has never sustained administrative adjudication in the absence of express statutory authorization.  *See, e.g.*, *Coit Indep. Joint Venture v. Fed. Savings & Loan Ins. Corp.*, 489 U.S. 561, 574 (1989) ("[W]hen Congress meant to confer adjudicatory authority on [an agency] it did so explicitly and set forth the relevant procedures in considerable detail.").

Moreover, the adjudicative regime created by OFCCP raises heightened constitutional concerns because of the multiple roles the government plays, thereby making the need for congressional clarity even more pressing.  The executive branch is simultaneously the contracting party, rule maker, prosecutor, and judge.  Because of this dynamic, the executive has a vested interest in the outcome of proceedings and is not neutral.  *See* The Federalist No. 47, *supra*.  Extra caution therefore must be exercised before concluding that Congress intended to displace an impartial judicial forum—and its attendant due-process protections—with administrative adjudication.  *See Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1380-81 (2018) (Gorsuch, J., dissenting); Christopher J. Walker & Melissa F. Wasserman, *The New World of Agency Adjudication,* 107 Cal. L. Rev. 141, 186-87 (2019) (agencies' statutory authority should be interpreted narrowly to avoid due-process concerns from adjudication by non-neutral executive officials).

### B.      The Procurement Act provides no statutory authorization.

Four years ago, after decades of relying in rulemakings on only EO 11,246 and its own historical practice, OFCCP cited the Procurement Act for the first time as the statutory basis for its regulations.  The agency asserted that "[the Act] authorizes a broad array of government contracting requirements, including E.O. 11,246's nondiscrimination requirements, to achieve that act's goal of economical and efficient procurement."  81 Fed. Reg. at 39,118 & n.80 (citing 40 U.S.C. §§ 101, 121(a)).[4]  Even that statement makes no attempt to justify the remedies in OFCCP's regime.  In any event, OFCCP's passing effort to retroactively validate its adjudication regime fails.  The Act is silent about OFCCP and its regime.  § I.B.1.  The Act furnishes OFCCP no rulemaking authority.  § I.B.2.  The Act cannot be used to justify a regime that has (at best) no more than an oblique relationship to economy and efficiency in procurement, § I.B.3, and Proposed Intervenors' invocation of old, inapposite caselaw does not show otherwise, § I.B.4.

### 1.      The Procurement Act is silent as to OFCCP and its regime.

Nothing in the Procurement Act authorizes OFCCP's prosecution and remediation regime.  The Act concerns the President's procurement authority—who the government will contract with and on what terms, and how it manages its property.  The Act does not authorize OFCCP to establish and operate an invasive agency-enforcement and -adjudication regime.

The Procurement Act "was designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector."  *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Kahn*, 618

---

[4] The Procurement Act is also the sole statutory basis Proposed Intervenors offer as authorization.  Prop. Intrvrs. Br. 21-41.  The States' amicus brief mentions the Rehabilitation Act and Vietnam Era Veterans' Readjustment Assistance Act as bases of "OFCCP's authority," ECF 15-1 at 2, but those statutes involve other aspects of OFCCP's regime not at issue here.  Defendants concede that those statutes are not relevant to this case.  Defs. MTD 2 n.1.

F.2d 784, 787 (D.C. Cir. 1979) (en banc).  Congress passed the Act "[t]o simplify the procurement, utilization, and disposal of Government property" and "reorganize certain agencies of the Government."  63 Stat. 377 (1949).  The House Committee Report, recognizing "[t]he need for an improved and efficient property management program," explained that the Act "establishes [the] General Services Administration [GSA], headed by an Administrator, answerable directly to the President, who would concern himself with the procurement, utilization, and disposal of Governmental property," so that "great strides can be made in increased efficiency and economy of operation of the Federal Government."  H.R. Rep. No. 81-670, at 1-2 (1949); *accord* S. Rep. No. 81-475, at 1 (1949).

Unsurprisingly, given the Procurement Act's singular focus on the President's procurement authority in furtherance of economy and efficiency objectives, nothing within it authorizes OFCCP's regime of administrative prosecution, adjudication, and remediation of legal claims, particularly given that regime's emphasis on social objectives.  The text is silent on several fundamental issues one would expect from a statute authorizing OFCCP to construct a comprehensive administrative regime for prosecution, adjudication, and remediation of employment-discrimination and affirmative-action violations.  The Act does not mention DOL or OFCCP.  Also, "nowhere in the Act is there a specific reference to employment discrimination." *Chrysler*, 441 U.S. at 304 n.34.  Nor is there reference to affirmative action, or to prosecution, adjudication, or remediation in either respect.  The legislative history is similarly silent.  That is dispositive:  Congressional authorization—especially of an administrative adjudication regime as expansive as OFCCP's—does not spring from such a void.  *Supra* § I.A.

### 2.      The Procurement Act does not provide OFCCP rulemaking authority.

Another key problem with OFCCP's reliance on the Procurement Act is that the Act does not authorize OFCCP to engage in any rulemaking whatsoever.  The Act specifically vests all rulemaking authority related to the Act in the GSA Administrator, not DOL or OFCCP.  40 U.S.C. § 121(c).  The Act forbids the Administrator from delegating "the authority to prescribe regulations on matters of policy applying to executive agencies," *id.* § 121(d)(2)(A), preventing DOL or OFCCP from receiving rulemaking authority indirectly, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 521 (S.D.N.Y. 2019), *appeal filed*, Nos. 20-31, 20-32, 20-41 (Jan. 3, 2020 2d Cir.)—not that OFCCP, Proposed Intervenors, or amici have identified any attempt by the GSA Administrator to delegate authority to DOL or OFCCP anyway.  That ends the matter:  DOL and OFCCP have no authority to promulgate any regulations under the Act.  Agencies, like courts, "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994).

The two provisions of the Procurement Act that OFCCP has invoked do not change the analysis.  The first, 40 U.S.C. § 101, explains that the Act's purpose is "to provide the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions," "[u]sing available property," "[d]isposing of surplus property," and "[r]ecords management."  The second, 40 U.S.C. § 121(a), authorizes the President to "prescribe … policies and directives" to guide executive agencies and officials in pursuit of these objectives.  *See* 63 Stat. at 389, § 205(a), *previously codified* at 40 U.S.C. § 486(a) (the "policies and directives shall govern the [GSA] Administrator and executive

15

agencies in carrying out their respective functions hereunder").[5]  In tandem, these provisions authorize the President to centralize government contracting, insist on inclusion of certain terms in government contracts to obtain less costly and more quickly delivered products and services, and direct government-property management.  They cannot be read to delegate to the President rulemaking authority that the Act specifically provides to a different entity and bars that entity from transferring.  OFCCP thus cannot draw rulemaking authority from the President via executive order.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specific statutory provision trumps a more general one, as when "a general authorization and a more limited, specific authorization exist side-by-side," which avoids "superfluity").

That conclusion is reinforced by the limited meaning of "policies and directives."  *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (delegation to the Secretary of Labor to prescribe "standards" was limited and did not "empower the Secretary to regulate the scope of the judicial power vested by the statute").  In administrative law, "policies and directives" govern how executive-branch officials must act, rather than create or alter a private party's rights and obligations.  *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-53 (D.C. Cir. 2014).  The original language of the "policies and directives" provision—the meaning of which has not changed, *supra* 15-16 & n.4—confirms this usage:  The policies and directives are aimed at how executive agencies "carry[] out their respective functions []under" the Act, 63 Stat. at 389, § 205(a).  That has nothing to do with granting authority to the President to promulgate rules for creating an administrative adjudicative and remediation regime.

---

[5] Although Congress in 2002 removed the reference to policies and directives "govern[ing] … executive agencies," that was part of ongoing housekeeping efforts in the United States Code, and thus "ma[de] no substantive change in the law."  H.R. Rep. No. 107-479, at 3 (2002).

