**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ORACLE AMERCIA, INC.,<br>                                    *Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR; U.S.<br>OFFICE OF FEDERAL CONTRACT<br>COMPLIANCE PROGRAMS; EUGENE<br>SCALIA Secretary of the U.S. Department of<br>Labor; CRAIG E. LEEN, in his official<br>capacity as Director of the U.S. Office of<br>Federal Contract Compliance Programs,<br>                                    *Defendants*. | Case No. 1:19-cv-3574-APM |

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA, CATO INSTITUTE, NATIONAL FEDERATION OF INDEPENDENT
BUSINESS, AND WASHINGTON LEGAL FOUNDATION
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF**

Steven P. Lehotsky
Jonathan D. Urick
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Ilya Shapiro
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(202) 842-0200

Jeffrey M. Harris (D.C. Bar #994058)
Alexa R. Baltes
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

Cory L. Andrews
Corbin K. Barthold
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF *AMICI CURIAE* ................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 2

ARGUMENT ................................................................................................................ 5

    I.       The OFCCP Administrative Enforcement Regime Is *Ultra Vires* ............................... 5

    II.     OFCCP's Extra-Statutory Administrative Enforcement Regime Allows It To Exert Undue Influence Over Contractors And To Coerce Unfair Settlements ........... 10

         A.     OFCCP audits and enforcement actions routinely involve excessive and arbitrary demands coupled with minimal procedural protections and little transparency. ...................................................................................................... 10

         B.     The threat of OFCCP's arbitrary enforcement process coupled with the consequences of noncompliance forces many contractors to acquiesce or settle rather than challenge the allegations of discrimination. ........................ 15

         C.     OFCCP's enforcement actions against Google and Oracle highlight the substantive and procedural flaws of the current system. ................................ 18

    III.    Restricting OFCCP To Activities Within Its Statutory Authority Would Neither Eliminate OFCCP's Role Nor Allow Discrimination To Go Unchecked. ................. 20

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)...................................................................................... 7, 9

*Chamber of Commerce v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996)............................................................................ 8

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979)................................................................................... 5, 6, 8

*City of Albuquerque v. Dep't of Interior,*
  379 F.3d 901 (10th Cir. 2004) ............................................................................ 7

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000)........................................................................................... 2

*Fort Bend Cty. v. Davis,*
  139 S. Ct. 1843 (2019)........................................................................................ 9

*Guardians Ass'n v. Civil Serv. Comm'n,*
  463 U.S. 582 (1983)......................................................................................... 22

*Gundy v. United States,*
  139 S. Ct. 2116 (2019)........................................................................................ 8

*J.W. Hampton, Jr., & Co. v. United States,*
  276 U.S. 394 (1928)........................................................................................... 7

*King v. Burwell,*
  135 S. Ct. 2480 (2015)........................................................................................ 2

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986)........................................................................................... 6

*Perkins v. Lukens Steel Co.,*
  310 U.S. 113 (1940)......................................................................................... 10

*Sekhar v. United States,*
  570 U.S. 729 (2013)......................................................................................... 10

*Util. Air Regulatory Grp. v. EPA,*
  573 U.S. 302 (2014)........................................................................................... 2

*Whitman v. Am. Trucking Ass'n,*
  531 U.S. 457 (2001)........................................................................................... 7

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952)........................................................................................... 6

**Statutes**

29 U.S.C. §§ 153-61 ............................................................................................ 9

29 U.S.C. §§ 657-61 ............................................................................................ 9

40 U.S.C. § 101 .................................................................................................... 6

40 U.S.C. § 121(a) .............................................................................................. 6

40 U.S.C. § 122 .................................................................................................. 7

42 U.S.C. § 2000d ........................................................................................ 7, 8, 9

42 U.S.C. § 2000e ............................................................................................ 8, 9

63 Stat. 389, § 205(a) (1949) ............................................................................ 7

**Other Authorities**

Bourree Lam, *The Department of Labor Accuses Google
   of Gender Pay Discrimination*, The Atlantic (Apr. 7, 2017), bit.ly/3cApZrA. ...................... 19

*Coalition Letter Opposing Suspect "Midnight Litigation" in
   Waning Days of Administration*, Frontiers of Freedom
   (Dec. 28, 2016), bit.ly/2Y3yMy0 ........................................................................... 18

Directive 2018-05, U.S. DOL OFCCP
   (Aug. 24, 2018), bit.ly/3bv2MHf ............................................................................ 15

EEOC, Charge Statistics,
   bit.ly/2yNCUI8 ....................................................................................................... 23

*Equal Opportunity Discrimination*,
   Wall St. J. (Dec. 26, 2019), on.wsj.com/2Y0Tajg ................................................. 20

Exec. Order 11246 ................................................................................ 5, 10, 21, 23

*Federal Contract Compliance Programs v. Frito-La*y,
   (ARB Case No. 10-132, May 8, 2012), bit.ly/2VPML7Z ....................................... 12

H.R. 114-699 (2017) ............................................................................................. 15

Jay-Anne B. Casuga & Martha Mueller Neff, *Goldman Sachs,
   Dell Settle Pay Bias Allegations for Millions*,
   Bloomberg Law (Sept. 30, 2019), bit.ly/2y9T66C ................................................ 17

Matt Drange, *U.S. Department of Labor Accuses
   Palantir of Discriminating Against Asians*,
   Forbes (Sept. 26, 2016), bit.ly/2XWeRBf ..................................................... 15, 17

*OFCCP By the Numbers*,
   U.S. Department of Labor, bit.ly/3bT5G8I ........................................................... 18

*OFCCP v. Google*, Case No. 2017 OFC-0004,
   Recommended Decision and Order at 34 (July 14, 2017), bit.ly/2zikbED ........... 10, 18, 19, 20

*OFCCP v. Google, Inc.*, Case No. 2017-OFCC-00004,
   Denial of Motion for Summary Judgment at 6 (Mar. 15, 2017), bit.ly/34UlnK6 .................. 19