At most, the President could order the GSA Administrator to delegate rulemaking authority, but the Administrator would still have to act on that order, and she could not because the Act prohibits it. *See Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016) ("[S]tatutory grants of authority to executive departments or agencies[] … flow from a source independent from the President … [who] cannot take away the agency's statutory authority *or exercise it himself*." (emphasis added) (citing *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 493 (2010))); *Nat'l Fed'n of Fed. Emps., Local 1622 v. Brown*, 645 F.2d 1017, 1022 (D.C. Cir. 1981) (although "the President may direct his [agency] subordinates' choices," he may do so only "[w]ithin the range of choice allowed by statute").

### 3. The Act's focus on procurement cannot justify OFCCP's adjudication regime, even if OFCCP had rulemaking authority under the Act.

Even indulging the notion that OFCCP somehow has rulemaking authority with respect to the Procurement Act, that authority could not confer the vast power to regulate into existence an administrative system to prosecute, adjudicate, and remediate employment-discrimination claims and affirmative-action violations. The fundamental problem remains: OFCCP's administrative system is simply too far afield from the procurement authority with which the Act is concerned. *See supra* § I.B.1. The Act cannot justify a regime it does not address.

The case in point is this Court's decision *Merck*, 385 F. Supp. 3d 81, which refused to find statutory authority for a rule just because it was promulgated to advance the goals of a statute that the agency administered. The Department of Health and Human Services (HHS) issued a rule compelling drug companies to disclose the wholesale prices of drugs marketed in television advertisements, invoking its authority to administer the Social Security Act (SSA). *Id.* at 84. The SSA "contain[ed] no explicit delegation of authority to HHS to regulate the televised marketing of drugs," *id.* at 89, but did "broad[ly] grant[] … rulemaking authority" to the HHS

Secretary:  It charged him with (1) "'mak[ing] and publish[ing] such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which' he is charged by the SSA, which include the Medicare and Medicaid programs"; and (2) "'prescrib[ing] such regulations as may be necessary to carry out the administration of the insurance programs under th[e] subchapter' … establish[ing] the Medicare program," *id.* at 90 (quoting 42 U.S.C. §§ 1302(a), 1395hh(a)(1)).  HHS argued that "Congress … explicitly directed HHS to operate Medicare and Medicaid programs efficiently," and that the agency's price-disclosure rule was valid because it "was designed to advance that directive by lowering the costs that public health insurance programs pay for prescription drug benefits."  *Id.* at 85 (quotation marks and citations omitted).

This Court disagreed because "the basic power that Congress gave to the Secretary was to establish rules and regulations for 'running' or 'managing' the federal public health insurance programs" and HHS's rule sought "to do more than that."  *Id.* at 90.  The "pricing decisions" of drug manufactures "of course[] affect[ed] the cost of pharmaceutical benefits offered under the Medicare and Medicaid programs," but only "in an indirect way."  *Id.* at 91.  Thus, "[t]he plain statutory text simply d[id] not support the notion … that Congress intended for the Secretary to possess the far-reaching power to regulate the marketing of prescription drugs."  *Id.*

The Procurement Act's lack of authorization here is even more evident.  OFCCP possesses no general rulemaking authority under the Act, unlike HHS under the SSA, depriving OFCCP of HHS's rejected argument from the start.  *See supra* § I.B.2.  But even putting that aside, to the extent the President's ability to issue "policies and directives" and the GSA Administrator's rulemaking authority matter, they extend only to "carry[ing] out" the Act's procurement function, 40 U.S.C. § 121(a), (c)(1), just as the HHS Secretary's relevant province

is only "administration" of SSA insurance programs, 42 U.S.C. §§ 1302(a), 1395hh(a)(1).  And like the SSA and the regulation of televised drug marketing, the Procurement Act nowhere lays out a regime for prosecution, adjudication, or remediation of employment-discrimination and affirmative-action claims.  That is not a recipe for authorization:  "An agency's general rulemaking authority plus statutory silence does not … equal congressional authorization." *Merck*, 385 F. Supp. 3d at 92.  "Nor does the absence of an express limitation" enable OFCCP "to arrogate to itself the power to regulate [an issue on which the Act is silent] as a means of improving the efficiency of" procurement.  *Id.* at 93.  "[T]he mere absence of an express statutory restriction is not a blank check to regulate on any subject matter that might conceivably advance a legislative purpose."  *Id.* at 94.

Thus, even if OFCCP's regime, like the rule in *Merck*, advanced the Procurement Act's interest in economy and efficiency in government procurement "in an indirect way," that would be insufficient.  *Id.* at 91.  Indeed, EO 11,246, which OFCCP's regime supposedly implements, does not refer to the Act or contain the words "economy" or "efficiency."  And it is doubtful that OFCCP's regime actually advances either objective, even indirectly.[6]

To vindicate their contrary understanding of the Procurement Act, Proposed Intervenors rely on *Kahn*, 618 F.2d 784.  Prop. Intrvrs. Br. 23-24.  But it does not support their view.  What *Kahn* upheld is nothing like the vast regime for administrative prosecution, adjudication, and

---

[6] For example, OFCCP's regime costs the government tens of millions of dollars every year. And subjecting contractors to the regime—denying them the protections Congress has provided elsewhere, *see infra* 24-27, 30-32, 33, 42-43—likely "creates an enormous disincentive for contractors to maintain or pursue government contracts notwithstanding a commitment to strong equal employment opportunity policies."  *See* U.S. Chamber of Commerce, *OFCCP Right Mission, Wrong Tactics Recommendations for Reform* 20 (2017), https://tinyurl.com/y7usygqh; *cf. Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 601-02 (1983) (White, J.) ("[L]iability for unintended discrimination might well dissuade potential nondiscriminating recipients from participating in federal programs, thereby hindering the objectives of the funding statutes.").

remediation that OFCCP created.  Rather, *Kahn* sustained an executive order and agency policy

that, "to relieve the distress caused" by "a cruel period of economic inflation," required major

federal contractors to satisfy wage and price controls.  618 F.2d at 785-86, 796.  *Kahn* held that

there was a "sufficiently close nexus" between such controls and the economy and efficiency

goals of the Procurement Act.  *Id.* at 792.  Importantly, the court emphasized the narrowness of

its decision, stressing that it did "not write a blank check for the President to fill in at his will";

instead, "[t]he procurement power must be exercised consistently with the structure and purposes

of the statute that delegates that power."  *Id.* at 793 ("emphasiz[ing] the importance to our ruling

today of the nexus between the wage and price standards and likely [government] savings").[7]

Kahn thus cannot save OFCCP's regime from a *Merck*-type analysis.  *Kahn* confirms that

the authority the Act grants the President is "the procurement power."  *Id.*; *see id.* at 789-90, 792;

*supra* § I.B.1.  That power is not quasi-legislative rulemaking and adjudicatory authority that can

sustain agency regulations creating a sprawling regime of administrative prosecution,

adjudication, and remediation of legal claims.  *See supra* 9, 11-12.  Rather, under *Kahn*, the

power allows the President to insist on certain terms in government contracts, such as wage and

price restrictions.  618 F.2d at 785-86, 796; *see id.* at 794 (noting the government's power "'to

determine those with whom it will deal, and to fix the terms and conditions upon'" purchases).[8]

---

[7] *Kahn*'s concurrences, necessary for the majority, stressed the same.  *See id.* at 796-97 (Bazelon, J., concurring) ("I write only to emphasize the close nexus between the Order and the objectives of the Procurement Act, and to underscore my understanding that nothing in the court's opinion intimates any views on the validity of other Executive Orders issued explicitly or implicitly pursuant to the authority granted by the Procurement Act[.]"); *id.* at 797 (Tamm, J., concurring) ("Lest we later be construed as having broadly interpreted the Procurement Act, I write separately only to emphasize my belief that the opinion we issue today is a narrow one.  It does not allow the President to exercise powers that reach beyond the Act's express provisions.").