*OFCCP v. Oracle Am., Inc.*, OFCCP No. R00192699,
   Complaint at 1 (Jan. 17, 2017), bit.ly/2ziO9bB ..................................................... 20

*OFCCP v. Oracle Am., Inc.*, OFCCP No. R00192699,
    Second Amended Complaint (Jan. 22, 2019), bit.ly/3aAvzbQ .............................................. 20

Ryan Mac & Matt Drange, *Palantir Pays $1.6 Million*
    *to Settle Hiring Discrimination Lawsuit with Department of Labor*
    (Apr. 25, 2017), bit.ly/2zpYtic ........................................................................................ 17

Simon Nadel & Jay-Anne B. Casuga, *Google's Pay-Data*
    *Fight With Labor Department Dropped,*
    Bloomberg Law (Feb. 4, 2019), bit.ly/3cCrJR0 .................................................... 20

*The US Department of Labor Sues Silicon Valley Tech Company*
    *for Discriminating Against Asian Job Appellants,*
    Department of Labor (Sept. 26, 2016), bit.ly/2RWaJNB .................................. 15

U.S. Chamber of Commerce,
    *Office of Federal Contract Compliance Programs:*
    *Right Mission, Wrong Tactics—Recommendations for Reform*
    (Fall 2017), uscham.com/2KnNuYC .......................................................... passim

## Regulations

41 C.F.R. § 60-30.14.................................................................................................. 6

41 C.F.R. § 60-1.20................................................................................................... 6

41 C.F.R. § 60-1.26................................................................................................ 6, 11

41 C.F.R. § 60-30.27.................................................................................................. 6

41 C.F.R. § 60-30.30.................................................................................................. 6

41 C.F.R. § 60-30.5................................................................................................... 6

42 Fed. Reg. 3454 (Jan. 18, 1977) ......................................................................... 6

62 Fed. Reg. No. 160 (Aug. 19, 1997)................................................................. 13

71 Fed. Reg. No. 116 (June 16, 2006) .................................................................. 13

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are organizations that have extensive experience with the important issues implicated by this case. Several of the *amici* have closely studied the Office of Federal Contract Compliance Programs (OFCCP) and have assisted members facing the OFCCP enforcement regime. Other *amici* have significant experience and expertise addressing administrative law, constitutional law, and separation-of-powers issues.

*Amici* strongly oppose any kind of employment discrimination and fully support efforts to ensure equal employment opportunities. But *amici* believe that OFCCP's administrative enforcement regime far exceeds the agency's statutory authority, fails to give enforcement targets a fair opportunity to defend themselves, and often coerces settlements of even meritless claims.

**Chamber of Commerce of the United States of America**: The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. One of the Chamber's responsibilities is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files *amicus* briefs in cases, like this one, that raise issues of concern to the nation's business community.

***Cato Institute:*** The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person (other than *amici* or their counsel) contributed money to fund this brief's preparation or submission.

1

of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*.

***National Federation of Independent Business:***  The National Federation of Independent Business ("NFIB"), based in Nashville, Tennessee, is the nation's leading small business association, representing members in Washington, DC, and all 50 state capitals. Its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the rights of its members to own, operate, and grow their businesses. To protect its members' interests, NFIB frequently files *amicus curiae* briefs in cases that threaten to harm small businesses.

***Washington Legal Foundation:*** WLF is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes and defends free enterprise, individual rights, limited government, and the rule of law. It often appears as an *amicus* in important statutory-interpretation cases, to urge the federal courts to prevent Executive Branch agencies from rewriting federal law. *See, e.g.*, *King v. Burwell*, 135 S. Ct. 2480 (2015); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* oppose racial and other forms of discrimination and believe that employers that violate the law should be held to account for their actions. But any such enforcement must take place through statutorily prescribed procedures with statutorily authorized remedies. OFCCP, however, relies on an administrative enforcement regime built on an illusory foundation, provides for massive monetary remedies that Congress never authorized, and coerces contractors to settle

even meritless claims rather than face years of burdensome and costly litigation before an internal DOL tribunal.

*First*, OFCCP's administrative enforcement scheme is *ultra vires*. When crafting anti-discrimination laws, Congress has paid careful attention to the means through which allegations of discrimination are adjudicated and remedied. Each of the landmark federal anti-discrimination laws—including Title VI, Title VII, and the Americans with Disabilities Act—expressly sets forth the standard for finding conduct unlawful, the procedures through which claims will be adjudicated, and the remedies available for violations. OFCCP claims the authority not only to adjudicate discrimination claims before in-house tribunals, but to award sweeping monetary and injunctive relief to remedy alleged violations. But Congress has authorized none of this, and there is no reason to believe Congress intended to grant OFCCP the sweeping powers it now claims. Indeed, even the Equal Employment Opportunity Commission—the federal agency directly tasked with preventing and remedying employment discrimination—lacks authority to adjudicate discrimination claims. It is highly implausible that Congress would have implicitly granted OFCCP broader enforcement, adjudicatory, and remedial powers than the EEOC—the agency specifically tasked with preventing and remedying employment discrimination.

*Second*, given that the OFCCP administrative enforcement regime lacks any statutory basis, it is unsurprising that its proceedings routinely lead to regulatory overreach and coerced settlements of even dubious claims. In light of OFCCP's ability to seek massive monetary awards before in-house tribunals, federal contractors often have little choice but to accede to the agency's demands. In recent years, OFCCP has wielded its power in increasingly aggressive ways—both by advancing extraordinarily broad substantive theories of discrimination and by making onerous and burdensome demands for information that employers have little ability to resist. Rather than

adhering to its mandate of promoting equal-opportunity policies, OFCCP now views its role as *remedying discrimination*—which OFCCP believes exists any time statistical disparities exist across broad groups of workers that are often not similarly situated. The result of this self-created, *ultra vires* regime is that companies that find themselves the target of an OFCCP enforcement action have no realistic option but to enter into multimillion-dollar settlements, even when the agency's evidence consists of nothing more than simplistic, overly generalized, and manipulated statistical disparities. Indeed, some companies are even passing on federal contracts or taking steps to wind down their federal contracts to extricate themselves from OFCCP's audit and enforcement regime.