[8] Proposed Intervenors cite cases similar to *Kahn* that fall to the same analysis.  They contend that "the D.C. Circuit and this Court … have repeatedly concluded that … Executive Order

Nor is anything to the contrary indicated by *Kahn*'s discussion of out-of-circuit decisions suggesting that the Procurement Act authorizes EO 11,246. *See id.* at 790-92. *Kahn* did not endorse that conclusion. *Id.* Even if *Kahn* had, that would have been (dubious) dictum. *See id.* at 791 (noting that "[t]he only direct court holding on the validity of the anti-discrimination [EOs] was" in *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159 (3d Cir. 1971), which "offered several alternative holdings" and "the vitality of two of the claimed bases … is subject to question"); *id.* at 796-97 (Bazelon and Tamm, JJ., concurring); *see also infra* § I.B.4. Moreover, Oracle's challenge does not necessarily turn on the validity of EO 11,246. Even if certain aspects of that order could be found to fall within the procurement power and be justified on economy or efficiency grounds, OFCCP's sweeping regime of administrative enforcement and adjudication is another story. *Kahn* says nothing about, and certainly does not endorse, that regime, which crucially depends on rulemaking and adjudicatory authority that *Kahn* does not address. And any "nexus" the regime might have with economy and efficiency "is simply too attenuated to allow a reviewing court to find the requisite connection," *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981), both under *Kahn* and *Merck*, *see supra* 19 & n.5.

---

11,246 … fall[s] within the scope of" the President's authority under the Procurement Act. Prop. Intrvrs. Br. 22-25 (citing *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003), *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp. 3d 7 (D.D.C. 2015) (*NAM*)). Not so. Neither *UAW* nor *NAM* held anything with respect to EO 11,246. *UAW* addressed EO 13,201, under which certain federal contracts "must include a provision requiring contractors to post notices at all of their facilities informing employees" of protections against "being forced to join a union or to pay mandatory dues for costs unrelated to representational activities." 325 F.3d at 362. *NAM* addressed EO 13,496 and a related regulation that "require[] as a condition of nearly all federal contracts that contractors post workplace notices informing their employees of their rights under the National Labor Relations Act." 103 F. Supp. 3d at 10. Like *Kahn*, these decisions upheld the inclusion of certain terms in government contracts as an exercise of procurement authority. They did not endorse an agency's creation and operation of an in-house regime for prosecution, adjudication, or remediation of legal claims, let alone one with no more than an indirect and attenuated connection to economy and efficiency.

4.      **The old, inapposite decisions cited by Proposed Intervenors highlight the lack of foundation for OFCCP's adjudication regime.**

Proposed Intervenors fail to support the Procurement Act's supposed authorization of OFCCP's regime by citing a handful of underdeveloped, decades-old, almost entirely out-of-jurisdiction decisions that cross-reference each other.  None lives up to the task.

The decisions betray the shakiness of OFCCP's regime, demonstrating why the Supreme Court was compelled to question "[t]he origins of the congressional authority for [EO 11,246]" as "somewhat obscure."  *Chrysler*, 441 U.S. at 304.  Most of the decisions speak only in dicta.[9] Those that offer holdings—relying on dicta from other decisions to get there—do not address the right question, or at least the full question.  For example, some focus on whether EO 11,246 itself is authorized,[10] when Oracle's challenge to OFCCP's elaborate administrative regime does not require a finding that EO 11,246 is invalid.  *See* Compl. ¶¶ 137-55.  And notably, none of the decisions addresses the core issue here: whether OFCCP's regulations underpinning its regime for administrative adjudication and remediation are statutorily authorized.[11]  *See supra* 11-12,

---

[9] *See, e.g.*, *Chrysler*, 441 U.S. at 306 n.34 (explaining that *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3 (3d Cir. 1964), and *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967), provide only "suggestions [in] dicta … without any analysis"); *Liberty Mut.*, 639 F.2d at 171 n.11 (explaining that *Ne. Constr. Co. v. Romney*, 485 F.2d 752 (D.C. Cir. 1973), contains only "dicta, since the court there simply assumed the validity of [EO 11,246]"); *Legal Aid Soc. of Alameda Cty. v. Brennan*, 608 F.2d 1319, 1329-30 (9th Cir. 1979) (noting that "Appellants do not disagree" that certain regulations "issued under" EO 11,246 "have the force of law").

[10] *See, e.g.*, *United States v. New Orleans Pub. Serv., Inc.*, 553 F.2d 459, 466 (5th Cir. 1977) (analyzing "legislative authori[ty] for the Executive Order"), *vacated*, 436 U.S. 942 (1978).

[11] *See, e.g.*, *United States v. Miss. Power & Light Co.*, 638 F.2d 899, 905-06 (5th Cir. 1981) (upholding only EO 11,246 and the regulation that the Equal Opportunity Clause "is deemed a part of all government contracts"); *New Orleans Pub. Serv*, 553 F.2d at 461 ("We hold that the Government can compel [through a district-court action] … a utility to follow [EO 11,246.]"); *Contractors Ass'n*, 442 F.2d at 162-63 (upholding "two orders issued by" DOL under EO 11,246 that required "submi[ssion] [of] an acceptable affirmative action program" from certain contract bidders); *Uniroyal, Inc. v. Marshall*, 482 F. Supp. 364, 368 (D.D.C. 1979) (upholding only

17-21.  To top it off, numerous decisions rely on reasoning repudiated by the Supreme Court,[12]

and none considers all the arguments Oracle raises.  No decision, for instance, addresses 40

U.S.C. § 121(c)'s delegation of rulemaking authority to the GSA Administrator or 40 U.S.C.

§ 121(d)(2)(A)'s restriction on the Administrator's ability to delegate her authority.  *See supra*

§ I.B.2.  "Questions which merely lurk in the record, neither brought to the attention of the court

nor ruled upon, are not to be considered as having been so decided as to constitute precedents."

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quotation marks omitted).

The bottom line:  Proposed Intervenors' dated decisions are not controlling or persuasive.

## C.  Title VII and the Contract Disputes Act conflict with OFCCP's regime, further demonstrating that it is not authorized by Congress.

Other statutes confirm that the Procurement Act does not authorize OFCCP's regime.

The Supreme Court, noting that Titles VI and VII fail to provide any express support for EO

11,246, has intoned that "the question has usually been put in terms of whether [the EO] is

*inconsistent*" with them.  *Chrysler*, 441 U.S. at 305 n.35 (emphasis added); *see Liberty Mut.*, 639

F.2d at 172.  OFCCP's administrative regime, which extends much further than EO 11,246,

conflicts with two statutes: Title VII and the CDA.  That militates against OFCCP's claim that its

regime is authorized by the Procurement Act or anything else.  *See Epic Sys. Corp. v. Lewis*, 138

S. Ct. 1612, 1630-32 (2018) (applying "the canon against reading conflicts into statutes," which

preferences "a persuasive interpretation that gives effect to all of Congress's work"); *FDA v.*

---

"various discovery provisions of [EO 11,246]" and related regulations to compel discovery);
*Duquesne Light*, 423 F. Supp. at 509 ("[I]t is enough for the Court to say that neither the
language nor the policy of the [Procurement Act] is contradicted by a suit [to enforce the
contractual obligations imposed by EO 11,246 seeking] restitutionary relief [in federal court.]").

[12] *Compare, e.g.*, *New Orleans Pub. Serv.*, 553 F.2d at 466 (invoking "implied congressional
approval"), *and Uniroyal*, 482 F. Supp. at 369 n.7 (invoking "implicit ratification by …
Congress"), *with infra* § I.C.5 (citing authorities repudiating implicit ratification).

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.").  Five points are particularly salient.

> **1.      In enacting Title VII, Congress considered, but rejected, expanding executive power over government contractors in connection with the Equal Opportunity Clause in their contracts.**

When debating whether to enact Title VII, Congress rejected legislation that would have expanded the President's authority to enforce the Equal Opportunity Clause in the way contemplated by OFCCP's reading of the Procurement Act.  If the President already possessed that power, the proposed legislation would have been superfluous.  Such "patently absurd consequences" strongly counsel against reading the Procurement Act, or anything else existing at the time of Title VII, as authorizing OFCCP's scheme.  *United States v. Brown*, 333 U.S. 18, 27 (1948); *supra* 23-24.  Moreover, Congress's refusal to grant authority that OFCCP's regime assumes it already has is strong evidence that the authority does not, in fact, exist.  *See United States v. S. Buffalo Ry. Co.*, 333 U.S. 771, 778-80 (1948).