*Third*, contrary to the arguments of OFCCP's *amici* and the proposed intervenors, a ruling for Oracle would not undermine the enforcement of federal anti-discrimination laws in this or any other setting. It is hardly anomalous for discrimination claims to be adjudicated in federal courts rather than before administrative agencies. Indeed, no other federal agency, *including the EEOC*, is authorized to adjudicate employment discrimination claims internally. For similar reasons, any policy-based concerns about efficiency and deterrence are irrelevant. "Efficiency" provides no basis to allow an agency to pursue extra-textual remedies through extra-textual procedures that Congress never authorized. And the fact that those extra-textual remedies may prompt the targets of OFCCP's investigations to settle even meritless claims rather than litigate should hardly be seen as vindicating "deterrence." At bottom, "the thread between [OFCCP's] regulations and any grant of authority by the Congress is so strained that it would do violence to established principles of separation of powers" to allow this unlawful system to continue based solely on policy grounds. *Chrysler Corp. v. Brown*, 441 U.S. 281, 307-08 (1979).

**ARGUMENT**

I.    **The OFCCP Administrative Enforcement Regime Is *Ultra Vires*.**

Adopted in 1965, Executive Order 11246 requires that all government contracts include a set of anti-discrimination provisions—collectively, an equal-opportunity clause—and that each contractor and subcontractor provide a compliance report at the direction of the Secretary of Labor. Exec. Order 11246 §§ 202, 203. The Order further provides that the Secretary is responsible for securing compliance, *id.* § 205, and may, to that end, "investigate the employment practices of any Government contractor or subcontractor … to determine whether or not the [equal opportunity-clauses] have been violated," *id.* § 206. If the Secretary finds that the equal-opportunity clause has been violated, the Executive Order sets forth six carefully defined "sanctions and penalties." *Id.* § 209. For example, the Secretary may publish the noncompliance, terminate or suspend the contract, or bar the contractor from future contracts, *see id.* § 209(1), (5), (6); or recommend that the Department of Justice or Equal Employment Opportunity Commission pursue relief in court for violations of the contract or Title VII of the Civil Rights Act of 1964, *id.* § 209(2)-(4).

The Department of Labor initially enforced Executive Order 11246 according to its plain terms. Beginning in 1977, however, the Department sought to formalize an expansive, unprecedented, and unauthorized reinterpretation of its mandate that continues today. *See* Office of Federal Contract Compliance Programs Final Rulemaking, 42 Fed. Reg. 3454, 3456 (Jan. 18, 1977) (asserting power to award "class and back pay relief"). Under the nominal guise of authority from Executive Order 11246, DOL has built an entire administrative enforcement regime that allows the agency—acting through OFCCP—to investigate, 41 C.F.R. § 60-1.20, bring enforcement actions, *id.* §§ 60-1.26, 60-30.5, adjudicate, *id.* § 60-30.14, review, *id.* § 60-30.27, and award monetary make-whole relief to *employees* of a contractor that it believes to have violated the equal-opportunity clause, *id.* §§ 60-30.30, 60-1.26(a)(2). This elaborate system not

only far exceeds the limited mandate of the executive order but also has no basis in any delegation of authority from Congress.

An agency "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). At the very least, all agency action must ultimately have a "nexus" to "some delegation of the requisite legislative authority by Congress." *Chrysler*, 441 U.S. at 304. Consistent with that overarching requirement, the President's power to issue an executive order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Here, it is unclear whether the requisite statutory authority exists even for the compliance system actually contemplated by Executive Order 11246. *See Chrysler*, 441 U.S. at 304 ("The origins of the congressional authority for Executive Order 11246 are somewhat obscure and have been roundly debated by commentators and courts."). But, in all events, no statute plausibly authorizes OFCCP's full-blown administrative enforcement regime, complete with the power to adjudicate discrimination claims in-house and award monetary, make-whole damages to employees.

The Procurement Act, 40 U.S.C. §§ 101 *et seq.*, is a nonstarter. The purpose of the Act is "to provide the Federal Government with an economical and efficient system" for contracting for goods and services. *Id.* To achieve those ends, the Act authorizes the President to "prescribe policies and directives … consistent with this subtitle," *id*. § 121(a)—or as an earlier, nearly identical version of the Act explained, "policies and directives … [to] govern the Administrator and executive agencies in carrying out their respective functions hereunder," *see* 63 Stat. 389, § 205(a) (1949); *see City of Albuquerque v. Dep't of Interior*, 379 F.3d 901, 914 n.6 (10th Cir. 2004) (explaining that the changed language did not alter the statute's substance).

Nothing in the Procurement Act purports to authorize an administrative adjudicatory apparatus, much less one that contemplates massive awards of monetary relief. To the contrary, Congress has confirmed that the reference to "policies and directives … consistent with this subtitle" is, without more, *insufficient* to authorize such a regime. When Congress amended the Act to prohibit any "program or activity carried on or receiving federal assistance under this subtitle" from discriminating on the basis of sex, 40 U.S.C. § 122(a), it inserted another provision authorizing enforcement "through agency provisions and rules similar to those already established" in express statutory text in Title VI of the Civil Rights Act of 1964, *id.* § 122(b). Thus, not only is administrative enforcement authorization not implicit in the Procurement Act, but when Congress *did* intend for such enforcement, it incorporated by reference Title VI—a statute that expressly authorizes and "elaborate[ly] restrict[s]" agency enforcement. *See Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (discussing 42 U.S.C. § 2000d–1).