The relevant provision is section 711(b) of proposed bill H.R. 7152, which would have authorized "[t]he President … to take such action as may be appropriate to prevent … an unlawful employment practice [such as a Title VII violation] by a person in connection with the performance of a contract with … the United States."  EEOC, Legislative History of Titles VII and XI of the Civil Rights Act of 1964, at 2014 (H.R. Rep. No. 88-914, at 14, § 711(b) (1963)) (Title VII Legislative History).  Opponents explained that this proposal "strengthened and broadened the enforcement provisions [of Title VII] by giving the President blanket and unlimited authority (sec. 711(b))" regarding government contractors.  *Id.* at 2087 (H.R. Rep. No. 88-914, at 87).

The proposed expansion of presidential power to permit administrative enforcement of Title VII obligations against federal contractors was rejected because of withering criticism that it went too far—not because such authority already existed.  As one Representative put it, section 711(b) was objectionable precisely because it "went beyond reasonable limits" in offering "blanket authority" to be "given to the President."  110 Cong. Rec. 2574 (1964) (statement of Rep. Willis).  Another similarly cautioned:  "Many of us have felt section 711[(b)] to be a highly dangerous section of the bill."  *Id.* at 2575 (statement of Rep. Dowdy).  The provision was ultimately struck from the amended version of H.R. 7152, which later passed.

In short, although Congress concluded in debating and enacting Title VII that it should not grant the President the authority to prosecute, adjudicate, and remediate discrimination claims against government contractors through administrative proceedings, OFCCP's argument is that Congress had already given the President that authority.  That does not stand up to reason.

>2.      **In enacting Title VII, Congress considered, but rejected, administrative adjudication of discrimination claims.**

OFCCP's regime also flaunts a model of administrative adjudication that Congress rejected when enacting Title VII.  *See* Compl. ¶¶ 75-79.  That is anomalous given the overlapping subject matter of the two regimes (employment discrimination) and OFCCP's expansive reach across one-fifth of the U.S. labor force.  *Supra* 11.

OFCCP's regulations place not just enforcement and prosecution authority but, critically, adjudicative authority, in DOL rather than a federal court.  *Compare* 41 C.F.R. §§ 60-1.26(b), 60-30.28 (OFCCP actions and appeals before DOL ALJs and the ARB), *with* 42 U.S.C. § 2000e-5(f) (Title VII actions brought in federal court).  Only after in-house administrative trial and adjudication and final decision by the ARB can a contractor facing an adverse judgment finally

obtain an audience with a federal judge, *see* 5 U.S.C. § 702, which is presumably limited to extremely narrow APA review, *id.* § 706(2).

Congress rejected such a regime in Title VII.  Early versions of Title VII proposed that an Administrator within DOL would have authority to investigate claims and prosecute complaints before an administrative Equal Employment Opportunity Board that would adjudicate the claim and "issue broad remedial orders to remedy violations which it f[ound]," with the prospect of judicial review available only of the final administrative decision.  Title VII Legislative History at 3070-71; *see id.* at 2150.  Congress rejected that approach.  In 1964, it created EEOC, which it vested with significantly less power:  EEOC retained authority to investigate discrimination claims and seek informal resolution, but it had no authority to conduct in-house adjudications. *See* Pub. L. 88-352, §§ 705-713, 78 Stat. 241, 258-62 (1964) (codified as amended at 42 U.S.C. § 2000e-5); *see also* Compl. ¶¶ 76-77.  To this day, EEOC does not adjudicate Title VII discrimination claims internally.  *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019).

Yet OFCCP claims that power for itself.  That is implausible.  It strains credulity that Congress gave the President and OFCCP the very powers in enforcing workplace discrimination laws that it denied to EEOC so long as the employers were government contractors.

> **3.     In amending Title VII, Congress limited OFCCP's power and expressed a narrow view of the agency's role.**

The Equal Employment Opportunity Act of 1972 (EEOA), which amended Title VII, also runs against OFCCP's regime.  *See* Compl. ¶¶ 80-98.  The EEOA limited OFCCP's power and expressed Congress's narrow conception of the agency's role in government contracting.  The EEOA's narrow view of OFCCP cannot be reconciled with the superpowered, wide-ranging administrative-adjudication regime that the agency has created.

*First*, as with Title VII, the EEOA reflects Congress's view that discrimination claims should be remedied through litigation in federal court. Congress *again* rejected the agency-adjudication model that defines OFCCP's regime. Early drafts of the EEOA would have transformed EEOC into an adjudicative agency with authority to make administrative findings of discrimination, issue cease-and-desist orders, and award compensatory relief. *See* Subcomm. on Labor of the Comm. on Labor and Pub. Welfare, 92d Cong., Legislative History of the Equal Employment Opportunity Act of 1972, at 157-87 (text of S. 2515, §§ 2-12) (EEOA Legislative History). As when Congress enacted Title VII, these proposals provoked an outcry from those who wanted to guarantee employers accused of discrimination the protections of a federal court. Per Senator Dominick: "The principal objection to [this] administrative approach is that it harkens back to the 'Star Chamber' proceedings …. That is, the EEOC would, in effect, become investigator, prosecutor, trial judge and judicial review board—all before you ever got to the Court of Appeals!" *Id.* at 560 (117 Cong. Rec. 40290 (1971)). Similar concerns led Representative Martin to declare, "[t]his is a very, very dangerous piece of legislation." *Id.* at 193 (117 Cong. Rec. 31959 (1971)); *see* Compl. ¶¶ 95-96.

Congress responded by stripping the proposed provisions. Rather than grant EEOC broad authority to prosecute discrimination claims in house, the EEOA gave EEOC the power to bring discrimination suits *in federal court*. *See* Pub. L. 92-261, 86 Stat. 103, 105-06 (1972) (codified as amended at 42 U.S.C. § 2000e-5(f)). Nevertheless, OFCCP's assertion of authority posits that Congress thought that the powers it denied EEOC—for a second time, no less—were powers it had already given OFCCP. That beggars belief.

*Second*, in enacting the EEOA, Congress rejected a proposal to transfer from OFCCP to EEOC "[a]ll authority, functions, and responsibilities vested in the Secretary of Labor pursuant

to Executive Order 11,246 relating to nondiscrimination in employment by Government contractors." EEOA Legislative History at 57 (text of H.R. 1746 § 717(f)); *see id.* at 74-75 (minority and separate views on H.R. 1746). Proposed Intervenors suggest (at 36) that this rejection favors their view because it left OFCCP intact, but statements made by members of Congress and executive officials during discussions of this proposal reflect a shared understanding of OFCCP's limited role—including its lack of statutory authority and inability to award individual relief. *See also infra* § I.C.5 (refuting implicit ratification).

For example, Senator Saxbe, the proponent of an amendment to eliminate the transfer, stressed that OFCCP was an "Executive order program" that did not implicate "judicial remedies for proven discrimination." EEOA Legislative History at 915. He noted that EEOC was a "regulatory agency under Title VII," whereas OFCCP was only a "procurement program manager." *Id.* at 916. Similarly, Representative Erlenborn explained that OFCCP had no statutory authority, but rather was a creature owing only to whatever inherent authority the executive possessed. *Id.* at 230-31; *see* Compl. ¶ 88 (quoting Rep. Erlenborn).

Executive officials expressed similar views. William Brown, then-Chairman of the EEOC, disfavored the proposed transfer because it would blur the distinction between prospective contract-specific actions that OFCCP dealt with, such as debarment, and retrospective individual redress handled by EEOC. EEOA Legislative History at 932; *see* Compl. ¶ 89 (quoting Chairman Brown). He, like Senator Saxbe and Representative Erlenborn, believed OFCCP's only mandate came from EO 11,246—and did not extend to back pay and other make-whole individual redress that OFCCP later came to claim it could impose.