The nondelegation doctrine requires that "when Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Construing a statute that never mentions enforcement or adjudication—let alone the power to issue make-whole monetary relief—as authorizing the creation of a comprehensive enforcement regime would raise nondelegation problems well beyond those that have recently come under the scrutiny of the Supreme Court. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting); *id.* at 2130-31 (Alito, J., concurring in the judgment). Here, the Act merely conveys Congress' intent that there be an "economical and efficient" system for federal contracting. Not only is there no *intelligible* principle that would guide

7

the creation of an administrative enforcement regime for alleged discriminatory practices (and the award of monetary damages for violations), there is no principle *at all*. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1330-31 (D.C. Cir. 1996) ("[U]nder the Procurement Act, [the President] does not have unlimited authority …. 'The procurement power *must* be exercised consistently with the structure and purposes of the statute that delegates that power.'"); *cf. Chrysler*, 441 U.S. at 306 ("[U]nless we were to hold that any federal statute that implies some authority to collect information must grant *legislative* authority to disclose that information to the public, it is simply not possible to find in these statutes a delegation of the disclosure authority asserted by the respondents here.").

The notion that Titles VI and VII of the Civil Right Act of 1964, 42 U.S.C. §§ 2000d-2000d–4, 2000e-2000e–17, might authorize the OFCCP administrative enforcement regime is even less plausible. As the Supreme Court has explained, neither statute contains a relevant "substantive delegation to the President" that would authorize Executive Order 11246—let alone a broad adjudicatory power that goes even beyond the terms of that order. *See Chrysler*, 441 U.S. at 305 n.35 ("Executive Order 11246 contains no provision for congressional review, and therefore is not promulgated pursuant to § 602 [of the Civil Rights Act of 1964]…. Titles VI and VII contain no other express substantive delegation to the President.").

If anything, Titles VI and VII show the clarity and precision with which Congress speaks when crafting enforcement regimes and remedies for alleged discriminatory practices. Title VI— which proscribes discrimination in programs and activities receiving federal financial assistance— expressly authorizes (and limits) agencies' power to pursue administrative enforcement for alleged violations of the statute. 42 U.S.C. § 2000d-1. To pursue such a claim, Congress provided that the agency must comply with a number of procedural requirements—for example, providing notice of

an action, pursuing conciliation, and providing written grounds for a decision to terminate federal funds. *Id.*; *see also Sandoval*, 532 U.S. at 290 (discussing procedural safeguards written into the enforcement design). Title VI also curtails the remedies that federal agencies can pursue for violations of disparate-impact regulations, limiting such relief to a termination of federal funds rather than monetary sanctions or penalties. 42 U.S.C. § 2000d-1; *see also Sandoval*, 532 U.S. at 288-90. Title VI is just one of many examples showing that when Congress intends to allow for administrative enforcement, it does so clearly, by carefully delineating both the substantive and procedural requirements for such enforcement. *See also, e.g.*, 29 U.S.C. §§ 657-61 (authorizing and defining DOL's authority to enforce Occupational Safety and Health Act); *id.* §§ 153-61 (authorizing and defining National Labor Relations Board's authority to enforce National Labor Relations Act).

OFCCP's administrative enforcement regime is likewise inconsistent with Title VII, the landmark federal law proscribing discrimination in employment. Title VII authorizes the EEOC to receive and investigate complaints, 42 U.S.C. §§ 2000e-5, 2000e-8, 2000e-9, but if the agency wants a claim *adjudicated* under Title VII, Congress requires that it go to federal court, *id.* § 2000e-5(f); *see Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("When the EEOC receives a charge … it does not 'adjudicate the claim.'" (cleaned up)). It strains credulity to think that Congress would have required all workplace discrimination claims under Title VII to be litigated in federal court while silently allowing OFCCP to adjudicate precisely the same types of claims in in-house tribunals with none of the enumerated employer protections. That theory "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

Finally, while OFCCP's administrative enforcement regime lacks *any* statutory authorization, the agency's practice of seeking monetary, make-whole relief for employees of

contractors accused of discrimination is uniquely problematic. *See* 41 C.F.R. § 60-1.26(a)(2) (providing for "back pay and other make whole relief for victims of discrimination identified during a compliant investigation or compliance evaluation"). As noted, § 209 of Executive Order 11246 provides for limited remedies for noncompliance with the equal-opportunity clause: prospective contract relief (such as terminating the contract or barring the company from future contracts) and/or referral to DOJ or the EEOC. Those remedies make sense. OFCCP monitors contract compliance, and the government has the power to "determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). Similarly, if OFCCP has reason to believe that a contractor committed fraud or violated some other provision of law, such as Title VII, it can refer the matter to DOJ or the EEOC. But nothing in the executive order purports to authorize—or could authorize—the use of an in-house adjudication to impose monetary remedies for the contractor's *employees.* Even the EEOC lacks such unilateral administrative power. *See OFCCP v. Google*, Case No. 2017 OFC-0004, Recommended Decision and Order at 34 (July 14, 2017), bit.ly/2zikbED ("Executive Order 11246 does not give OFCCP general authority to enforce anti-discrimination laws in the private sector; its authority is limited to federal government contractors during the performance of their contracts.").

## II.   OFCCP's Extra-Statutory Administrative Enforcement Regime Allows It To Exert Undue Influence Over Contractors And To Coerce Unfair Settlements.

### A.   OFCCP audits and enforcement actions routinely involve excessive and arbitrary demands coupled with minimal procedural protections and little transparency.

Given that the OFCCP administrative enforcement regime is unmoored from any statutory constraints, it is unsurprising that the agency often pursues expansive substantive theories of liability while offering minimal procedural protections for employers. *See, e.g.*, U.S. Chamber of Commerce, *Office of Federal Contract Compliance Programs: Right Mission, Wrong Tactics—*

*Recommendations for Reform* (Fall 2017), uscham.com/2KnNuYC ("Chamber Report"). Consistent with Executive Order 11246, OFCCP initially focused on promoting equal employment opportunities by ensuring that contractors made good-faith efforts to employ and advance women, racial minorities, veterans, and individuals with disabilities.