Then-Under Secretary of Labor (and later D.C. Circuit Judge) Laurence Silberman echoed Chairman Brown. He explained that EEOC and OFCCP are "substantially different"

both in purpose and the remedies they seek.  *Equal Employment Opportunities Enforcement Act of 1971: Hearing on S. 2515, S. 2617, and H.R. 1746 Before the Subcomm. on Labor of the Comm. on Labor & the Pub. Welfare*, 92d Cong. 80-81 (1971).  He noted that "contracting agencies" should declare any offending contractor a "nonresponsible offeror … ineligible for contract award"—"a powerful inducement to compliance."  *Id.* at 79.  He said nothing about remedies for discrimination victims.  Instead, he explained that "[T]itle VII created [EEOC] to redress identifiable instances of discrimination," whereas OFCCP sought to "assure that contractors take affirmative action to provide equal employment opportunity."  *Id.* at 80-81.[13]

*Third*, Congress amended Title VII to limit agency repudiation of government contracts. Specifically, where a government contract is with an "employer [that] has an affirmative action plan … previously … accepted by the Government," Title VII bars "any agency … of the United States" from "den[ying], with[holding], terminat[ing], or suspend[ing]" the contract under any "equal employment opportunity law or order" unless and until the employer receives a "full hearing and adjudication under the [APA]."  42 U.S.C. § 2000e-17.  Proposed Intervenors claim (at 40) that this provision somehow approves of OFCCP's regime.  But the provision does not purport to approve of any agency regulations—and certainly not ones that were not promulgated until five years later, such as those stemming from OFCCP's 1977 power grab.  Rather, the provision *limits* agencies (including OFCCP) by mandating procedural protections that must be provided before certain *contractual* relief can be imposed against a government contractor.

---

[13] Even those who *supported* the transfer expressed a narrow understanding of OFCCP's authority.  Howard Glickstein, then-Staff Director of the U.S. Civil Rights Commission, favored the transfer because it would increase the President's enforcement options beyond contract termination.  *Equal Employment Opportunity Enforcement Procedures: Hearing Before the Gen. Subcomm. on Labor of the Comm. on Educ. and Labor*, 92d Cong. 108 (1971); *see* Compl. ¶ 92 (explaining similar view of Civil Rights Commission itself).  Of course, OFCCP's authority would not have needed supplementation if it *already had* the great powers it claims now.

The provision's legislative history evinces Congress's narrow understanding of OFCCP's mission and underscores that the provision's point was to limit the agency's reach—not bless the agency's actions.  Senator Ervin, the provision's chief proponent, explained that government contracts are "referred to [OFCCP] for *only one purpose*": to "afford[] that office an opportunity to determine whether the affirmative action plan which is required is in compliance with the laws, the Executive order, and the regulations prohibiting discrimination in employment.  That is the *only function of [OFCCP]* in the matter."  EEOA Legislative History 955 (emphases added). The provision's procedural protections were designed to curb problematic exercises of agency power through judicial oversight:  "All [§ 2000e-17] says is that after [OFCCP] ha[s] approved [an affirmative-action plan], they cannot repudiate the approval without affording the employer … the opportunity to have the question determined, not by arbitrary action on the part of an executive office, but by *a court of justice*."  *Id.* (emphasis added).  Congress's refusal to allow agency repudiation of a contract absent procedural protections speaks volumes against OFCCP's arrogation of power years later, and in no way approves of OFCCP's regime.

### 4.      OFCCP's regime is inconsistent with the Contract Disputes Act.

OFCCP's regime conflicts with the CDA, which governs virtually "any … contract … made by an executive agency for" the procurement of personal property and services.  41 U.S.C. § 7102(a).  Two CDA protections that OFCCP ignores deserve particular attention.

*First*, the CDA imposes a six-year statute of limitations that OFCCP's regime does not respect.  Except where fraud is involved, the CDA provides that "each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim."  41 U.S.C. § 7103(a)(4)(A).  Yet OFCCP's regulations are silent on any limitations period, *see* 41 C.F.R. § 60-1.26(b)(1), and OFCCP maintains that it is not bound by

any, *see OFCCP v. Wash. Metro. Area Transit Auth.*, No. 84-OFC-8, 1989 WL 1003977, at *5-6 (Mar. 30, 1989).  Proposed Intervenors contend that, "[a]lthough OFCCP regulations do not list a limitations period, the agency's Guidance Manual on the subject does."  Prop. Intrvrs. Br. 31. But the Manual does not establish a limitations period—OFCCP says that the Manual is non-binding and thus that OFCCP is not required to adhere to it.  Silverman Decl. ¶ 5, Exh. C (OFCCP Opp. to Mot. JOP 11 n.8); *accord* OFCCP, *Federal Contract Compliance Manual*, Introduction (2019) (the Manual "does not establish substantive agency policy" or "create new legal rights or requirements" and it "is subject to change without public notice"); *cf. Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor*, 118 F.3d 205, 214-15 (4th Cir. 1997) (discussing OFCCP's seven-year delay in bringing an enforcement action).

 *Second*, OFCCP's regime is inconsistent with a contractor's CDA right to *de novo* review in federal court.  The CDA requires *de novo* review of "a written decision by the contracting officer" adjudicating a "claim by the Federal Government against a contractor relating to [the] contract," 41 U.S.C. § 7103(a)(3), in the Court of Federal Claims, regardless of "any contract provision, regulation, or rule of law to the contrary," *id.* § 7104(b)(1), (b)(4).  As recounted above, OFCCP's regime charts a much different and more difficult course, allowing a contractor to appeal to federal court only after an adverse agency adjudication, numerous aspects of which are presumably subject to deferential APA review.  *See* 5 U.S.C. § 706(2)(A), (2)(D), (2)(E).

 To be clear, these two deviations from the CDA are just the start.  There are a host of other procedural protections and mechanisms that the CDA prescribes but that OFCCP's regime eschews.  *See, e.g.*, 41 U.S. §§ 7104(a), 7105 (alternative option to appeal to agency boards); *id.* § 7103(f)(3)-(5) (providing a contractor with procedural remedies in the event of delay).  At the

very least, OFCCP's departures from the CDA's framework show that OFCCP's regime, far from being authorized by Congress, is something Congress would not endorse.

### 5. Proposed Intervenors' arguments regarding implicit congressional ratification go nowhere.

Proposed Intervenors' last bastion is implicit congressional ratification.  *See* Prop. Intrvrs. Br. 34-41.  It provides no refuge, particularly given the backdrop of conflicts presented above. "Congress may legislate"—and thus authorize OFCCP's regime—"only through the passage of a bill which is approved by both Houses and signed by the President."  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989)).  Proposed Intervenors largely invoke failures to "circumscrib[e] or eliminat[e] Executive Order 11,246 and OFCCP's [regime]," Prop. Intrvrs. Br. 35, but a failure to reprove does not stand in for affirmative endorsement.  It deserves, at most, no more than "little weight in the interpretive process," especially in light of the fact that OFCCP's regime has never been endorsed by the Supreme Court.  *Central Bank*, 511 U.S. at 187; *see Chrysler*, 441 U.S. at 304-06 & nn.34-36.

The supposed ratifications that Proposed Intervenors press are particularly long on inference and short on substance: discrete changes to the Procurement Act, Prop. Intrvrs. 38-39, as well as things outside the Procurement Act, *id.* 35-37.  The Supreme Court has "spoken … bluntly" about reliance on such supposed failures to overturn a prevailing state of affairs: "[W]hen … Congress has not comprehensively revised a statutory scheme but has made only isolated amendments … [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the [status quo]." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (quotation marks omitted); *see Helvering v.*

*Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.").

One amendment Proposed Intervenors cite for implicit ratification (at 38) in fact confirms that Congress never authorized OFCCP's regime.  Congress amended the Procurement Act in 1976 to include a prohibition on sex discrimination in programs receiving federal assistance.  *See* Pub. L. 94-519, § 8, 90 Stat. 2456 (now codified at 40 U.S.C. § 122(a)).  In so doing, Congress expressly authorized administrative enforcement through "agency provisions and rules similar to" those already established under Title VI, *id.* § 122(b)—which is to say, a regime with "elaborate restrictions on agency enforcement," *Sandoval*, 532 U.S. at 290.  This amendment confirms that, when Congress grants an agency adjudicatory authority, it does so expressly and with limitations.  It does not hide agency adjudicatory authority—let alone blanket agency adjudicatory authority—in a general, facially inapposite statement about "policies and directives."  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and brackets omitted)).