Beginning in the 1990s, however, OFCCP began to view its mission as not just promoting equal-employment policies but as rooting out what it believed to be "systemic" discrimination. *See* Chamber Report at 17-18 (citing 62 Fed. Reg. No. 160 (Aug. 19, 1997); 71 Fed. Reg. No. 116 (June 16, 2006)). OFCCP often does not allege that specific employees faced deliberate discrimination. Instead, it asserts sweeping, non-intentional disparate-impact theories based on mere statistical disparities across different groups of employees, often without controlling for nondiscriminatory factors that could have explained those disparities. Since 2009, "OFCCP has accelerated this shift toward nondiscrimination issues and potential monetary remedies in a dramatic, unprecedented way." *Id.* at 18.

OFCCP enforcement begins with periodic "audits" of federal contractors. Given OFCCP's ability to seek massive monetary awards before in-house tribunals, federal contractors often have little choice but to accede to the agency's demands during the audit process; contractors are justifiably concerned that any pushback during audits will result in OFCCP seeking severe penalties during a subsequent enforcement action.

The audit process begins when the agency sends a Scheduling Letter and Itemized Listing to the contractor. Before 2014, that Letter requested general compensation data aggregated by salary grade or salary band, and the agency followed up for more information if needed. Chamber Report at 21-22. Beginning in 2014, however, OFCCP required individualized compensation data for *every* employee, including full-time, part-time, contract, and temporary workers; the agency

11

also required data about applicants, hiring, promotion, and termination, broken down by individual racial categories. *See id*. at 21-23. Contractors needed to submit all this information within 30 days of receiving the letter. *Id.* at 23. Given the sheer volume of this request, many contractors struggled to meet the deadline, yet OFCCP would often grant an extension of just a few days, if it granted any additional time at all. *Id.* at 23-24.

The process then moves to the "desk phase" of the audit, where OFCCP reviews the submitted information and sometimes requests additional data. *Id.* at 24. OFCCP can seek additional data "where [it] discovers a potential violation during a desk audit" and the request is "motivated by [an] objective deficiency." *Federal Contract Compliance Programs v. Frito-La*y at 4, 6 (ARB Case No. 10-132, May 8, 2012), bit.ly/2VPML7Z. But many of those so-called "deficiencies" or "potential violations" merely involve statistical disparities across large groups of employees who have been lumped together and may not share key similarities such as title, education, experience, or geography. For example, in *Frito-Lay*, OFCCP cited a "statistically significant disparity" in the hiring rates of women compared to men to justify a request for *years* of additional data, documents, and information. *Id.* at 5-6.

Employers interviewed by the Chamber noted that the desk audit phase often entailed little more than a fishing expedition, with OFCCP demanding voluminous amounts of data and documents on unrealistic time frames. *See* Chamber Report 28-30. Some employers received requests for information about their employees' national origin, even though employers are typically prohibited by law from requesting this information. Others received requests for information about employees' visa or immigration status.

Other requests were stunning in their breadth and audacity. One employer received a request for resumes, applications, and interview notes for all 12,000 applicants for every open

position across the company. *Id.* at 29. Another request insisted that the contractor produce 5,000 job applications even though nearly half of those involved applicants who did not meet the minimum job requirements. *Id.* In many cases, OFCCP would demand that the contractor submit the data within 3 to 5 days, notwithstanding the near-impossibility of compiling such voluminous information on that timetable.

Another "key point of frustration" with the OFCCP process is the utter lack of transparency during the audit phase. *Id.* Despite its oft-voluminous information requests, OFCCP would typically remain silent about the relevance or necessity of the data being sought, leaving the employer in the dark about why the information was being requested. *Id.* The agency also displayed a "wholesale unwillingness to engage with the contractor to narrow the requests." *Id.*

Next, during the "on-site" phase of the OFCCP audit, large teams of auditors would spend days (or sometimes weeks) at the contractor's office poring through its books and records. *Id.* at 31. Once again, this process has become adversarial rather than cooperative, and contractors expressed significant frustration that OFCCP would rarely tell them in advance what subjects it hoped to discuss. "The mystery, in many cases, extends right up until the start of the on-site review." *Id.* at 32. Although OFCCP gave the contractors no notice of the topics to be discussed, the auditors would often demand unlimited access to employees and files. In one instance, the auditor delivered a list of more than 100 employees it wanted to interview—including several senior executives—less than two weeks before the visit. *Id.* at 33. In another instance, OFCCP demanded the personal email addresses and phone numbers for more than 5,000 employees in advance of its audit. *Id.* During the on-site audits, the auditors would continue to demand more information, sometimes requesting up to 60 individual data points for each of the hundreds or thousands of employees at a company. *Id.*

OFCCP's aggressive investigation methods, lack of transparency, and hide-the-ball tactics unquestionably influence the subsequent administrative proceedings, starting with the "notice of violation," which is the first step in an administrative enforcement proceeding. In a typical agency enforcement regime, the focus is on *compliance*, and the agency will often work cooperatively with the regulated party to remedy any defects and to ensure future compliance. In recent years, however, if OFCCP's audits found a statistical disparity among the contractor's workforce, the agency would then blindside the company with a "notice of violation," with no opportunity to respond or to voluntarily address the alleged violation. *Id.* at 34-35. And these notices of violation were often short and provided little detail about the calculations or statistical methodologies underlying OFCCP's analysis. *Id.*