In addition, the amendment's utter silence on OFCCP is telling.  The amendment's reference to "agency provisions and rules" "similar to" those under Title VI does not refer to OFCCP's regulations, because Title VI does not vest rulemaking authority in OFCCP, but rather in "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity."  42 U.S.C. § 2000d-1.

Likewise, the amendment does not even speak to employment discrimination—it speaks only to discrimination with respect to "a program or activity carried on or receiving federal

33

assistance," 40 U.S.C. § 122(a), a fact confirmed by Title VI, which generally *foreswears* application to "any employment practice of any employer," 42 U.S.C. § 2000d-3.  That is why *Chrysler*—which post-dates the amendment—explains that "nowhere in the [Procurement] Act is there a specific reference to employment discrimination."  441 U.S. at 304 n.34.  Indeed, "a program or activity carried on or receiving federal assistance" under the amendment does not refer to a government contract for services or products, as Title VI and related precedent dictate. *See Estate of Boyland v. Young*, 242 F. Supp. 3d 24, 28-29 (D.D.C. 2017) (holding that the term "financial assistance" in Title VI is not satisfied by compensation from a government-service contract; collecting similar rulings on the term "federal financial assistance" in the Rehabilitation Act), *aff'd sub nom. Estate of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117 (D.C. Cir. 2019).

The final nail in the coffin is that the amendment speaks only to sex discrimination, not other forms of discrimination (such as race and national-origin discrimination) dealt with under OFCCP's regime.  Presumably, that fact and all the others listed above are why OFCCP has never in rulemaking invoked the amendment as a basis for its authority—foreclosing the amendment's consideration as such.  *See Council for Urological Interests v. Burwell*, 790 F.3d 212, 223 (D.C. Cir. 2015) (courts "cannot consider [an] argument" regarding an agency's authority that the agency never "articulate[d] … during … rulemaking").

Proposed Intervenors also unsuccessfully invoke OFCCP appropriations.  Prop. Intrvrs. Br. 37-38.  Courts are "reluctant to hold that appropriation acts affect any substantive legislation whatsoever."  *D.C. Fed'n of Civic Ass'ns, Inc. v. Airis*, 391 F.2d 478, 482 (D.C. Cir. 1968).  The most specific supposed appropriation-based ratification OFCCP can find is two words in a House Committee Report indicating that funds were meant to be used to, among other things, "expand enforcement."  H.R. Rep. No. 116-62, at 24 (May 15, 2019).  That is not enough.  For an

34

appropriation to have any weight, it "must *plainly show* a purpose to bestow *the precise authority which is claimed.*" *Ex parte Mitsuye Endo*, 323 U.S. 283, 303 n.24 (1944) (emphases added).  A legislative-history reference to "[e]xpand[ing] enforcement" has any number of meanings, including increasing investigation and imposition of contract-based remedies or referrals to DOJ and EEOC.  *See id.* ("Congress may [through appropriations] support [part of] the effort[s]" of an agency program "without ratifying every phase of the program.").  Because the appropriations Proposed Intervenors rely upon do not specifically address or definitively approve of OFCCP's in-house prosecution, adjudication, and remediation regime, they cannot salvage that regime.

> **D.**      **The Procurement Act cannot constitutionally authorize OFCCP's regime.**

If the Procurement Act were interpreted to authorize OFCCP's enforcement, adjudicative, and remedial regime, it would be via an unlawful delegation of authority in violation of the separation of powers.  The Act would empower the President to make three quintessentially legislative decisions—what issues to regulate, who to do the regulating, and how to regulate the issues—constrained only by his judgment about whether his choices advance "economy" and "efficiency" in federal procurement.  So interpreted, the Act would fail both the traditional standard reflected in modern nondelegation jurisprudence and the more searching inquiry favored by a majority of the Supreme Court.  Never before has the Supreme Court upheld so substantial a delegation with such minimal congressional guidance.

> ***The Procurement Act violates nondelegation if it authorizes OFCCP's regime.***  "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  "[T]he integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch." *Id.* at 371-72

(quotation marks omitted).  Under prevailing Supreme Court decisions, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Id.* at 372 (quotation marks and brackets omitted).[14]  This standard requires Congress to "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372-73 (quotation marks omitted).  In other words, Congress must define (1) what issues are to be regulated, (2) who is to do the regulating, and (3) how that regulation is generally to be accomplished.  The more power Congress confers, the clearer it must be in setting the boundaries of the executive's discretion.  *See Whitman*, 531 U.S. at 475.

If interpreted to authorize OFCCP's administrative regime, the Procurement Act would violate these principles.  The Act would not define what substantive issues or policies are to be regulated, who in the executive branch is responsible for carrying out the regulations, or how the unnamed executive agency is to accomplish the President's chosen objectives.

*First*, the Procurement Act would not define who or what is to be regulated.  The Act gives the President broad authority to design and run a procurement system.  40 U.S.C. §§ 101, 121.  The only ostensible "boundar[y] of this delegated authority," *Mistretta*, 488 U.S. at 373 (quotation marks omitted), is that the President's policy choices "accord with the values of 'economy' and 'efficiency,'" *Kahn*, 618 F.2d at 792.  These meager bounds are even weaker than they appear, given the Act's authorization for any "policies and directives that *the President*

---

[14] A majority of the Supreme Court has recently proposed a more onerous standard, encouraging the Court to revisit and reconsider its earlier nondelegation decisions because they are inconsistent with "the original meaning of the Constitution."  *Gundy v. United States*, 139 S. Ct. 2116, 2139 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *see id.* at 2130-31 (Alito, J., concurring); *Paul v. United States*, 140 S. Ct. 342 (2019) (Mem.) (statement of Kavanaugh, J.).

considers necessary."  40 U.S.C. § 121 (emphasis added).  Congress is the one constitutionally

tasked with making policy choices, not the President.  *Brown & Williamson*, 529 U.S. at 133.  If

the President's notions of "economy" and "efficiency" could be interpreted to authorize the

internal adjudication of employment-discrimination claims, they could be interpreted to cover the

creation of an administrative regime addressing practically any social or political objective.

 *Second*, to the extent it is held to authorize OFCCP's scheme, the Procurement Act would

fail to define who is to do the regulating.  The Act authorizes the President to "prescribe policies

and directives" and vests rulemaking authority in only the GSA Administrator.  40 U.S.C.

§ 121(a), (c).  The Act prohibits sub-delegation "on matters of policy applying to executive

agencies."  *Id.* § 121(d)(2)(A).  Thus, if OFCCP has authority under the Act, it must come not

from a delegation by Congress, but from the President's general authority to issue "policies and

directives."  That would defy the Supreme Court's teaching that nondelegation principles require

*Congress* to specify "the public agency which is to apply" the policy.  *Mistretta,* 488 U.S at 373

(quotation marks omitted).  None of the delegations upheld by the Court missed this key

element.  *See Whitman*, 531 U.S. at 472-73 (express authority to EPA); *Fed. Power Comm'n v.

Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (to Federal Power Commission); *NBC v. United

States*, 319 U.S. 190, 225-26 (1943) (to FCC).

 *Third*, the Procurement Act would not define how the regulation is to be accomplished.

It authorizes the President to "prescribe policies and directives" related to efficient and

economical procurement.  40 U.S.C. §§ 101, 121.  If that authorization were to reach beyond the

President's authority to set internal executive-branch procurement policies and determine who

the government contracts with and on what terms, it would impose no limit on the President's

discretion to determine how to effectuate his objectives.  Consider the policy choices underlying

the regime in this case.  OFCCP had to decide to create an administrative enforcement and adjudicative regime, rather than rely on breach-of-contract actions in federal court.  Once OFCCP created the regime, it had to make a host of policy choices about the procedures, the substantive standards, the identity of the adjudicator, the form of the appellate process, and the relief to be awarded.  Without any intelligible principle governing these regulatory choices, a reviewing court would be unable "to test the application of the policy in … light of these legislative declarations."  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).