Finally, OFCCP would often advance substantive theories of "discrimination" unmoored from both statutory authority and common sense. OFCCP "is frequently unbending in its reliance on its own statistical methodologies and rarely willing to consider the contractor's differing statistical analyses." *Id.* at 35. As noted above, in many cases, OFCCP merely identified statistical disparities across broad groups of employees while ignoring nondiscriminatory explanations for those disparities. For example, in a much-criticized complaint against Palantir Technologies, OFCCP claimed that Asians were underrepresented in hiring in three of the 44 job roles at Palantir. *Id.* at 36-37 (summarizing Palantir case).[2] Remarkably, OFCCP ignored: (1) the qualifications of the candidates who applied for those three roles; (2) that there were no disparities for 41 out of 44

---

[2] The Palantir complaint is summarized in the Chamber Report and can be found as an attachment in Matt Drange, *U.S. Department of Labor Accuses Palantir of Discriminating Against Asians*, Forbes (Sept. 26, 2016), bit.ly/2XWeRBf. An inflammatory press release announcing the complaint remains on DOL's website. *See The US Department of Labor Sues Silicon Valley Tech Company for Discriminating Against Asian Job Appellants*, Department of Labor (Sept. 26, 2016), bit.ly/2RWaJNB.

roles at the company; and (3) that a third of the company's employees were, in fact, Asian. In short, OFCCP accused Palantir of discrimination based on little more than gross statistical disparities stripped of all context. *Id.* Cases like the Palantir complaint led the House Appropriations Committee to criticize OFCCP for its "overreliance upon statistical evaluation methods." *See* H.R. 114-699 at 13 (2017). The Committee emphasized that, "[d]espite the concerns … OFCCP continues to rely too heavily on the use of statistical methods" in what has essentially become "enforcement of a de facto quota." *Id.*[3]

## B. The threat of OFCCP's arbitrary enforcement process coupled with the consequences of noncompliance forces many contractors to acquiesce or settle rather than challenge the allegations of discrimination.

As noted, OFCCP wields significant power over contractors using onerous procedures that are fundamentally skewed in the agency's favor, with no statutory constraints on either the agency's substantive or procedural authority. Unsurprisingly, this creates a powerful incentive for contractors to yield to the agency's demands rather than fight back against even unreasonable requests. The "fear of future retribution from the powerful Agency" "runs so deep" that several contractors "expressed concern about relaying their experiences with OFCCP for [the Chamber Report], *even anonymously*." Chamber Report at 2 (emphasis added). Small businesses in particular often lack resources to engage legal counsel to fight back against OFCCP's burdensome data and document requests. Some companies are even passing on federal contracts or taking steps

---

[3] In 2018, well after OFCCP filed its complaint against Oracle, the agency issued a Directive meant to clarify and soften the misuse of statistical modeling. *See* Directive 2018-05, U.S. DOL OFCCP (Aug. 24, 2018), bit.ly/3bv2MHf. The Directive asserts that for future actions, OFCCP will seek non-statistical evidence, though such evidence is explicitly not required to support a complaint. *Id.* It also asserts that it will incorporate more robust variables and try to do a better job of informing contractors—before litigation—of the statistical disparity at issue. *Id.* *Amici* applaud this position. But the need for this Directive is evidence that there has been a substantial problem in this area. And without meaningful statutory constraints on OFCCP, nothing constrains a future administration from reverting to the prior policy.

to disengage from federal contracting to insulate themselves from OFCCP's audit and enforcement regime. *Id.* at 38. For those companies that continue to serve as federal contractors, however, there is often no choice but to accede to OFCCP's demands, no matter how unreasonable.

During an audit, the only way to challenge OFCCP's actions is to refuse to comply, which triggers a show cause order and, eventually, administrative litigation before the same body that is prosecuting the case. That litigation, in turn, threatens negative publicity, debarment from future federal contracts, and an inability to bid on state or local procurements that require compliant status with OFCCP. *Id.* at 29-30 n.76. At bottom, any pushback on OFCCP's audit requests is "a risky and expensive option" that many businesses are simply unwilling to take. *Id.* OFCCP understands this and uses it as leverage to extract massive volumes of data and documents even from companies that have been accused of no wrongdoing.

The coercion problem is even more pronounced in those cases in which OFCCP files a complaint alleging that a contractor has engaged in some kind of discriminatory practice. As long as the agency can point to some statistical disparity, the contractor has every reason to fear massive monetary liability before the agency's in-house tribunal. Last year, Dell Technologies and Goldman Sachs settled with DOL for a combined $17 million following separate allegations of race and gender pay discrimination based on statistical disparities. *See* Jay-Anne B. Casuga & Martha Mueller Neff, *Goldman Sachs, Dell Settle Pay Bias Allegations for Millions*, Bloomberg Law (Sept. 30, 2019), bit.ly/2y9T66C; *see also id.* (discussing 2019 $4.2 million settlement between OFCCP and Bank of America). A spokesperson for Goldman Sachs emphasized that the company "disagrees with the OFCCP's statistical analysis that is the basis of the agency's allegation," but decided to settle the matter to "avoid further litigation." *Id.*

Palantir Technologies provides another example of a company settling dubious claims. As noted, OFCCP filed a complaint based on statistical disparities in Palantir's hiring practice for three out of 44 job titles within the company, even though the company's overall mix of workers showed no discrimination whatsoever. Chamber Report at 36-37. Nevertheless, based solely on those three isolated job titles, OFCCP accused Palantir of "discriminat[ing] against Asian applicants on the basis of their race" and sought the full panoply of sanctions: cancelation of all government contracts, debarment from future government contracts, and "complete [monetary] relief to the affected class of Asian applicants including lost compensation, interest, and all other benefits of employment." *See* Palantir Complaint at 2, 5, *in* Drange, *supra*. When it settled the claim seven months later for over $1.6 million, a Palantir spokesperson explained that the company continued to "disagree with the allegations made by the Department of Labor" but that it "settled this matter … in order to focus on [its] work." *See* Ryan Mac & Matt Drange, *Palantir Pays $1.6 Million to Settle Hiring Discrimination Lawsuit with Department of Labor* (Apr. 25, 2017), bit.ly/2zpYtic.