These problems are magnified by the scope of power conferred by Congress.  *See Whitman*, 531 U.S. at 475.  The Court has demanded, for example, that Congress provide "substantial guidance" governing EPA's issuance of regulations "that affect the entire national economy."  *Id.*  The authority OFCCP now asserts is staggeringly broad.  Based on nothing more than a general delegation in the Procurement Act, the agency insists it can impose on 20% of the economy its own internal scheme to enforce and adjudicate substantive prohibitions and impose strict sanctions for violations, with only limited opportunity for judicial review.  Our separation of powers does not countenance so expansive and unbounded a delegation of authority.

***Proposed Intervenors' nondelegation defense fails.***  Proposed Intervenors (at 27 n.3) rest their entire nondelegation defense on a footnote in *Kahn*, 618 F.2d at 793 n.51.  But *Kahn*'s footnote underscores why the delegation here is unconstitutional.  As discussed, *Kahn* upheld an executive order imposing wage and price controls under the Procurement Act.  In doing so, it rejected an argument offered only by an amicus that the Act violated the nondelegation doctrine.  The sum total of *Kahn*'s reasoning was (1) that the Act's "efficiency" and "economy" standard "can be applied generally to the President's actions to determine whether those actions are within the legislative delegation," and (2) that "administrative standards" in the executive order at issue

38

there are sufficient to permit meaningful "judicial review." *Id.*  The Supreme Court abrogated the latter justification in *Whitman*, where it held that an agency's self-imposed limits on its discretion cannot "cure an unconstitutionally standardless delegation of power."  531 U.S. at 473.  Meanwhile, the first justification, assuming it can stand apart from the second, does not apply here because the asserted delegation is far broader than what the Court sustained in *Kahn*.

*Kahn* presented none of the nondelegation problems at issue in this case.  First, *Kahn* held that the executive order there was directly aimed at reducing prices, a classic understanding of "economy" and "efficiency."  618 F.2d at 792-93.  Sustaining the President's authority in that regard did not sanction the President's power to regulate all manner of noneconomic social ills, as it would in this case.  Second, the executive order there kept the relevant procurement authority within the Office of the President, which has certain authorities under the Procurement Act.  *See id.* at 786.  By contrast, OFCCP is an agency unmentioned and ineligible for delegation of authority by the Act.  *Supra* § I.B.1, 2.  Third, the executive order there exercised only procurement authority—the authority to determine who the government contracts with and on what terms.  *Id.* at 786 (imposing controls under threat of termination or debarment).  That is a world away from OFCCP's creation of an administrative scheme for prosecuting, adjudicating, and remediating employment-discrimination claims.  In all the ways *Kahn* held the delegation there satisfied the Court's nondelegation standards, the asserted delegation here fails.

***This Court should interpret the Procurement Act to avoid constitutional issues.***  This Court should avoid these grave questions by interpreting the Procurement Act not to supply OFCCP with such far-reaching authority.  "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (quotation marks omitted).

Applying the constitutional-avoidance doctrine is particularly appropriate in nondelegation cases, where otherwise broad delegations can be understood in context to be sufficiently cabined to be constitutional.  *See Mistretta*, 488 U.S. at 374 n.7.

Here, it requires little effort to interpret the Procurement Act constitutionally.  First and foremost, it reaches only procurement authority—not the broad administrative enforcement and adjudicative power OFCCP claims.  *Supra* § I.B.1, 3.  Apart from that limiting construction, this Court could also interpret the Act not to supply any substantive authority to OFCCP, since the Act does not mention the agency.  Lastly, the Act's reach could be limited to economic problems affecting procurement, rather than any social goal the President or an agency chooses to pursue.

If the Court finds these constructions unavailable, however, it will have to assess whether the breathtaking delegation necessary to sustain OFCCP's regime under the Procurement Act accords with separation of powers.  The Supreme Court's precedents offer only one answer:  No.

## II.    At A Minimum, The Procurement Act Does Not Authorize OFCCP's Provision Of Injunctive And Monetary Relief Through Agency Adjudication.

In addition to being unlawful for all the reasons discussed above, OFCCP's regulations providing for administrative orders of injunctive and monetary relief, 41 C.F.R. §§ 60-1.26(a)(2), (b)(1), 60-30.30, suffer from two additional—and independently fatal—flaws.

*First*, EO 11,246 itself does not grant the agency authority to order injunctive or monetary relief.  Section 209 authorizes a limited set of expressly enumerated sanctions and penalties—administratively issued injunctive and monetary relief not among them.  Monetary relief is not mentioned at all; injunctions are mentioned only in § 209(2), in reference to DOJ's ability to seek an injunction in federal court.  The Executive Order's express enumeration of specific relief should preclude additional relief of OFCCP's invention.  *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (invalidating DOL regulation that was

"incompatible" with a statute's "comprehensive remedial mechanism"); *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").

In a remarkable overreading of the Executive Order, Proposed Intervenors argue that authority flows not from § 209, but from § 202(6).[15]  Section 202 is not an authority-granting provision; rather, it is the language of the Equal Opportunity Clause to be included in government contracts.  Section 209 is the provision enumerating the relief permissible under the Executive Order.  Proposed Intervenors urge a different reading because the contract language in § 202 mentions § 209's relief of cancellation, termination, and suspension of contract and debarment of the contractor, and then provides that "such other sanctions may be imposed and remedies invoked as provided in [EO 11,246], or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law."  *See* Prop. Intrvrs. Br. 32-33.  That makes little sense. The "such other sanctions … and remedies" referred to in Section 202(6) are most naturally read as the other relief provided in § 209 that § 202(6) does not expressly mention—referral to DOJ or EEOC for non-OFCCP proceedings (and relief obtainable therein)—as well any relief that may be allowed pursuant to a valid law independent of the Executive Order (which Proposed Intervenors have not identified).  Where the Executive Order already provides specific and exhaustive relief, it cannot be that a provision recounting the language of the Equal Opportunity Clause is itself a delegation of authority for the Secretary to provide any and all relief the Secretary chooses, from injunctions to individual compensatory damages to class-based relief, or (if he so desired) punitive or treble damages.

---

[15] This refers to the original EO.  Section 202(7) is the provision in the most recent version.

Nor can Proposed Intervenors balloon the narrow scope of § 202 based on § 201's general statement that "[t]he Secretary shall adopt such rules and regulations and issue such orders as are deemed necessary and appropriate to achieve the purposes of Parts II and III of this Order." *See* Prop. Intrvrs. Br. 32.  As *Merck* and other decisions recognize, general authority to implement a law does not give an agency free rein to do whatever it pleases in furtherance of the law's goals. *See supra* 10, 17-19.  The Executive Order sets forth specific relief, so that is the relief available. *Compare Ragsdale*, 535 U.S. at 89-92, *with id.* at 101 (O'Connor, J., dissenting) (arguing—*unsuccessfully*—that general authorization grants the Secretary "the power to craft appropriate remedies for regulatory violations" not mentioned in a statute).

Moreover, even if § 202 could be read to grant residual authority to impose "other" relief beyond that expressly provided in § 209, ordinary rules of construction would dictate that any such relief be of the same kind as the enumerated relief. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) (for a non-exhaustive list of remedies, "[a]pplying the canons of *noscitur a sociis* and *ejusdem generis*, we will expand on the remedies explicitly included … only with remedies similar in nature to those enumerated").  The Executive Order's enumerated relief falls into two categories: (1) prospective actions that a contracting party can take in response to a material breach of contract, and (2) referral to the EEOC or DOJ for litigation in federal court.  An administrative order granting an injunction or retrospective class-based monetary relief for the benefit of the contractor's employees and job applicants falls into neither category.  Section 202 cannot reasonably be read to grant carte blanche to impose whatever relief the agency chooses, even relief far removed from what is provided in § 209.