On its website, DOL boasts of the $81 million that OFCCP has collected in the last three years—"the highest three-year period on record." *See OFCCP By the Numbers*, U.S. Department of Labor, bit.ly/3bT5G8I; *see also id.* (attaching a "Monetary Relief Obtained" spreadsheet, which notes $40.5 million "in monetary relief to class members" in fiscal year 2019). But there should be no cause for celebration when a government agency reaches beyond its statutory authority to extort settlements from contractors that have little chance of defending themselves during the OFCCP's skewed and one-sided audit, investigation, and enforcement process.

### C. OFCCP's enforcement actions against Google and Oracle highlight the substantive and procedural flaws of the current system.

Two recent OFCCP actions against Google and Oracle well illustrate the problems with the current regime. Google and Oracle were both targets of OFCCP's "non-routine, last minute, legally unorthodox, midnight litigation" in the days just before the change of administrations in January 2017. *See Coalition Letter Opposing Suspect "Midnight Litigation" in Waning Days of Administration*, Frontiers of Freedom (Dec. 28, 2016), bit.ly/2Y3yMy0; Chamber Report at 26, 37.

Google's case reflects OFCCP's abusive data-collection process, *i.e.*, its "willy-nilly search anywhere and everywhere for practices that might be causing a disparity in the compensation data." *See Google*, Recommended Decision and Order at 26. After Google had already produced compensation data for 21,000 employees as well as hundreds of thousands of additional compensation records—at a cost totaling 2,300 hours of effort and approximately $500,000—OFCCP demanded complete job and salary history for all Google employees, "going back for its longest-term employees to the founding of the corporation in 1998." *Id.* at 4-8. OFCCP offered no explanation for this request. Google refused, and OFCCP filed a complaint with an ALJ.

In his Recommended Decision and Order, the ALJ determined that OFCCP's demands were "unreasonable," *id.* at 24, upholding them in part and rejecting them in part, *id.* at 3. The ALJ made several important points regarding OFCCP's behavior, but two stand out. First, despite *zero* complaints having been filed with OFCCP by Google employees, and despite *zero* actual evidence of discrimination, OFCCP demanded the production of documents and data that would have cost nearly as much as the entire value of Google's government contract; Google's contract was worth approximately $600,000 over three years, yet the company estimated that it would cost $500,000

and take 2,300 hours to respond to OFCCP's requests. *Id.* at 1-2, 4, 13-14, 40 n.97.[4] Moreover, even though "[n]o one—including OFCCP—knows whether the audit will reveal a violation of Google's non-discrimination or affirmative action obligations," *id.* at 2, this did not stop OFCCP from publicly accusing Google of having "systemic compensation disparities against women pretty much across the entire workforce." *See* Bourree Lam, *The Department of Labor Accuses Google of Gender Pay Discrimination*, The Atlantic (Apr. 7, 2017), bit.ly/3cApZrA.

Second, the ALJ's decision in the Google case shows just how far OFCCP has strayed from its original mission of promoting equal-employment policies. Given that Google had announced it was spending $115 million in 2014 and $150 million in 2015 to promote diversity initiatives, OFCCP argued that because "Google is so large and profitable … no burden is too great" in terms of forcing Google to comply with OFCCP's document and data requests. *Google*, Recommended Decision and Order at 40. But as the ALJ explained, "[t]his argument suggests an *animus* that is difficult to understand. What is the policy wisdom of using Google's diversity initiatives against it? I would think that the Department would laud government contractors that spend hundreds of millions of dollars on diversity initiatives, not use those voluntary efforts against these companies." *Id.* at 40 n.97. This case was so egregious that the ALJ found it necessary to rein in OFCCP's overreach, but that is unfortunately the exception, not the rule. And even though the ALJ largely sided with Google, OFCCP's enforcement action imposed significant costs on Google, both reputational and monetary.[5]

---

[4] *See also OFCCP v. Google, Inc.*, Case No. 2017-OFCC-00004, Denial of Motion for Summary Judgment at 6 (Mar. 15, 2017), bit.ly/34UlnK6 ("[I]f OFCCP is entitled to an order requiring Google to comply with the full extent of its demands, it begins to appear that the [government] contract had a poison pill.").

[5] OFCCP initially appealed the ALJ decision but later dropped that appeal. *See* Simon Nadel & Jay-Anne B. Casuga, *Google's Pay-Data Fight With Labor Department Dropped*, Bloomberg Law (Feb. 4, 2019), bit.ly/3cCrJR0.

Oracle's case is similarly instructive as to OFCCP's overreach. On January 17, 2017, OFCCP filed a complaint against Oracle alleging "systemic compensation discrimination against women and Asian and African Americans in three lines of business." *See OFCCP v. Oracle Am., Inc.*, OFCCP No. R00192699, Complaint at 1 (Jan. 17, 2017), bit.ly/2ziO9bB. As usual, citing only statistical disparities and zero employee complaints, OFCCP claimed that Oracle owed $400 million. *See OFCCP v. Oracle Am., Inc.*, OFCCP No. R00192699, Second Amended Complaint at 7 (Jan. 22, 2019), bit.ly/3aAvzbQ. Oracle is still fighting those allegations more than three years later—most recently in an administrative enforcement proceeding, where "[OFCCP] presented no evidence of intentional discrimination or even witnesses who claimed as much." *See Equal Opportunity Discrimination*, Wall St. J. (Dec. 26, 2019), on.wsj.com/2Y0Tajg; *id.* ("[DOL] should have dropped this case long ago.").

## III. Restricting OFCCP To Activities Within Its Statutory Authority Would Neither Eliminate OFCCP's Role Nor Allow Discrimination To Go Unchecked.