*Second*, if EO 11,246 were construed to include monetary relief, that would exceed any arguable grant of statutory authority.  No statute authorizes an agency to order monetary relief

against an employer for alleged employment discrimination or failure to take affirmative action. Congress deliberately withheld this authority from EEOC under Title VII, and it granted no such authority to agencies when it expressly authorized administrative enforcement of discrimination prohibitions in Title VI, Title IX, and Section 504 of the Rehabilitation Act through administrative adjudication. *See supra* 25-27, 33; 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; 29 U.S.C. § 794a; *Sandoval*, 532 U.S. at 290. Congress could have legislated to subject contractors to this form of extra-contractual liability, so long as it did so clearly and unambiguously—as it did, for example, in the Walsh-Healey Public Contracts Act and the McNamara-O'Hara Service Contract Act. 41 U.S.C. §§ 6503(b)(2), (e), 6705(a), (b)(1). But Congress did not do that here.

Nor would it change the analysis if the Procurement Act could be construed to authorize OFCCP to unilaterally impose traditional contract remedies—which it assuredly does not. Monetary relief for aggrieved employees and job applicants is not such a remedy. Even if such individuals could be deemed third-party beneficiaries of government contracts—which itself is doubtful, *see D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1479-80 (7th Cir. 1985)—traditional contract principles would not permit the government to recover monetary relief on their behalf. *See* Restatement (Second) of Contracts § 307 cmt. b (1981).

Thus, even if OFCCP's administrative regime could be upheld as a general matter, OFCCP's regulations providing for injunctive and monetary relief cannot.

## III.   Amici's Policy Arguments Are Irrelevant And Ill-Conceived.

Amici argue policy, but policy cannot cure the lack of congressional authorization: "An agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress." *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002). This Court recognized as much in *Merck*. 385 F. Supp. 3d at 84.

Moreover, amici's policy arguments are wrong.  Amici go to great lengths to describe equality problems in the workplace.  Oracle agrees:  Discrimination anywhere, including in the workplace, is unacceptable.  Oracle's suit does not dispute the value of antidiscrimination law nor ask the government to contract with employers engaged in discrimination.  *Contra* ECF 16-1, Former Officials' Br. 23.  Instead, Oracle's lawsuit seeks to vindicate constitutional separation of powers and anchor OFCCP's adjudication and remediation regime in what Congress authorized.

Requiring OFCCP to act pursuant to statutory authority, as all agencies must, would not "gut[]" OFCCP.  *Contra* ECF 15-1, States' Br. 20.  For instance, OFCCP dedicates considerable attention and effort to conducting audits—a function it could continue to perform if Oracle is granted the relief it seeks here.  ECF 14, Oracle Intervention Opp. 6-8, 10-11.  Likewise, OFCCP could continue to conduct investigations.  *Id.*  And it could still offer compliance assistance to contractors and engage in conciliation efforts.  *Id.*; *contra* Former Officials' Br. 10, 13-14.

Similarly, OFCCP would still have a role in enforcement—although to be sure, to pursue breach-of-contract claims or impose remedies like backpay, OFCCP would have to refer matters to DOJ or EEOC for prosecution in federal court.  That would hardly make OFCCP "unique." *Contra* States' Br. 11-12.  Referral for litigation is common.  Investigative agencies, such as FBI, DEA, and the Secret Service, refer matters to DOJ for criminal prosecution.  Referrals occur in the civil context, too.  *See, e.g.*, DOJ, *Consumer Protection Branch*, https://tinyurl.com/qoox2oq (last visited April 24, 2020).  Accordingly, amici are wrong to argue that it would be needlessly inefficient, or even impossible, for DOJ or EEOC to litigate OFCCP-investigated claims.  *Contra* Former Officials' Br. 17-20; States' Br. 21.  Contrary to amici's speculation that only OFCCP prosecution can "keep[] contractors honest," States' Br. 20, referral to an impartial agency provides for a thorough, objective, fresh analysis prior to prosecution.

DOJ and EEOC enforce workplace-discrimination claims already. Amici at times offer the false impression that OFCCP holds up all federal antidiscrimination law. But DOJ and EEOC routinely enforce Title VII, the Americans with Disabilities Act, and the Age Discrimination in Employment Act with respect to all employers, including federal contractors. Nor is there reason to believe that states would lose valuable federal assistance if EEOC took a greater role with regard to government contractors. In fact, EEOC cooperates with states on antidiscrimination by statute. *See, e.g.*, 42 U.S.C. §§ 2000e-4(g)(1), 2000e-5(d), 2000e-8(b); *see also EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 122 (1988). Amici's argument boils down to contingencies about the agencies' current funding and staffing. Agencies are more dynamic than amici suppose. Resources can be reallocated. Statisticians can join other agencies. *Contra* States' Br. 12, 21-23. Agencies can, and do, work together to enforce antidiscrimination laws. And agencies can—and must—do so within the confines of congressional authorization. This case concerns OFCCP's violation of that fundamental principle of the rule of law, and amici's policy arguments offer no response.

## CONCLUSION

This Court should grant Oracle summary judgment.

Dated: April 24, 2020                    Respectfully submitted,


/s/ Andrew D. Silverman
Andrew D. Silverman (D.C. Bar No. 1013835)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:     +1 212 506 5000
Facsimile:     +1 212 506 5151
asilverman@orrick.com

Robbie Manhas (D.C. Bar No. 1029976)
Peter E. Davis (C.A. Bar No. 320256)
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC  20005-1706
Telephone:     +1 202 339 8400
Facsimile:     +1 202 339 8500
rmanhas@orrick.com
peter.davis@orrick.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

ORACLE AMERICA, INC.,

                Plaintiff,

    v.

U.S. DEPARTMENT OF LABOR; U.S.
OFFICE OF FEDERAL CONTRACT
COMPLIANCE PROGRAMS; EUGENE
SCALIA, Secretary of the U.S. Department
of Labor; CRAIG E. LEEN, in his official
capacity as Director of the U.S. Office of
Federal Contract Compliance Programs

                Defendants.

</td><td>

Case No. 19-cv-3574 (APM)

</td></tr>
</table>

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Oracle America, Inc. (Oracle) has existing contracts with the federal government in amounts that individually and collectively exceed $50,000.  Declaration of Douglas Doran, ¶ 3.

2.      The Office of Federal Contract Compliance Programs (OFCCP) considers Oracle subject to its jurisdiction as a federal contractor.  Declaration of Andrew D. Silverman, Exh. A, OFCCP Administrative-Enforcement Compl. ¶¶ 1-5.

3.      On January 17, 2017, OFCCP filed a Complaint against Oracle in the U.S. Department of Labor, Office of Administrative Law Judges, alleging that Oracle engaged in compensation and hiring discrimination and seeking back pay and injunctive relief.  *Id.*  OFCCP Administrative-Enforcement Compl. ¶¶ 7-10, Prayer for Relief.

4.      OFCCP's administrative lawsuit against Oracle remains pending, with OFCCP continuing to allege that Oracle engaged in compensation discrimination and continuing to seek

back pay and injunctive relief.  Silverman Decl., Exh. B, OFCCP's Second Amended Compl.

¶¶ 11-42, Prayer for Relief; Silverman Decl. Exh. E, Order Clarifying Issues for Hearing at 2-3;

Silverman Decl. Exh. D, Order on Post-Hearing Briefing Deadlines.

Dated: April 24, 2020                                  Respectfully submitted,


                                                       /s/ Andrew D. Silverman
                                                       Andrew D. Silverman (D.C. Bar No. 1013835)
                                                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                       51 West 52nd Street
                                                       New York, NY 10019-6142
                                                       Telephone:     +1 212 506 5000
                                                       Facsimile:     +1 212 506 5151
                                                       asilverman@orrick.com

                                                       Robbie Manhas (D.C. Bar No. 1029976)
                                                       Peter E. Davis (C.A. Bar No. 320256)
                                                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                       Columbia Center
                                                       1152 15th Street, N.W.
                                                       Washington, DC  20005-1706
                                                       Telephone:     +1 202 339 8400
                                                       Facsimile:     +1 202 339 8500
                                                       rmanhas@orrick.com
                                                       peter.davis@orrick.com


                            *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 24th day of April, 2020, a true and correct copy of the foregoing Motion and Memorandum and accompanying Proposed Order were served via CM/ECF upon counsel of record.


/s/ Andrew D. Silverman
Andrew D. Silverman