The proposed intervenors and *amici* supporting DOL raise hyperbolic claims that cabining OFCCP's authority to its proper sphere would render the agency toothless to ensure that contractors meet their equal-employment obligations. *See* CWA/USW Br. (Doc. 10-1) at 1; Former Officials Br. (Doc. 19-1) at 7, 17. Not so. Even without the ability to bring claims for massive monetary awards before in-house tribunals, OFCCP would still be able to collect data and investigate contractors' compliance with affirmative-action obligations. *See* Exec. Order 11246 §§ 202, 203, 205, 206. And if OFCCP uncovers a problem, it can impose contract-based remedies such as suspension or debarment, *id.* § 209(1), (5), (6), or refer the matter to the EEOC or DOJ for other relief under Title VII or other civil and criminal laws, *id.* §209(2)-(4). Thus, this case does not raise a question of *whether* the federal government can defend against employment

discrimination; rather, Oracle's complaint addresses only the question of *who* has the relevant enforcement authority and *how* alleged discrimination may be addressed and remedied.

Perhaps recognizing as much, *amici* and intervenors advance the policy-based argument that a ruling for Oracle would make anti-discrimination efforts less effective. For example, the former government officials assert that "contractors would be far less inclined to try to achieve meaningful conciliation agreements with OFCCP if OFCCP did not itself have the power to ask an ALJ to adjudicate the discrimination it has identified," and that contractors would be "less likely to agree to relief like backpay, priority hiring, or training if OFCCP were stripped of the power to seek those particular remedies." Former Officials Br. at 19; *see also* States' Br. (Doc. 17) at 20 ("Eliminating the administrative enforcement powers that Oracle is challenging would have ripple effects, undermining OFCCP's ability to incentivize compliance.").

Those arguments are deeply flawed on several levels. At the outset, they prove too much. *Every* federal agency could do better at achieving "voluntary compliance" if it had more draconian remedies at its disposal and access to a more favorable forum. *Amici* are likely correct that a contractor would be less likely to voluntarily agree to remedies such as "backpay [or] priority hiring" if OFCCP lacked authority to award those remedies. But that argument merely begs the question of whether OFCCP has statutory authority to order those remedies in the first place. If OFCCP lacks such authority, then its inability to coerce contractors into accepting such relief is a feature, not a bug. Moreover, as explained above, there are important interests on the other side of the ledger that *amici* and proposed intervenors ignore. When an agency can seek massive monetary damages before an in-house tribunal based on expansive and limitless substantive theories, the target of the action will have every incentive to settle even dubious claims rather than get bogged down in years of litigation with associated reputational exposure. In all events, these are delicate

policy decisions, and it is ultimately up to Congress—not the OFCCP—to strike the proper balance between ensuring "compliance" with the law without giving the agency too much power to deter or punish innocent conduct. *See*, *e.g.*, *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 601-02 (1983) (White, J.) ("[L]iability for unintended discrimination might well dissuade potential nondiscriminating recipients from participating in federal programs, thereby hindering the objectives of the funding statutes.").

Relatedly, proposed intervenors and *amici* argue that cabining OFCCP's administrative enforcement regime will make identifying and combating discrimination less efficient. In their view, it is a waste of time and resources for OFCCP to refer discrimination claims to DOJ or EEOC for enforcement efforts, since those agencies would need to conduct their own investigations and may have enforcement priorities that differ from OFCCP's. *See* CWA/USW Reply (Doc. 20) at 5-6; Former Officials Br. at 19. The States' *amicus* brief similarly suggests that the enforcement process will be less efficient if "DOJ [has] to litigate in an Article III court" rather than "resolving violations of [Executive Order 11246] administratively." States' Br. at 21.

*Amici* and proposed intervenors ignore the fact that referring discrimination claims that need judicial resolution to DOJ or the EEOC is precisely what Executive Order 11246 says to do. Although the Secretary has some authority to determine which companies the government should (or should not) contract with, the Executive Order itself contemplates that DOJ or the EEOC would handle any enforcement proceedings for alleged violations of Title VII or the criminal laws. *See* Exec. Order 11246 § 209. And, once again, *amici*'s arguments prove too much. The EEOC receives more than 70,000 discrimination complaints each year. *See* EEOC, Charge Statistics, bit.ly/2yNCUI8. For the complaints that EEOC believes to have merit, it would surely be more "efficient" for the agency to adjudicate those claims before an in-house administrative tribunal

rather than having to go to federal court. But Congress made a different choice. If "efficiency" provides no basis to allow administrative adjudication for the tens of thousands of employment discrimination charges that are filed with the EEOC each year, then it should follow *a fortiori* that it is not unduly burdensome or inefficient for the government to litigate similar claims arising out of government contracts in federal court. Abusive enforcement and coercive tactics should not be mistaken for "efficiency."

### CONCLUSION

OFCCP's administrative enforcement regime far exceeds the bounds of authority delegated to it by Congress. Oracle's motion for summary judgment should accordingly be granted.

Dated: May 3, 2020                                    Respectfully submitted,

   *s/ Jeffrey M. Harris*

Steven P. Lehotsky                                    Jeffrey M. Harris (D.C. Bar #994058)
Jonathan D. Urick                                     Alexa R. Baltes
U.S. CHAMBER LITIGATION CENTER                        CONSOVOY MCCARTHY PLLC
1615 H Street, NW                                     1600 Wilson Blvd., Ste. 700
Washington, DC 20062                                  Arlington, VA 22209
(202) 463-5337                                        (703) 243-9423
                                                      jeff@consovoymccarthy.com
Ilya Shapiro
CATO INSTITUTE                                        Cory L. Andrews
1000 Massachusetts Ave., NW                           Corbin K. Barthold
Washington, DC 20001                                  WASHINGTON LEGAL FOUNDATION
(202) 842-0200                                        2009 Massachusetts Ave., NW
                                                      Washington, DC 20036
                                                      (202) 588-0302

*Counsel for Amici Curiae*